## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS, INC.; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; and ALLERGAN SALES, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> PETER NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and DAVID BERGANTINO, in his official capacity as Auditor General of the State of Rhode Island <br><br> *Defendant*. | Case No. _____ |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively "AbbVie"), by and through their undersigned attorneys, bring this action for declaratory and injunctive relief against the Rhode Island Attorney General and the Rhode Island Auditor General, challenging the applicability and constitutionality of Rhode Island's recently enacted S. 114.[1]  In support, AbbVie alleges as follows:

### PRELIMINARY STATEMENT

1.      AbbVie brings this lawsuit to challenge the constitutionality of S. 114—a recently enacted Rhode Island law that requires, among other things, AbbVie to transfer its pharmaceutical products to certain commercial pharmacies at substantially discounted prices on pain of civil

---

[1]      S. 114 is attached as Exhibit 1.

penalties.  In so doing, Rhode Island's statute violates the Supremacy Clause by impermissibly changing the terms of a federal drug-pricing regime—the federal 340B Program—and significantly increasing the cost of participation in that regime.  In addition, S. 114 effects an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment.  It is also unconstitutionally vague.

2.    S. 114 arises out of a long-running dispute about the requirements that the federal 340B program places upon drug manufacturers.  In short, the federal 340B statute, 42 U.S.C. § 256b, establishes a comprehensive program that requires pharmaceutical manufacturers to offer their drugs at statutorily set and significantly reduced prices to a list of fifteen specifically enumerated types of healthcare providers known as "covered entities."  Making these offers of drugs at the significantly reduced prices to these providers is required for manufacturers who want to participate in federal Medicaid and Medicare programs.  *See* 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

3.    Under the 340B statute, manufacturers are required only to "offer" their drugs to covered entities at the 340B price—not "sell" them ***unconditionally***.  42 U.S.C. § 256b(a)(1).  That is, the 340B statute requires only that manufacturers make an offer at a particular price to a particular set of covered entities.  But it preserves the liberty of manufacturers to insist upon other non-price terms.  And commercial pharmacies, like Walgreens and CVS, are not among the 340B statute's list of entities entitled to an "offer" of the 340B price.

4.    The federal statute grants the Secretary of the U.S. Department of Health and Human Services ("HHS") ***exclusive*** authority to enforce its provisions.  *See* 42 U.S.C. § 256b(d). The statute leaves no role for states or other third parties to change the requirements of the federal 340B program or the conditions it imposes on manufacturers in return for participating in Medicaid

and Medicare.  Nor do states or other third parties have any authority to enforce the federal statute's requirements.  The Supreme Court has confirmed as much, explaining that third-party enforcement "would undermine the agency's efforts to administer" the 340B program and other related federal programs "harmoniously and uniformly."  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-20 (2011).

5.      Further, because forcing manufacturers to transfer their drugs at discounted prices to covered entities would raise serious constitutional concerns, Congress did not mandate participation in the 340B program outright and instead tied it to an ostensibly voluntary choice: participation in Medicaid and Medicare.  And to further incentivize manufacturer participation in the 340B program—*i.e.*, to prevent the cost of participation from becoming too high—Congress carefully limited the program and adopted certain safeguards to ensure that manufacturers' discounted drugs would be used to help needy patients, rather than become a buy-low, sell-high scheme for commercial entities.  For example, in a statutory provision designed to prevent "diversion," Congress prohibited covered entities from transferring manufacturers' reduced-price drugs to anyone other than the entity's own patients.  *See* 42 U.S.C. § 256b(a)(5)(B).  In effect, that provision prohibits other commercial entities from either participating in the 340B program or profiting from the sale of manufacturers' drugs at the 340B discounted price.

6.      Nevertheless, over the last decade covered entities have entered into contractual arrangements with commercial pharmacies (called "contract pharmacies") that allow those pharmacies to earn windfall profits from the sale of manufacturers' drugs.  Instead of serving the covered entities' uninsured and low-income patients, the for-profit contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to patients (including indigent patients) at full price, and pocket the difference.  Contract pharmacies accomplish this arbitrage

through a complicated accounting system known as the "replenishment model," described in more detail below. The bottom-line result is that for-profit commercial pharmacies and the covered entities they contract with are able to pocket billions of dollars every year, splitting the profits at the expense of both manufacturers and the needy patients who are supposed to be served by the federal 340B program.

7.    Neither contract pharmacies nor the replenishment model are features of the ordinary commercial drug-distribution system in the United States. They solely exist in the 340B context, where they are unauthorized by statute. AbbVie is involved in no other commercial arrangement using contract pharmacies or the replenishment model. Contract pharmacies and the replenishment model are creatures only of the federal 340B drug discount arbitrage regime.

8.    In response to these abuses—and because Congress left room for manufacturers to impose reasonable conditions on their 340B offers—manufacturers (including AbbVie) have exercised that right by implementing policies that decline to transfer 340B drugs to an unlimited number of contract pharmacies. For example, subject to further detail explained below, AbbVie will only transfer 340B drugs to one contract pharmacy affiliate of a covered entity, provided it is within 40 miles of the covered entity. That is in stark contrast to the arrangement that covered entities, contract pharmacies, and now, the State of Rhode Island, would like, in which AbbVie would transfer unlimited 340B drugs to dozens or hundreds of contract pharmacies per covered entity.

9.    It is beyond dispute that AbbVie's policy complies with—and indeed, is enabled by—federal law because manufacturers are bound only to "offer" their drugs at discounted prices to the covered entities. The 340B statute does not compel *unconditional* sales, nor does it require manufacturers to transfer 340B-discounted drugs *wherever* and to *whomever* a covered entity

4

demands. And it certainly does not require manufacturers to subsidize commercial pharmacy *profits* under the guise of 340B compliance.

10. Manufacturers' decisions to address these abuses resulted in litigation between manufacturers and HHS, and the U.S. Courts of Appeals for the Third and D.C. Circuits confirmed that the manufacturers' policies are lawful under the federal program. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023). Again, Congress required manufacturers to *offer* their covered outpatient drugs at discounted prices in return for participating in Medicaid and Medicare, and the 340B statute preserved manufacturers' liberty to include reasonable, bona fide terms in those offers. *See Novartis*, 102 F.4th at 460–64; *Sanofi*, 58 F.4th at 703–06. Congress did not require manufacturers to provide their drugs to third-party commercial pharmacies or otherwise support arbitrage of their charitable discounts.

11. Numerous states, including Rhode Island, participated in the Third Circuit and D.C. Circuit cases as *amici curiae*, on the losing side. After that loss, many states turned to their own legislatures to propose and implement legislation to reach their desired 340B outcomes and attempt to impose requirements under the federal 340B statute that Congress chose not to impose. Rhode Island's S. 114 is an example of one such piece of legislation.

12. In particular, S. 114 not only eliminates manufacturers' federally preserved ability to impose reasonable conditions on their 340B offers—it imposes new conditions on Medicare and Medicaid participation that Congress never authorized. *See Novartis*, 102 F.4th at 460 ("[W]e think that this silence *preserves*—rather than abrogates—the ability of sellers to impose at least some delivery conditions." (emphasis added)). Among other things, S. 114 prohibits manufacturers from limiting the "acquisition" of 340B discounted drugs by for-profit pharmacies contracted with

covered entities.  S. 114 § 5-19.3-5(a).  Rhode Island's law effectively transfers to covered entities *and commercial pharmacies* unfettered authority to demand manufacturers' property at significantly reduced prices for the benefit of private parties.  This state-imposed harm—compelling manufacturers to transfer their drugs at discounted prices on terms not required by federal law and to which AbbVie would not agree—cannot stand because it violates the United States Constitution.  S. 114 should be enjoined for the following reasons.

13.    *First*, S. 114 is preempted by the federal 340B program.  The doctrine of federal preemption requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).  Rhode Island's S. 114 must yield.

14.    By seeking to change the requirements of when and to which entities manufacturers must offer drugs at a discounted price as a condition of participating in federal Medicaid, S. 114 unlawfully modifies the requirements of the federal 340B program.  S. 114 likewise obstructs the 340B statute's objectives by imposing obligations on drug manufacturers that conflict with the actual federal requirements, thereby raising the costs of Medicaid participation above those set by Congress and deterring manufacturers from participating at all.

15.    S. 114 also blocks manufacturers from requesting claims data for contract pharmacy dispenses.  *See* S. 114 § 5-19.3-5(c) ("A pharmaceutical manufacturer … shall not impose additional terms or limitations not required by federal law as a condition of 340B participation."); *cf. id.* § 5-19.3-3(a)(5) (prohibiting manufacturers "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," from "[r]equir[ing] submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing").  That impairs a liberty the 340B statute grants.  And it prevents AbbVie from accessing

6

the federal 340B administrative dispute resolution system ("ADR"). It further interferes with AbbVie's participation in the federal government's recently announced pilot rebate program—a program that assumes manufacturers may collect claims data from covered entities and contract pharmacies in order for those entities to obtain a 340B rebate.

16.     Finally, S. 114 impermissibly injects state officials armed with state-law penalties into what Congress intended to be an exclusively federal compliance scheme.

17.     ***Second***, S. 114 is an impermissible taking under the Fifth and Fourteenth Amendments. Neither the federal government nor the States have any authority to force A-to-B transfers of private property for the benefit of private parties. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005). Rhode Island's law does just that. It requires drug manufacturers like AbbVie to transfer their property at steeply discounted prices to other private entities if those entities have third-party contracts that purport to allow them to access AbbVie's drugs at those discounted prices. And S. 114's text makes clear that it seeks to regulate "acquisition" of said drugs at the discounted 340B price. *See* S. 114 § 5-19.3-5(a). Rhode Island has no authority to take AbbVie's private property for private use. By seeking to change the requirements for when drug manufacturers must provide 340B-priced drugs to contract pharmacies at the request of covered entities, the statute unlawfully appropriates private property for the private benefit of commercial pharmacies and does so without serving any valid public purpose. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (holding government's confiscation of portion of farmers' raisin crop for charitable or other purpose without just compensation was a *per se* taking).

18.     ***Third***, S. 114 violates AbbVie's due process rights under the Fourteenth Amendment because it is impermissibly vague. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate

persons or entities must give fair notice of conduct that is forbidden or required."). The statute contains broad, open-ended, and ambiguous provisions—provisions that fail to place AbbVie on notice of what is prohibited, and that invite arbitrary enforcement. For example, S. 114 bars manufacturers from "interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by" a contract pharmacy. S. 114 § 5-19.3-5(a). The law also vaguely prohibits any "interfer[ence] with a 340B contract pharmacy that is actively contracted with a 340B covered entity." *Id.* § 5-19.3-5(b). The law provides no elaboration or guidance as to what constitutes prohibited interference. Meanwhile, state officials wield boundless discretion to arbitrarily impose civil sanctions on manufacturers for violating that impenetrable provision. *Id.* §§ 5-19.3-7(1), 5-19.3-8; R.I. Stat. §§ 6-13-6, 6-13.1-5, 6-13.1-8.

19.    AbbVie seeks a declaration that S. 114 is unconstitutional because it is preempted by federal law, constitutes an unconstitutional taking, and is void for vagueness. AbbVie further seeks injunctive relief barring the Rhode Island Attorney General and the Rhode Island Auditor General from enforcing S. 114 against AbbVie.

## PARTIES TO THE ACTION

20.    AbbVie, Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, and advancing medical science in areas such as immunology, oncology, and neuroscience. Since 2012, AbbVie, Inc. has participated in the federal 340B drug discount program, helping uninsured and vulnerable patients obtain access to the medications they need. AbbVie's headquarters are located in North Chicago, Illinois. AbbVie, Inc. is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B

Pharmaceutical Pricing Agreements, with HHS's Health Resources and Services Administration ("HRSA").[2]

21.    Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

22.    Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

23.    AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

24.    Pharmacyclics LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

25.    Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

26.    Defendant Peter Neronha is the Attorney General of the State of Rhode Island.  The Attorney General is responsible for prosecuting civil and criminal actions on behalf of the State.

---

[2]    On February 11, 2025, President Trump issued Executive Order 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative.  *See* 90 Fed. Reg. 9,669 (Feb. 11, 2025).  On March 27, 2025, HHS announced it intended to restructure, including by creating an Administration for a Healthy America (or "AHA") which will have authority over, among other sub-agencies, HRSA.  *See* Dep't of Health & Human Servs., *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025), https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

R.I. Stat. § 28-14-22.  He is also specifically empowered to investigate and enforce violations of the Rhode Island General Laws Deceptive Trade Practices Act § 6-13, which is named as the enforcement mechanism in S. 114's violations section.  R.I. Stat. § 6-13.1-7; S. 114 § 5-19.3-8.  This suit is brought against the Attorney General solely in his official capacity.

27.    Defendant David Bergantino is the Auditor General of the State of Rhode Island.  He is authorized to "[i]nvestigate complaints and take appropriate actions to ensure compliance with" Rhode Island's new law.  S. 114 § 5-19.3-7(1).  He is also responsible for "[p]romulgat[ing] rules and regulations necessary to carry out the provisions of" the new law.  *Id.* § 5-19.3-7(2).  This suit is brought against the Auditor General solely in his official capacity.

## JURISDICTION AND VENUE

28.    AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.

29.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

30.    The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Court's inherent equitable powers, including the power to enjoin the actions of state officials if contrary to the United States Constitution or federal law.  *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).

31.    Venue is proper in this District under 28 U.S.C. § 1391(b) because this action challenges a Rhode Island law that is applicable to AbbVie's sale and distribution of drugs within this District.  AbbVie sells and distributes drugs to multiple 340B covered entities within this District, and these entities purport to maintain contract pharmacy arrangements.  Venue is also proper because Defendants maintain offices within this District through which they would enforce the challenged law.

## GENERAL ALLEGATIONS

A.    **The 340B Drug Pricing Program**

32.    This case concerns section 340B of the federal Public Health Service Act, which created the federal "340B program" as part of the authority granted in the Veterans Health Care Act of 1992.  *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

33.    The purpose of the federal 340B program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves."  Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

34.    Before Congress created the 340B program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients.  In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended consequence of creating disincentives for manufacturers to continue providing those voluntary discounts.  H.R. Rep. No. 102-384, pt. 2, at 9-10 (1992).  Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B program, turning the manufacturers' previous voluntary support into a federal mandate.

35.    The 340B statute requires that any manufacturer that participates in the federal Medicaid Drug Rebate Program must "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities"—disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients.  42 U.S.C. § 256b(a)(1).

36.     The statute expressly limits participation in the 340B program to "covered entities." *See id.* § 256b(a)(4).   The statute defines "covered entities" to include only organizations and service providers that predominantly serve low-income patients.   The definition includes, for example, federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients.   *Id.*   For-profit commercial pharmacies are not included in the statutory list of "covered entities."   *Id.*   Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies.  *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."), *aff'd sub nom. Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).

37.     The discounted 340B price for each of the manufacturers' drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at section 1927 of the Social Security Act.   42 U.S.C. §§ 256b(a)(1)-(2) & (b).   The resulting prices, called the 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers.   For the vast majority of innovator drugs, the mandatory discounts range from at least 23.1% to more than 99.9% of the average price in the market.   *See* 42 U.S.C. § 1396r-8(c); 42 U.S.C. § 256b(a)(1).   Many mandatory 340B ceiling prices are as little as one penny per unit of drug.

38.     To indicate their agreement to participate in the federal 340B program and comply with its requirements, manufacturers sign a form contract with HHS, called the Pharmaceutical Pricing Agreement ("PPA").   That agreement is drafted by HHS.   It has "no negotiable terms,"

and it "incorporate[s] the statutory obligations and record[s] the manufacturers' agreement to abide by them." *Astra*, 563 U.S. at 117-18.

39.    The PPA imposes no obligation on participating manufacturers to make **unconditional** sales to covered entities. Additionally, the PPA neither requires manufacturers to sell discounted drugs to contract pharmacies nor to facilitate the transfer of their discounted drugs to contract pharmacies. Nor does it grant covered entities any right to obtain unfettered access to manufacturers' drugs at discounted prices through contract pharmacies.

40.    Both the PPA and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B program or profiting from the sale of manufacturers' drugs at discounted prices. Over the past decade, however, that is exactly what has happened as a result of covered entities entering into contractual relationships with commercial pharmacies. Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat the indigent and uninsured patients that visit a covered entity and receive healthcare services from the covered entity itself, commercial contract pharmacies sell manufacturers' drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by the covered entity through the federal 340B program at discounted prices, pocketing the difference (the "spread") for their own financial benefit.

41.    In recent years, commercial contract pharmacies have earned annually over $3.3 **billion** in "spread." *See* Eric Percher et al., Nephron Rsch. LLC, *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption*, at 3, 30-31 (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone).

42.    These abuses of the federal 340B program violate the letter and spirit of the federal 340B statute. Congress designed the 340B statute with the intent that there would be a close nexus

13

between the federal drug pricing program and its only valid public purpose—helping low-income and uninsured patients obtain access to medications at discounted prices. Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the program.

43.    The federal statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs "to a person who is not a patient of the entity."  42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.").

44.    The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates."  They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug.  *Id*. § 256b(a)(5)(A).

45.    The 340B statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the program's integrity by "provid[ing] for improvements in compliance by covered entities … in order to prevent diversion" and violations of the statute's duplicate discount prohibition.  *Id.* § 256b(d)(2)(A).

46.    The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal Administrative Dispute Resolution ("ADR") process.  *See id.* §§ 256b(d)(l)(B)(v), (d)(3).  Notably, HRSA recently issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process.  *See* 89 Fed. Reg. 28,643 (April 19, 2024).  The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute.  Under the rule, a "340B ADR Panel" within HRSA is tasked with resolving not only disputes about drug

prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"—the exact issue S. 114 seeks to address. *See* 42 C.F.R. §§ 10.3, 10.21; *accord id.* § 10.22(c)(1) ("A manufacturer is responsible for obtaining relevant information or documents from any wholesaler or other third party that facilitate the sale or distribution of its drugs to covered entities."); 89 Fed. Reg. 28,649 (April 19, 2024) ("HHS agrees and has modified § 10.21(a)(1) to further explain that an overcharge claim generally includes claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."); *id.* at 28,644 ("[T]he 340B Program is related to drug pricing and drug distribution.").

47.    The statute entrusts enforcement of the 340B statute **exclusively** to the Secretary of HHS and details what penalties may apply. *See* 42 U.S.C. §§ 256b(a)(5)(C)-(D), (d)(l)(B)(v), (d)(3).    As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B program, and private enforcement by covered entities "would undermine [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 119-20.

48.    Failure to comply with the statutory requirements under the 340B program may result in termination of the PPA (and the manufacturer's ability to participate in Medicaid), federal enforcement actions, and potentially the imposition of large civil penalties. *See* 42 U.S.C. §§ 256b(a)(5)(D), (d)(1)(B)(vi), (d)(2)(B)(v), (d)(3)(A).

### B.    The Growth in Contract Pharmacy Arrangements

49.    In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities **that lacked an in-house pharmacy** from entering into a contractual relationship with a **single** outside pharmacy to dispense covered outpatient drugs to the covered

entity's patients.  61 Fed. Reg. 43,549 (Aug. 23, 1996).  The guidance made clear that it "create[d] no new law and create[d] no new rights or duties."  *Id.* at 43,550.

50.    Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations.  They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

51.    In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B program.  The guidance stated, for the first time, that the agency recommended manufacturers allow covered entities to enter into contractual relationships with an ***unlimited*** number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own.  75 Fed. Reg. 10,272 (Mar. 5, 2010).

52.    Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers.  Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations.  *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law.").  In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit covered entities from using multiple contract pharmacies, it did not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

53.    Following issuance of the 2010 guidance, covered entities dramatically increased their use of contract pharmacies, with a recent study reporting an increase of 12,000% between 2010 and 2024.  *See* Elanor Blalock, *For-Profit Pharmacy Participation in the 340B Program: 2024 Update*, BRG (Jan. 2025) ("BRG Report").  As of 2023, over 33,000 pharmacy locations—

"more than half of the entire U.S. pharmacy industry"—acted as 340B contract pharmacies, up from fewer than 1,300 pharmacy locations in 2010. *See* U.S. Senate Comm. on Health, Educ., Labor & Pensions, 119th Cong., *Congress Must Act To Bring Needed Reforms To The 340B Drug Pricing Program* 3 (Apr. 2025) ("Cassidy Report"), https://tinyurl.com/44c6w2en. This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B-discounted drugs. For example, in 2009 sales of 340B-priced drugs totaled just $4.2 billion, but by 2023 they had increased by more than 30-fold to $124 billion. *See* Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, USC Schaeffer Cntr. For Health Pol'y & Econ. 5 (Oct. 2021) ("Mulligan"), https://tinyurl.com/3a5h2zex; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023*, IQVIA (2024), https://tinyurl.com/ywkdbbju.

54.    Similarly, the number of covered entities participating in the program jumped from around 15,000 in 2010 to more than 50,000 by 2020. *See* Mulligan, *supra*, at 4; U.S. Gov't Accountability Off., *Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements*, GAO-20-108, at 23 (2019), https://www.gao.gov/assets/d20108.pdf ("Given the weaknesses in HRSA's oversight, some hospitals that do not appear to meet the statutory requirements for program eligibility are participating in the 340B Program and receiving discounted prices for drugs for which they may not be eligible.").

55.    Nor does the program's explosive growth correlate with an increase in indigent patients, or improvements in care. Indeed, since 2010, the percentage of uninsured patients in the United States has fallen by nearly 38%. *See* Kenneth Finegold et al., U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, Trends in the U.S. Uninsured

Population, 2010-2020, Issue Brief No. HP-2021-02, at 2 (Feb. 11, 2021), https://tinyurl.com/4rf9cm8t.

56.    Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities.  The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts.  Contract pharmacies are not "agents" of the covered entities; they are merely business partners.  Indeed, large contract pharmacies like CVS and Walgreens charge "complex fees for pharmacy and administrative services to covered entities" that increase year over year.  Cassidy Report, *supra*, at 18.  Importantly, these arrangements do not exist outside the context of the federal 340B program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted 340B drugs to their customers at full prices.

57.    Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

58.    A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B-purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B-purchased inventory.

59.    Most contract pharmacies, however, use what is known as the "replenishment" model.  The replenishment model is, as covered entities self-describe it, "an accounting mechanism" by which they retroactively match discounts for the pharmacy with previously (full price) dispensing events to customers. *See AbbVie Inc. v. Murrill*, No. 6:23-CV-01307-RRS-CBW (W.D. La. June 6, 2024) ("*Murrill*"), Summ. J. Hr'g Tr. at 59-60 (Ron Connelly, counsel for the

Louisiana Primary Care Association); 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996). In practice, the replenishment model permits the "transfer" of 340B-priced drugs to contract pharmacies with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B-eligible or not.

60.     Under the replenishment model, no 340B-purchased drugs are kept in stock at the contract pharmacy. Instead, "the pharmacy has an initial stock of drugs" obtained through ordinary commercial purchases at the non-340B price (Figure 1, step 1, *infra*). *See Murrill*, Summ. J. Hr'g Tr. at 60 (Ron Connelly, counsel for the Louisiana Primary Care Association). Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities. As explained below, the pharmacy determines which previous dispenses were 340B eligible and once sufficient eligible dispenses for a particular drug accumulate, the covered entity orders additional quantities of that drug at the federal 340B price (Figure 1, step 6). The covered entity directs AbbVie to transfer those drugs to the contract pharmacy to "replenish" the non-340B-priced drugs dispensed by the contract pharmacy on the covered entity's behalf (Figure 1, step 2). *See* Decl. of RADM Krista M. Pedley, Dir., Off. of Pharmacy Affs., HRSA, *Eli Lilly & Co. v. Becerra*, No. 1:21-cv-00081-SEB-MJD, ECF No. 125-2 ¶¶ 3-11 (S.D. Ind.). Sometimes the contract pharmacy actually places the order on behalf of the covered entity for more drugs at the federal 340B price.



**Figure 1.** Replenishment Model Step-By-Step.

61.    Once the contract pharmacy receives the replenishment order, the 340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may be dispensed to any subsequent patient" (Figure 1, step 3). *See id.* at ¶ 11.

62.    In other words, under the replenishment model, contract pharmacies do not keep a separate inventory of 340B-priced drugs but instead dispense drugs to both 340B and non-340B patients alike out of their general inventories.  Nor do most contract pharmacies attempt to determine prior to or at the point of sale whether the patient is eligible for a 340B discounted drug. In almost all instances, contract pharmacies dispense the 340B-priced drugs to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient (Figure 1, step 4).  The pharmacy or a third-party administrator ("TPA") carries out a 340B determination at the back end, well after a drug has been dispensed (and likely consumed) by the patient.  This determination is made using a black box algorithm (unknown by AbbVie) based on

20

the contract pharmacy's own criteria, without any involvement from the covered entities (Figure 1, step 5). If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B-priced drugs AbbVie must sell. But in reality, the contract pharmacies' criteria often include prior patients, who no longer receive the 340B-discounted drugs at the pharmacy but that are included under a "once-a-patient-always-a-patient" approach, so the covered entity and its pharmacies are able to maximize the arbitrage profits from the 340B program. As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58.

63.     The replenishment model also encourages diversion by allowing covered entities to transfer federally discounted drugs to pharmacies, who are not "a patient of the entity." *See* 42 U.S.C. § 256b(a)(5)(B).

64.     Although HRSA interpreted the federal 340B statute to allow the use of pharmacies, it did so because "[w]e believe that the relationship between the covered entity and the contract pharmacy is one of agency." 61 Fed. Reg. 43,549, 43,554 (Aug. 23, 1996). Additionally, HRSA assumed that the covered entities purchasing the drugs would retain title and responsibility for them even after directing shipment to the contract pharmacy. *Id.* at 43,553. However, in practice, covered entities do not retain title to the drugs.

65.     As explained above, contract pharmacies (typically through a TPA) instruct covered entities to place orders—sometimes even placing the order itself, without going through a covered entity—of additional quantities of drugs at the discounted 340B price to "replenish" the general inventories that they will use to supply non-340B-eligible sales. Significantly, as a result

of such replenishment, even though the drugs are purchased by or on behalf of covered entities, contract pharmacies effectively take title to the drugs. At no point in time does a covered entity take title to the drugs under this model. *See Sanofi Sues HHS, HRSA for Contract Details Between Covered Entities, Contract Pharmacies*, 340B Report (June 13, 2024), https://tinyurl.com/bdmx88wu (according to a covered entity spokesperson, "in order for the replenishment model to function, 'the title to 340B drugs transfers to the contract pharmacy at the time it is taken into inventory.'"). AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity.

66.    In practice, therefore, covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans. For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices.

67.    By dramatically expanding the pool of individuals who can access the discounted drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B program. One study found that in 2018 alone, covered entities and their contract pharmacies generated approximately $64 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices. *See* BRG Report, *supra*, at 7. And a recent report from the U.S. Senate Committee on Health, Education, Labor & Pensions found that a covered entity in Virginia generated $276.5 million in 340B savings and revenue from September 2018 through September 2023, while another covered

entity in Ohio accrued $933.7 million in 340B savings and revenue from April 2020 through June 2023. Cassidy Report, *supra*, at 6.

68.    When commercial pharmacies are brought into the program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity.  As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real-time like a covered entity can).  HHS Office of Inspector General, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 1 (2014) ("HHS Report"), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

69.    Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increases, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit. *See* U.S. Gov't Accountability Off., *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 44 (June 2018), https://www.gao.gov/assets/d18480.pdf (noting that approximately two-thirds of diversion findings in HRSA audits involved drugs distributed at contract pharmacies); *id.* at 35, 43-44 (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies, and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

70.    Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B program, but uninsured

and underinsured patients are not benefitting. *See* HHS Report, *supra*, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to uninsured patients at their contract pharmacies"); Cassidy Report, *supra*, at 9 (explaining that the covered entities under investigation "do not pass 340B discounts directly to their patients and differ on how patients receive discounts on their 340B drugs"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall. St. J. (Sept. 10, 2020), https://tinyurl.com/yxehpc7v (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away"); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, IQVIA 12 (Sept. 27, 2022), https://tinyurl.com/2wdtuh52 ("The 340B Drug Discount Program as it exists today is a complex system of arbitrage … in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum 2 (June 17, 2022), https://tinyurl.com/2npan7wc (finding that contract pharmacy growth from 2011 to 2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

71.     For example, the North Carolina Department of the State Treasurer published a recent report explaining that "some hospitals are using the 340B program to enrich themselves rather than to serve vulnerable communities," and that the hospitals "expanded into wealthier neighborhoods with a higher percentage of insured individuals who pay more for the drugs." Dale R. Folwell, N.C. Dep't of State Treasurer, *Overcharged: State Employees, Cancer Drugs, and the*

*340B Drug Pricing Program*, N.C. State Health Plan 3, https://tinyurl.com/4cy8an69.  This State is no different: 67% of contract pharmacies are in affluent neighborhoods.  *See* Pioneer Institute Public Policy Research, *340B In Rhode Island* (2025), https://tinyurl.com/2t4c38pn.

72.    While commercial pharmacies are driving massive growth in the 340B program—at double-digit annual rates—charity care by hospitals has decreased.  Commentators have noted, for example, that as the 340B program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined.  *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program, 7-8 (Oct. 30, 2020), https://tinyurl.com/4s5ptxxy; Adam J. Fein, *EXCLUSIVE: 340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019), https://tinyurl.com/4z8dmjsv.

73.    Both the New York Times and Wall Street Journal have run exposés describing the flaws in contract pharmacy arrangements, flaws that enable large scale arbitrage and damage the very communities that the federal 340B program was designed to help.  *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, NY Times (Sept. 24, 2022), https://tinyurl.com/3sbxuswa (describing how one 340B hospital "has been slashing services at Richmond Community while investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, Wall. St. J. (Dec. 22, 2022), https://tinyurl.com/yc2uc6yp ("The data show that hospitals often extend their 340B discounts to clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose.").

74.     A recent New York Times investigation into Apexus, the government contractor managing 340B drug pricing, exposed systemic price manipulation, lack of oversight, and financial exploitation within contract pharmacy arrangements—allowing for significant financial abuse at the expense of the communities the program was meant to protect.  Apexus, which is responsible for negotiating better prices and access to mediations, has a direct financial incentive to expand the program and maximize hospital profits.  Because Apexus "is allowed to collect a fee for almost every drug sold under the program," it has actively developed strategies to drive 340B sales and increase covered entity revenue.  These strategies include training covered entities on how to maximize 340B revenue; operating a "purchasing optimization team" advising hospitals on which drugs to generate the highest margins; and running a certification program teaching hospitals how to capture more patients and prescriptions under 340B.  These tactics have prioritized profit generation over patient benefit, increasing Apexus's and covered entities' financial gains at the expense of patients, insurers, and manufacturers.  Hospitals face no restrictions on which outpatient prescriptions they classify as 340B, allowing them to mine patient records from as far back as 36 months to claim additional patients under the program—even if those patients never directly benefit from the discounts.  In some cases, hospitals have passed inflated drug costs onto patients instead of sharing the savings.  *See* Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/33ftpfdf.

75.     Congress has also expressed concern over growing abuses in the 340B program.  On April 24, 2025, the Majority Staff of the Senate Health, Education, Labor & Relations ("HELP") Committee, chaired by Senator Cassidy, released a report titled "Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program,"—the culmination of a nearly two-

year investigation into contract pharmacy arrangements and other 340B-related issues. In its findings, the Senate HELP Committee determined that not only have contract pharmacies grown by sheer numbers, but major commercial pharmacy chains like CVS, Walgreens, Express Scripts, OptumRx, and Walmart, account for 75% of all contract pharmacy relationships. *See* Cassidy Report, *supra*, at 3.

76.    As part of the Senate HELP Committee's investigation, several covered entities expressly told Congress that they do not pass on discounts to patients, and do not specifically account for 340B revenue in their budgets. *See id.* at 10. And large commercial pharmacy chains like CVS and Walgreens disclosed that they collect significant fees associated with 340B dispensing. For example, for patients with third-party insurance, CVS collects between $35 and $85 per brand-name drug dispensing event depending on the days-supply of the prescription dispensed. *Id.* CVS reported to the Committee that in 2023 it made $382 million in 340B-related dispensing fees and "annual gross and net revenues generated from the 340B program." *Id.* at App. 106.

77.    While the replenishment model contributes to the abuses described above—issues manufacturers are rightfully trying to address—S. 114 goes further: it mandates that manufacturers sell or transfer discounted drugs on terms Congress never required and that manufacturers never agreed to. The injuries manufacturers face under S. 114 do not stem from the 340B program itself or even from the replenishment model specifically, but from the state's attempt to override federal law and impose ***state*** requirements on AbbVie's participation in a ***federal*** program. Even if the replenishment model were eliminated entirely, S. 114 would still compel manufacturers to transfer property under conditions they oppose, stripping them of their federally acknowledged ability to impose reasonable limitations on their 340B offers. In doing so, S. 114 not only conflicts with

27

federal law—it also effects a taking. The statute forces manufacturers to sell valuable property at below-market rates, to third parties, with no room to impose conditions or decline a sale.

### C.    Manufacturers' Response to HRSA's Overreach

78.    AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B-priced drugs to an unlimited number of commercial pharmacies.

79.    AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B-discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing covered entities.

80.    As 340B abuse continued to grow, with covered entities seeking the provision of 340B-priced drugs to an excessive number of for-profit pharmacies—sometimes located more than 100 miles from the covered entity's location—AbbVie updated its policy to place reasonable limits around provision to contract pharmacies. Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for the in-house pharmacy. However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, AbbVie will take orders for one designated contract pharmacy, provided that the one contract pharmacy is located within 40 miles of the HRSA registered covered entity parent site, and the covered entity submits limited claims data on 340B utilization for that pharmacy location. In addition, Grantee Covered Entities may use an unlimited number of contract pharmacies as long as the Grantee registers with 340B ESP™, a web-based platform made available to covered entities at no cost,

and submits claims data.[3]  *See* Ltr. from E. Scheidler to 340B Covered Entities (July 1, 2025), https://tinyurl.com/s2k2mu4c.

81.    In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered outpatient drugs "at or below the applicable ceiling" price set by statute.  *See* 42 U.S.C. § 256b(a)(1).  AbbVie is committed to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's 340B-discounted drugs to qualifying patients.  If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

82.    AbbVie's policy is consistent with those upheld by the Third and D.C. Circuits.  *See Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463-64.

83.    In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B program by covered entities and contract pharmacies.

### D.    Litigation in Federal Courts

84.    HHS initially recognized that it lacked authority to compel manufacturers to transfer drugs to contract pharmacies.  *See* Tom Mirga, *HRSA Says Its 340B Contract Pharmacy Guidance Is Not Legally Enforceable*, 340B Report (July 9, 2020), https://340breport.com/hrsa-says-its-340b-contract-pharmacy/.  The agency then reversed its position and attempted to impose a new obligation on manufacturers.

---

[3]    "Claims data," as used in the administration of the 340B program, refers to prescription-level information necessary to determine whether a drug is subject to a 340B discount, a Medicaid rebate, or both, and whether the recipient is a patient of a covered entity.

29

85.    On December 30, 2020, HHS issued a final decision—labeled an "Advisory Opinion"—that for the first time ever purported to require manufacturers to facilitate the transfer of their products to for-profit commercial pharmacies. *See* U.S. Dep't of Health & Hum. Servs., Advisory Op. No. 20-06, Contract Pharmacies Under the 340B Program, at 1 (Dec. 30, 2020), https://tinyurl.com/2ca6rmnm. Various manufacturers brought suit in early 2021 to challenge this HHS decision.

86.    On May 17, 2021, the government sent certain manufacturers "violation" letters purporting to enforce the 340B statute. AbbVie received a violation letter on October 17, 2022, stating that HHS had made a final determination that AbbVie's policy violated the 340B statute by not agreeing to transfer 340B discounted drugs to unlimited contract pharmacies because "AbbVie's actions have resulted in overcharges." *See* U.S. Dep't of Health & Hum. Servs., Violation Letter to AbbVie (Oct. 17, 2022), https://tinyurl.com/47ybp3kw.

87.    While the December 30 decision was later withdrawn following a ruling from the federal district court for the district of Delaware, *see AstraZeneca*, 543 F. Supp. 3d at 47, the previously issued violation letters were not withdrawn.

88.    Rhode Island filed amicus briefs in the Third and D.C. Circuit Courts of Appeals in support of HHS, expressing disapproval of the manufacturers' policies. *See* Brief of Amicus Curiae States, *Sanofi*, 58 F.4th 696 (3d Cir. 2023) (Nos. 21-3167 et. al), 2022 WL 1617655; Corrected Brief of Amicus Curiae States, *Novartis*, 102 F.4th 452 (D.C. Cir. 2024) (Nos. 21-5299 et al.), 2022 WL 1644996.

89.    On January 30, 2023, the Third Circuit issued a decision recognizing that Congress intentionally "chose not to" impose delivery-related obligations on manufacturers, explaining that the federal 340B statute's plain text suggests that Congress intended "one-to-one transactions

between a covered entity and a drug maker without mixing in a plethora of pharmacies." *See Sanofi*, 58 F.4th at 704.

90.    The Third Circuit further found that manufacturers' policies do not prevent covered entities from participating in the 340B program or entering into contractual relationships with commercial pharmacies.  Under manufacturers' policies, covered entities "can still buy and dispense unlimited discounted drugs by having them delivered to an in-house or contract pharmacy." *Id*. at 703.

91.    The Third Circuit rejected the argument that manufacturers were not permitted to address program abuses, such as diversion and duplicate discounting, by imposing restrictions on when they will transfer drugs to commercial pharmacies.

92.    On May 21, 2024, the D.C. Circuit issued its own opinion endorsing the same view, holding that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Novartis*, 102 F.4th at 460.  As a result, as long as a manufacturer's policy "neither precludes [it] from making a bona fide 'offer' nor increases its contract 'price'"—such as only "deliver[ing] section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity"—the condition is legitimate and may be enforced without running afoul of section 340B.  *Id.* at 463-64.

93.    In the face of those federal decisions, several states enacted their own laws trying to achieve what HHS could not.  Those state laws—passed in Arkansas, Louisiana, Maryland, Mississippi, Missouri, West Virginia, South Dakota, North Dakota, Utah, Oklahoma, and others—try to limit manufacturers' ability to condition the federal offer by forcing them to transfer their drugs to an unlimited number of contract pharmacies at the 340B-discounted prices.  A new round

of federal litigation commenced.  Manufacturers challenged the laws as unconstitutional on several grounds, and that litigation continues today.

94.    Some courts have allowed the state laws to take effect.  *See, e.g.*, *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024) (Arkansas).  By contrast, the Southern District of West Virginia preliminarily enjoined West Virginia's contract pharmacy law, holding the law unconstitutionally conflicted with section 340B.  *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 451-60 (S.D. W. Va. 2024).  The West Virginia court found that laws like Rhode Island's S. 114 regulate "price, not delivery."  *Id.* at 455.  Under such laws, "[t]he question is only about what price the pharmacy and the covered entity will pay."  *Id.*  In other words, "the system is about delivery **at a given price**, not delivery *per se*."  *Id.*

95.    Other cases await decisions in district court, and multiple appeals are now pending before the U.S. Courts of Appeals for the Fourth and Fifth Circuits.

**E.    The Inflation Reduction Act and HRSA's Rebate-Model Pilot Program**

96.    The Inflation Reduction Act of 2022 established the so-called "Drug Price Negotiation Program" (DPNP).  *See* 42 U.S.C. § 1320f.

97.    The DPNP requires the Secretary of HHS to set a "maximum fair price" (or MFP) in Medicare for drugs selected under the DPNP.  *See id.* § 1320f(a)(3).

98.    If they want to continue participating in Medicare and Medicaid, manufacturers of "selected drugs" are obligated to make the "maximum fair price" available to all eligible individuals, which generally includes drugs dispensed by hospitals and pharmacies that provide care to Medicare-covered individuals.  *Id.* §§ 1320f(c)(2), 1320f-2(a)(3).

99.    Failure to provide access to the "maximum fair price" can subject a manufacturer to significant civil monetary penalties that can reach into the millions of dollars per day.  *Id.* §§ 1320f-6(c), 1320f-2(a)(5).

100.    The Centers for Medicare & Medicaid Services (CMS)—the agency tasked with administering the DPNP—has to-date selected a "maximum fair price" for one drug that AbbVie manufactures: Imbruvica, which treats certain blood cancers.  CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026*, https://tinyurl.com/2584m4h7.

101.    The MFP for Imbruvica is set to go into effect on January 1, 2026.  CMS, *Medicare Dug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026*, https://tinyurl.com/mr4c67rz.

102.    Separately, the DPNP contemplates that an individual eligible to receive the "maximum fair price" for a selected drug may sometimes (or even often) receive the drug at a 340B hospital or pharmacy, and the dispensed drug may also be subject to a pharmaceutical pricing agreement under the 340B statute.  To that end, the DPNP contains an MFP-340B nonduplication provision.  42 U.S.C. §1320f-2(d).  That provision obligates the manufacturer of a drug that is both subject to the "maximum fair price" and a pharmaceutical pricing agreement to provide **only** the lower of the two price concessions—but not both.  *See id.*

103.    CMS has disclaimed any responsibility for identifying and deduplicating MFP-340B dispenses.  *See* CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027*, at 230 (Oct. 2, 2024), https://tinyurl.com/ychztdfu ("2027 Guidance") ("CMS will not, at this time, assume responsibility for nonduplication of discounts between the 340B ceiling price and MFP."); *id.* at 54 ("Neither CMS nor the [contract facilitating data flow between CMS, manufacturers, and providers] will verify that a claim was or was not billed as a 340B-eligible drug.").

104.    That leaves avoiding duplicate MFP-340B discounts in the hands of manufacturers like AbbVie.  Indeed, that is precisely the result that CMS intends:  "CMS strongly encourages manufacturers to work with dispensing entities, covered entities and their 340B TPAs, and other prescription drug supply chain stakeholders (e.g., wholesalers) to facilitate access to the lower of the MFP and the 340B ceiling price, wherever applicable."  *Id.* at 232.

105.    Claims data is the most efficient and accurate method of ensuring compliance with the DPNP's nonduplication provisions because it enables manufacturers to quickly identify which dispenses were both MFP- and 340B-eligible.

106.    After widespread concern about the significant nonduplication issues facing manufacturers with both a selected drug and a pharmaceutical pricing agreement, HRSA issued a notice calling for applications to implement a pilot program rebate model for effectuating the 340B price to covered entities and contract pharmacies.  *See* 90 Fed. Reg. 36,163 (Aug. 1, 2025) (the "Pilot Rebate Program").  The Pilot Rebate Program arises primarily out of concerns addressed to "340B and Maximum Fair Price … deduplication" for manufacturers (like AbbVie) that have drugs subject to both price concessions.  *See id.* at 36163.  Notably, the Program specifically contemplates that manufacturers will request, and covered entities will submit, claims data for dispenses.  *Id.* at 36,164-65.

107.    AbbVie is preparing an application with the expectation of participating in the Pilot Rebate Program.  And either way, the Pilot Rebate Program confirms that the federal 340B Program encompasses the right of manufacturers to request claims data from covered entities and contract pharmacies.

F.    **The Rhode Island Law**

108.    After federal courts concluded that the federal 340B statute grants manufacturers the freedom to adopt policies to combat contract-pharmacy 340B abuse, Rhode Island turned to its own legislature to take that freedom away.

109.    In January 2025, the Rhode Island General Assembly introduced legislation—S. 114—to limit manufacturers' right to attach reasonable conditions to the federal 340B offer made to covered entities.

110.    Recognizing S. 114's serious problems, Deputy Speaker of the Rhode Island House, Raymond A. Hull, spoke against the bill during the House's June 18, 2025, floor vote, stating:

> I stand in direct opposition to … the 340B bill.  In the makeup of how it was designed in 1992 by Congress, it was directly designed to give the benefits to communities that purchase drugs, and they were able to benefit from the savings and put the savings back into the communities—which would be your health centers and hospitals that were in undesirable neighborhoods or [caring for] underserved individuals.  What actually is happening here is that the hospital systems are now gaming the system, because they can.  What actually is happening here … is that the pharmacies now can establish a pharmacy in a neighborhood, and then game it somewhere else in a richer neighborhood, but not pass the benefits back on to where it actually was intended for.  All I'm asking for … is some transparency.  What are the pharmacies doing with the savings?  Is it going back to where it actually was intended to?  Because Congress set up this program, through big pharma, to send the money back to help relieve.  And I tell you, the great benefits are to our health centers, they benefit tremendously from it, and you can see that they are taking the money and putting it back into the services they provide.  But some of these pharmacies, they're learning how to take the benefits and not put it back where it needs to belong, but into their pockets.  I stand opposed to the bill.

S. 114 House Floor Discussion, 33:40–36:05 (June 18, 2025), https://capitoltvri.cablecast.tv/show/11464?site=1.

111.    Despite such objections, the General Assembly passed S. 114 on June 20, 2025, and it was signed by the Governor on June 27, 2025.  S. 114 is set to take effect on October 1, 2025.

112.    The text of S.114 makes clear that changing the terms of the federal 340B program and compelling a private wealth transfer of 340B-priced drugs from one party to another are its regulatory objects.

113.    Start with its key defined terms.  S. 114 defines "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b [(*i.e.*, the federal 340B statute)] and is purchased by a covered entity as defined in § 256b(a)(4)."  S. 114 § 5-19.3-2(1).  S. 114 also defines "340B covered entity"—another critical term—by referencing the federal 340B statute.  *Id.* § 5-19.3-2(3).  In other words, the Rhode Island statute cannot exist outside the context of the federal 340B program.  It regulates only transactions occurring (or not occurring) within that program.

114.    Next is the main point of S. 114: it compels manufacturers to transfer discounted 340B drugs to commercial pharmacies.  "A pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B covered entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by [HHS]." *Id.* § 5-19.3-5(a).

115.    As a practical matter, S. 114 expands the pool of entities authorized by Congress to receive drugs purchased at 340B prices.  By sweeping in 340B contract pharmacies, Rhode Island demands that manufacturers provide both covered entities and commercial contract pharmacies unfettered access to their drugs at discounted 340B prices.  *Id.*  That is contrary to what Congress wanted.  *See* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or

otherwise transfer the drug to a person who is not a patient of the entity"); *see also id.* § 256b(a)(4) (defining "covered entity," which does not include contract pharmacies).

116.    To make matters worse, S. 114 provides no meaningful standard for determining when its provisions have been violated.  Rhode Island's law does not define "interfere" or give any notice as to what would constitute unlawful "indirect[]" interference with "the acquisition of a 340B drug by" a contract pharmacy.  S. 114 § 5-19.3-5(a).  And the law contains a broad catch-all provision, stating that "[a] pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not interfere with a 340B contract pharmacy that is actively contracted with a 340B covered entity."  *Id.* § 5-19.3-5(b).  So even if a manufacturer could be confident that certain conduct was not interference under Section 5-19.3-5(a), the same conduct could still trigger liability under Section 5-19.3-5(b)'s catch-all.  Perhaps recognizing that S. 114 imposes vague and sometimes incomprehensible requirements, the General Assembly authorized the Rhode Island Auditor General to "promulgate rules and regulations necessary to carry out the provisions of this chapter."  *Id.* § 5-19.3-7(2).

117.    Rhode Island's law subjects manufacturers to steep financial penalties for violation S. 114's indecipherable prohibitions.  S. 114 provides that a violation of its provisions is a violation of Rhode Island's Deceptive Trade Practices Act and Unfair Sales Practices Act.  *Id.* § 5-19.3-8. S. 114 thus empowers the Attorney General to seek civil penalties of up to $10,000 per violation. R.I. Stat. § 6-13.1-8.  The Attorney General may also move to enjoin manufacturers' alleged violations of S. 114 and seek additional penalties for violations of such injunctions.  *Id.* § 6-13.1-5.  The Auditor General has the broad authority to "[i]nvestigate complaints" and take whatever actions he deems "appropriate … to ensure compliance with" Rhode Island's 340B law.  S. 114 § 5-19.3-7(1).  And on top of all that, private parties may file suit under the Deceptive Trade

Practices and Unfair Sales Practices Acts to seek "actual damages or five hundred dollars ($500), whichever is greater," as well as treble damages and equitable relief. R.I. Stat. §§ 6-13-6, 6-13.1-5.2(a). If an injunction is issued, "it shall be the duty of the attorney general … to enforce" it. *Id.* § 6-13-6.

118.    At the same time, S. 114 frustrates AbbVie's ability to ensure rudimentary compliance with the 340B program and avail itself of the federal ADR procedure. The law prohibits manufacturers from requiring the submission of claims data as a condition to the offer of 340B discounted drugs. *See* S. 114 § 5-19.3-5(c) ("A pharmaceutical manufacturer … shall not impose additional terms or limitations not required by federal law as a condition of 340B participation."); *cf. id.* § 5-19.3-3(a)(5) (prohibiting manufacturers "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," from "[r]equir[ing] submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing"). Such data is critical, however, to manufacturers' ability "to utilize the federal dispute resolution system." *Morrisey*, 760 F. Supp. 3d at 453.

119.    S. 114 cites no source, under the 340B statute or elsewhere, that authorizes Rhode Island to add requirements to the conditions for participating in the federal 340B program, to expand the pool of entities permitted to benefit from 340B pricing, to compel the transfer of AbbVie's property at confiscatory prices for private use, or to establish an enforcement process for Rhode Island officials and private parties to seek remedies for alleged violations of the federal 340B requirements.

120.    In one section, S. 114 purports to limit its own scope to avoid conflicts with federal law. It states that "[n]othing in this [act] is to be construed or applied to be in conflict with …

38

[a]pplicable federal law and related regulations." S. 114 § 5-19.3-9(b)(1). But there is no way to harmonize S. 114 with the federal 340B statute.

121. But there is no way to harmonize S. 114 with federal law. There is no role for states to regulate the transfer of 340B-priced drugs to pharmacies who are not permitted as a matter of federal law to participate in the federal program or obtain access to manufacturers' drugs at discounted prices. S. 114's provisions inevitably create conflict.

## STANDING

122. AbbVie is injured by S. 114 because S. 114 imposes state-level requirements not mandated by Congress and that directly conflict with and frustrate the federal 340B program. S. 114 overrides the discretion manufacturers retain under federal law to impose reasonable conditions on their 340B offers, and subjects AbbVie to conflicting obligations, compliance burdens, and potential enforcement actions. The law also forces AbbVie to provide its private property to another private party in a prohibited A-to-B wealth transfer. Moreover, the law subjects AbbVie to enforcement by Rhode Island state officials and private parties in the form of civil suits and regulatory processes designed to impose steep financial penalties.

123. AbbVie's injuries are fairly traceable to S. 114 because the state statute compels a private transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies—in the absence of any recognized public use or purpose and in violation of federal law. S. 114 compels sales at the discounted price against AbbVie's wishes and on terms it would not agree to; in other words, in the absence of S. 114, those sales or other transfers to covered entities and their contract pharmacies at the discounted price *would not occur*. The statute prohibits AbbVie from enforcing its contract pharmacy policy, which otherwise conditions the sale or transfer of 340B-discounted drugs. S. 114 thus compels a transaction that would not take place but for the state's law. Put differently, the existence and enforcement of S. 114 results in the

difference between a sale at the discounted price occurring or not.  In addition, the statute seeks to impose new state-law obligations on drug manufacturers participating in the 340B program beyond those required by the federal statute.  Neither section 340B, nor any existing regulation, nor the PPA, contains these requirements.

124.    A favorable ruling is likely to redress AbbVie's injuries.  Enjoining the provisions of S. 114 that unconstitutionally force the taking of manufacturers' private property for no public use would redress AbbVie's injuries because AbbVie's property would not be unconstitutionally taken, and AbbVie would not be exposed to state-imposed penalties for exercising its rights under the 340B program and the Constitution.  Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions, accumulating penalties.

## BASIS FOR INJUNCTIVE RELIEF

125.    Irreparable harm is "a substantial injury that is not accurately measurable or adequately compensable by money damages."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (citation omitted).  This can occur when money damages cannot provide adequate compensation or would not be recoverable under 42 U.S.C. § 1983 due to sovereign immunity under the Eleventh Amendment.  *See Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221–22 (1st Cir. 2003) (reversing denial of preliminary injunction because "[t]he unavailability of ... monetary damages against either the Commonwealth or the defendants in their official capacities [went] a long way toward establishing irreparable injury," and because "[s]hould the plaintiff prevail in her suit without having been reinstated in the meantime, she may ... never be able to recoup her lost wages."); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) ("The moratorium [on collecting rent during COVID-19 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery.").

126.     A taking occurs each and every time a drug manufacturer is required against its own volition to transfer its drugs at the 340B-discounted price to a commercial pharmacy for the private benefit of that for-profit pharmacy.  Effecting an unconstitutional taking of AbbVie's private property in a forced transfer to another private party for no recognized public use or purpose constitutes an irreparable injury.  *See Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998) (affirming grant of preliminary injunction on takings claim); *see also Laclede Gas Co. v. St. Charles County*, 713 F.3d 413, 419-20 (8th Cir. 2013) (same).  Thus, "a plaintiff that proves that a government entity has taken its property for a private, not a public, use is entitled to an injunction against the unconstitutional taking, not simply compensation."  *Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño,* 604 F.3d 7, 17 (1st Cir. 2010) *(*quotation marks and citation omitted).

127.     Further, if S. 114 is not enjoined as applied to AbbVie, AbbVie would be exposed to additional state law requirements as a condition of participating in the federal 340B program and would risk violating S. 114 simply by performing its federally mandated functions.  A party may be irreparably injured in the face of the threatened enforcement of a preempted law.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  Because S. 114 is preempted, AbbVie "is likely to experience irreparable harm by having to choose between" exercising its rights under federal law, "which opens [it] up to liability under state law, or complying with an unconstitutional state law."  *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 62–63 (D. Me. 2022), *aff'd* 51 F.4th 1 (1st Cir. 2022).

128.     If drug manufacturers such as AbbVie are required to provide their drugs to contract pharmacies, the magnitude of the economic loss is beyond the capacity of Rhode Island to compensate with damages.  Discounted purchases under the program reached approximately $66.3

billion for fiscal year 2023 in the United States. *See* Health Res. & Servs. Admin., *2023 340B Covered Entity Purchases* (Oct. 2024), https://tinyurl.com/56nzphvm.

129.    The cost to AbbVie of complying with state laws like Rhode Island's is substantial. AbbVie estimates that, for example, the cost of complying with similar state laws in Mississippi and Missouri last year cost AbbVie around $33.1 million and $35 million, respectively. Complying with Rhode Island's law will cost AbbVie tens of millions of dollars per year (if not more). And as the number of states adopting these kinds of laws increases, so does the irreparable harm imposed.

130.    As of filing, at least 19 other states have already passed contract-pharmacy laws akin to Rhode Island's S. 114—but with material differences among and between those state laws, complicating compliance and subjecting manufacturers to different and varying enforcement:

| | AR | CO | HI | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restricts collection of claims data | – | ✓ | – | ✓ | – | ✓ | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Defines "340B entity" to include pharmacies | – | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | – | – |
| Applies only to certain 340B covered entities | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – |
| Prohibits conditioning 340B offers on receipt of contracts | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – |
| Requires "acquisition" by a pharmacy or entity | – | ✓ | ✓ | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Requires delivery to any location | – | ✓ | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ |

| | AR | CO | HI | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prohibits "interfering" with "eligible patients" or pharmacies | – | – | – | – | – | ✓ | – | – | – | ✓ | – | ✓ | ✓ | – | – | – | – | – | ✓ | – |
| Prohibits use of rebates | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – |
| Restricts right to impose time limits on replenishment orders | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – |
| Applies to an "agent" or "affiliate" | – | ✓ | ✓ | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | ✓ | ✓ | ✓ | ✓ |
| Imposes criminal sanctions | – | – | ✓ | – | ✓ | – | – | – | ✓ | ✓ | – | ✓ | ✓ | – | – | – | ✓ | ✓ | – | – |
| Creates a private right of action | – | ✓ | ✓ | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | – |

131.    Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from S. 114. That is, the law effects a repeated and ongoing mandatory private wealth transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies for the private benefit of that pharmacy and for no recognized public use, in violation of the U.S. Constitution. The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B program. And S. 114 threatens to impose significant penalties upon manufacturers if they do not capitulate to Rhode Island's attempt to modify the terms of that federal program.

132.    Granting injunctive relief here would not harm Rhode Island. It is well settled that states do "not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)); *see also Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272,

1283 (11th Cir. 2024) ("[T]he government has no legitimate interest in enforcing an unconstitutional law." (quotation marks and citation omitted)); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 46 (D. N.H. 2024) ("The State has no interest in enforcing an unconstitutional law, and the public interest is harmed by the enforcement of a law repugnant to the United States Constitution." (cleaned up)). Moreover, there is no evidence that uninsured and needy patients—in Rhode Island or anywhere else—benefit from the use of contract pharmacies. Rhode Island has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

133.    Granting injunctive relief would be in the public interest. The public has no interest in unconstitutional laws being enforced, particularly those that force a transfer of private property for no public use or purpose. *See Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation."). By contrast, the public has a strong interest in preventing states from imposing unconstitutional requirements that force the transfer of private property for the private benefit of private commercial parties. Further, the public has a strong interest in enforcing federal law and not permitting states to change the requirements for participation in federal healthcare programs.

### FIRST CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Federal Preemption Under the Supremacy Clause, U.S. Const. art. VI, cl. 2*

134.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

135.    Under the Supremacy Clause of the Constitution, federal law is "the supreme Law of the Land … , any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding." U.S. Const. art. VI, cl. 2.  As a result, federal statutes enacted by Congress can preempt state law.  *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

136.    Preemption can take multiple forms: "Preemption has three branches: 'express,' 'field,' and 'conflict.'" *Maine Forest Prods. Council*, 51 F.4th at 6 (quoting *Arizona v. United States*, 567 U.S. at 387, 399 (2012)).

137.    One type of implied preemption is field preemption, which occurs where "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).  Field preemption occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

138.    Every element of the federal 340B program—from eligibility and pricing to compliance and enforcement—is governed by federal law.  "Price regulation is exclusively controlled by the federal statute, and state enforcement of it would necessarily intrude on the federal scheme." *Morrisey*, 760 F. Supp. 3d at 458 (internal citation omitted).

139.    S. 114 directly intrudes on the federal 340B scheme.  Rhode Island's law bars manufacturers from denying, restricting, prohibiting, or interfering, directly or indirectly, with "the acquisition of a 340B drug by, or delivery of a 340B drug to" contract pharmacies, and the term "340B drug" is defined by reference to the 340B ceiling price established by federal law.  S. 114 §§ 5-19.3-5(a), 5-19.3-2(1).    Thus, the Rhode Island law prohibits manufacturers from conditioning their 340B offers by declining to transfer their drugs to contract pharmacies ***at a particular price***.  *See Morrisey*, 750 F. Supp. 3d at 455-56.  Manufacturers violate laws like S. 114 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering [their] drugs to those pharmacies." *Id.*  That the state law defines the drugs in issue as

"340B drug[s]" confirms that S. 114 is a price regulation: "*Price* is what distinguishes between an 'ordinary drug' and a 340B Program drug—a fact that seems to be reflected in the [Rhode Island] statute itself." *Id.* (emphasis added).

140.    Indeed, S. 114 *expressly* regulates 340B drug pricing.  The law defines "340B drug" to mean "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to [the 340B program] and is purchased by a covered entity as defined in [the federal 340B statute]." S. 114 § 5-19.3-2(1).  And the definition of "340B covered entity" is likewise pegged to "the federal 340B drug discount program." *Id.* § 5-19.3-2(3).

141.    S. 114 was enacted in response to manufacturers' policies, which (according to HRSA and HHS) result in overcharges.  But the federal statute does not authorize state regulation concerning 340B pricing and who is entitled to access manufacturers' drugs at discounted 340B prices.  It leaves no room for states to interfere with the carefully designed 340B program.  *See Arizona*, 567 U.S. at 401 (holding that where Congress has occupied the field, state laws that impose additional obligations are preempted).

142.    The federal 340B statute carefully prescribes who may access 340B discounts, when, and under what conditions—including compliance with federal anti-diversion and duplicate discount requirements.  The federal statute governs how prices and discounts are calculated and what obligations manufacturers must follow, requiring them to offer 340B pricing *only* to covered entities—not third parties.  *See* 42 U.S.C. § 256b(a)(1).

143.    It is foundational constitutional law that States may not regulate Congress's creations.  *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 359 (1819).  A state law may not change the conditions for participation in the federal Medicare and Medicaid programs.  Any attempt by Rhode Island to regulate in this area impermissibly changes the requirements for

participating in federal healthcare programs and nullifies the "natural effect" of federal law. *Crosby*, 530 U.S. at 372-73.

144.    Another type of implied preemption is conflict preemption.  Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations omitted).  Rhode Island's law conflicts with or otherwise obstructs Congress's 340B program in multiple ways.

145.    S. 114 effectively expands the number of entities entitled to receive 340B-discounted prices and attempts to force manufacturers to transfer their drugs to third parties—specifically, commercial pharmacies—who are not covered entities.  This state regulation directly conflicts with the federal 340B statute, which authorizes discounts only to covered entities and leaves manufacturers free to impose reasonable conditions on those offers.  Indeed, Congress specifically defined which entities qualify for 340B discounts and intentionally chose not to mandate manufacturer participation in contract-pharmacy arrangements.  *See AstraZeneca*, 543 F. Supp. 3d at 60.

146.    Rhode Island has no lawful authority to force manufacturers to transfer their drugs under the 340B program at deeply discounted prices to any entity, let alone commercial pharmacies that do not qualify as covered entities under the federal program.

147.    The carefully delineated obligation for manufacturers to "offer" 340B priced drugs to covered entities is lawfully imposed by federal law solely as a condition of a manufacturer's participation in federal healthcare programs.  *See* 42 U.S.C. § 256b(a)(1).  To the extent that Rhode

Island seeks to impose, through S. 114, substantive obligations on manufacturers beyond what federal law requires, that state law obligation is preempted by federal law.

148.    S. 114 tees up other conflicts, too.  For example, Rhode Island's law prohibits manufacturers from requiring claims or utilization data as a condition on the manufacturers' 340B offer.  *See* S. 114 § 5-19.3-5(c) ("A pharmaceutical manufacturer … shall not impose additional terms or limitations not required by federal law as a condition of 340B participation."); *cf. id.* § 5-19.3-3(a)(5) (prohibiting, manufacturers "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," from "[r]equir[ing] submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing").  The federal 340B program contemplates that manufacturers can request claims data:  Before accessing the federal ADR system (the exclusive means for enforcing 340B violations), manufacturers must first "conduct an audit."  42 U.S.C. § 256b(d)(3)(B)(iv).  And before conducting an audit, the manufacturer must have "reasonable cause" to suspect a violation—which requires access to claims data.  *See* 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996) (allowing audits only when the manufacturer already "has documentation," including "sufficient facts and evidence," indicating that there is "reasonable cause" to believe the covered entity violated section 340B).  By preventing manufacturers like AbbVie from requiring claims data or otherwise seeking clarity from covered entities, Rhode Island effectively forecloses manufacturers' only avenue to pursue audits or claims against covered entities for violations of the 340B program's requirements.  That is why *Morrisey* found that a claims data prohibition in a West Virginia law directly conflicted with federal law and was thus preempted.  *See Morrisey*, 760 F. Supp. 3d at 451-53.

149.    Further, the replenishment model results in diversion, which the federal statute forbids.  *See* 42 U.S.C. § 256b(a)(5)(B).  Thus, S. 114 is preempted because it expressly or

impliedly protects the use of the replenishment model, a practice clearly in conflict with Congress's mandates.

150.    Rhode Island's law also conflicts with the federal program by installing a parallel enforcement regime.  S. 114 empowers the Rhode Island Attorney General, the Auditor General, and private parties to enforce the law's provisions against manufacturers.  S. 114 §§ 5-19.3-7(1), 5-19.3-8; R.I. Stat. §§ 6-13-6, 6-13.1-5, 6-13.1-8.   "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities." *Astra*, 563 U.S. at 117.  "The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the [HHS-manufacturer] contract's ceiling-price obligations instead." *Id.* at 118. Rhode Island's law—by creating a new forum for litigating 340B issues and giving state officials and private parties the ability to sue manufacturers— is an even more brazen attempt to end-run Congress's choice not to include private enforcement of 340B than was at issue in *Astra*.

151.    Relatedly, S. 114 unlawfully purports to authorize the Rhode Island Auditor General to "[p]romulgate rules and regulations" concerning the duties, rights, and obligations of manufacturers participating in the 340B program.  *See* S. 114 § 5-19.3-7(2).  But Congress left no room for states to delegate 340B rulemaking authority to state officials.   Congress plainly delegated such authority exclusively to the Secretary of HHS.  *See, e.g.*, 42 U.S.C. § 256b(d)(1)(A) (directing "the Secretary" to establish manufacturer-compliance regime "in order to prevent overcharges" and other 340B "violations"); *id.* § 256b(d)(3)(A) (providing that "the Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims" by covered entities and manufacturers); *accord Astra*, 563 U.S. at 120-22 (stressing

Congress's desire for centralized federal authority in implementing the 340B program). By throwing another rulemaking entity into the mix, Rhode Island obstructs Congress's wishes.

152.    Congress not only defined who was entitled to administer the 340B program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), but it also delineated which tools were available to the Secretary to ensure compliance. The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B program for handling disputes among manufacturers and covered entities concerning program compliance. *See* 42 U.S.C. §§ 256b(d)(1)-(3). Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B program and engage in "overcharging." *See id.* Rhode Island's attempt to install an alternative compliance and enforcement regime, with different regulators and distinct penalties, is preempted because it conflicts with the procedures detailed in the 340B statute and any lawfully promulgated federal rules implementing the statute.

153.    Finally, the growing patchwork of divergent state laws exacerbates the constitutional and compliance problems. The difficulty of complying with varying state regulatory frameworks only increases as more states pass new and different laws relating to the 340B program. As of filing, 19 other states have passed contract pharmacy laws akin to S. 114. State laws such as those passed by Arkansas, Colorado, Hawaii, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Utah, Vermont and West Virginia, have material differences among and between themselves, complicating compliance by manufacturers and subjecting manufacturers to different and varying enforcement. Compare, for example, W. Va. Code § 60A-8-6a (extending similar prohibitions to an "agent, or affiliate" of a manufacturer); La. Rev. Stat. § 40:2883 (prohibiting a manufacturer from "prevent[ing] or interfer[ing] with ***any patient's choice*** to

receive such drugs from the 340B entity" (emphasis added)); N.M. H.B. 78, § 1(A)(4), 57th Leg., 1st Sess. (2025) (covering only entities "receiv[ing] federal grant funding"); and Neb. L.B. 168, § 3(1), 109th Leg., 1st Sess. (2025) (compelling delivery to "***any location***" authorized by a covered entity (emphasis added)).  Some states, like Tennessee, prohibit requiring the submission of claims data while others do not.  *Compare* Md. Health Occupations Code § 12-6C-09.1 (prohibiting restrictions on "delivery" or "acquisition" of "340B drugs"), *with* Tenn. S.B. 1414, § 47-18-136(a)(1), 114th Gen. Assembly (2025) (restricting the collection of "any health information, claims or utilization data, purchasing data, payment data, or other data").  Some states, like Utah, impose criminal penalties for failure to comply while others do not.  *Compare* Mo. Rev. Stat. §§ 407.095, 407.100, 407.110 (allowing for civil penalties), *with* Utah Code Ann. § 31A-2-308(9) (making violations of the statute a Class B misdemeanor).

154.    As these laws continue to accrete, administration of the 340B program and compliance with a patchwork of state laws may become untenable, with potential catastrophic effects for the nationwide prescription drug industry.  *See* Adam J. Fein, *EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019*, Drug Channels (June 16, 2021), https://tinyurl.com/4jdjhh7u (analyzing HRSA data to find the 340B program accounted for "16% of … total U.S. gross sales of brand-name drugs at list prices" in 2020).

155.    Importantly, the injury here flows ***not*** from the federal program itself, but from Rhode Island's attempt to override and distort it.  S. 114 does not merely interact with the 340B statute—it imposes new obligations that conflict with the structure Congress created.  Here, AbbVie does not challenge Congress's design or dispute the requirements imposed under federal law.  Rather, it challenges Rhode Island's effort to rewrite those requirements by transforming a conditional federal offer into a mandatory, state-enforced sale on terms the federal statute does not

require (and which may in fact even *violate* the federal statute), and by effectively foreclosing AbbVie's ability to access the federal enforcement scheme. Rhode Island's law does not fill a gap: It tears through the fabric of the federal scheme Congress designed to be uniform, voluntary, and within the exclusive federal enforcement authority of HHS.

## SECOND CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Federal Preemption By HRSA's Pilot Rebate Program: Supremacy Clause, U.S. Const. art. VI, cl. 2*

156.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

157.    Rhode Island's law is not merely preempted by the 340B Program. S. 114 is also independently preempted by HRSA's Pilot Rebate Program.

158.    Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372–73.

159.    AbbVie is preparing an application to participate in HRSA's Pilot Rebate Program.

160.    AbbVie meets the eligibility criteria for the Pilot Rebate Program because AbbVie has both a signed pharmaceutical pricing agreement with HHS and a signed DPNP "Agreement" with CMS for initial price applicability year 2026.

161.    The Pilot Rebate Program assumes, and explicitly contemplates, that manufacturers may collect claims data under the 340B Program.

162.    Rhode Island's new law prohibits manufacturers' collection of claims data. *See* S. 114 § 5-19.3-5(c) ("A pharmaceutical manufacturer … shall not impose additional terms or limitations not required by federal law as a condition of 340B participation."); *cf. id.* § 5-19.3-

3(a)(5) (prohibiting, manufacturers "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," from "[r]equir[ing] submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing").

163.    S. 114 interferes with AbbVie's ability to participate in the Pilot Rebate Program because the Program contemplates AbbVie requesting and obtaining the very same claims data that Chapter 103 prevents AbbVie from requesting and obtaining.

### THIRD CLAIM FOR RELIEF

*Prospective Injunctive Relief and Declaratory Relief –*
*Violation of Takings Clause, U.S. Const. amend. V, cl. 4*

164.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

165.    The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V; *see also Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 234-35 (1897) (incorporating and making applicable to states the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

166.    The Takings Clause extends to both real and personal property.  *Horne*, 576 U.S. at 358.  It is not limited to instances when the government physically appropriates property for its own use through eminent domain.  A taking can also occur through legislation and regulation that sufficiently deprives a user of its property rights.  *See E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998).

167.    Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo*, 545 U.S. at 477 (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation").  Such private takings are always

unconstitutional, since "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("It is against all reason and justice" to allow government to "take[] property from A. and give[] it to B.").

168.    "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).  Statutes or regulations that mandate the physical transfer of personal property from one private party to another private party amount to an unconstitutional taking with or without just compensation.

169.    Rhode Island's S. 114 appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies.  On its face, S. 114 prohibits manufacturers from "deny[ing]," "restrict[ing]," "prohibit[ing]," or "otherwise interfer[ing] with" the "acquisition of" manufacturers' drugs at 340B-discounted prices by contract pharmacies.  S. 114 § 5-19.3-5(a).  Rhode Island thus requires manufacturers to provide their drugs to commercial pharmacies at below-market prices by purporting to add that as a state-law obligation attached to the federal 340B scheme.  That is an impermissible *per se* violation of the Constitution's Takings and Due Process Clauses.

170.    Rhode Island mandates that pharmaceutical manufacturers provide drugs at below-market prices, depriving them of control over their own pricing structures and revenue.  It compels sales or transfers of AbbVie's drugs at the 340B-discounted price that, in the absence of S. 114, would not occur.  AbbVie's offer is conditioned on the covered entity's acceptance of AbbVie's contract-pharmacy policy.  Without S. 114, if a covered entity counteroffered with a term requiring unlimited contract-pharmacy access, AbbVie would simply refuse and no sale at the 340B-discounted price would take place.  However, when S. 114 is in force, it will operate to compel

AbbVie to accept the counteroffer and complete the sale at the discounted price on terms AbbVie would not otherwise have agreed to.

171.    S. 114 expands the federal 340B program requirements in a way that shifts financial burdens onto manufacturers, reducing revenue and eliminating rebate offsets, without just compensation and with no justified public use.

172.    In the alternative, S. 114 effectuates a regulatory taking.

173.    In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

174.    S. 114's requirement that manufacturers transfer their drugs to commercial pharmacies is constitutionally impermissible because it requires the physical acquisition of AbbVie's drugs by another private party for no public purpose or use; imposes significant financial losses on AbbVie and other manufacturers; interferes with drug manufacturers' reasonable investment-backed expectations; and serves no valid government purpose because it deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties.

### FOURTH CLAIM FOR RELIEF

#### *Declaratory/Injunctive Relief –*
#### *Due Process Clause, U.S. Const. amend. XIV*

175.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

176.    The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

177.    A statute offends the Due Process Clause if it is impermissibly vague—*i.e.*, if the law "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Fox Television Studios*, 567 U.S. at 253 (citation omitted)); *see also Local 8027, AFT-N.H., AFL-CIO v. Edelblut,* 651 F. Supp. 3d 444, 454–60 (D.N.H. Jan. 12, 2023).

178.    S. 114's text makes it impossible to know what it prohibits and how it might be enforced.

179.    Consider the law's first "interference" provision:  "A pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not deny, restrict, prohibit, or otherwise ***interfere*** with, either ***directly or indirectly***, the acquisition of a 340B drug by, or delivery of a 340B drug to, a" contract pharmacy.    S. 114 § 5-19.3-5(a) (emphases added).    That prohibition is unconstitutionally vague because it does not provide manufacturers fair notice as to what is proscribed, and it invites arbitrary enforcement.  The law provides no guidance on what "interfere" means.  "Interfere" (or "interference") is not defined.  Nor is the term—as used in S. 114— part of a list that would otherwise provide context clues as to its meaning.  The statute exacerbates these problems by prohibiting even "indirect[]" "interfer[nce]."  *Id.*

180.    But even if a manufacturer could make sense of Section 5-19.3(a), there is another, broader "interference" prohibition:  "A pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not impose additional terms or limitations not required by federal law as a condition of 340B participation."  *Id.* § 5-19.3-5(c).  Thus, conduct that may be lawful under

Section 5-19.3-5(a) may nevertheless be unlawful under Section 5-19.3-5(b).  The statute does not provide an answer.

181.    What is more, the "interference" provision contains no apparent scienter requirement.  It does not, for example, require interference to be purposeful or intentional.  So AbbVie could be subject to civil liability for accidentally "interfering" (whatever that means) with a contract pharmacy.  And claims of interference are bound to occur.  Covered entities and contract pharmacies are fiercely resistant to making their contracts available to manufacturers or the public.  That aggravates the already glaring vagueness problem because manufacturers have no idea what terms they might potentially "interfere" with.  *E.g.*, *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."); *Edelblut*, 651 F. Supp. 3d at 460 ("[L]aws that fail to incorporate a scienter requirement may also receive greater scrutiny.").

182.    S. 114 is thus unconstitutionally vague—both on its face and as applied to AbbVie's ability to enforce its contract-pharmacy and claims-data policies.  Rhode Island's law fails to provide sufficient notice as to what conduct is prohibited, particularly in the complex and data-dependent context of 340B transactions.  And it invites arbitrary enforcement.  People of normal intelligence must guess at S. 114's meaning and may well offer vastly different yet reasonable interpretations of its scope.

## PRAYER FOR RELIEF

**WHEREFORE,** AbbVie prays for the following relief:

1.    A declaration, order, and judgment holding S. 114 unlawful because it is preempted by federal law and unconstitutional under the Supremacy Clause;

2.      A declaration, order, and judgment declaring that S. 114 effects an impermissible taking of AbbVie's property for private benefit;

3.      A declaration, order, and judgment declaring that S. 114 is unconstitutionally vague in violation of the Due Process Clause;

4.      A declaration, order, and judgment holding that the 340B statute does not require drug manufacturers to unconditionally provide 340B pricing to covered entities or contract pharmacies, or to transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

5.      A preliminary and permanent injunction enjoining Defendants from enforcing S. 114;

6.      An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

7.      Any other relief that this Court deems just and proper.

Dated: August 12, 2025                    Respectfully submitted,

                                          _/s/Joseph V. Cavanagh, III___
                                          Joseph V. Cavanagh, III (#6907)
                                          Blish & Cavanagh, LLP
                                          30 Exchange Terrace
                                          Providence, RI  02903
                                          Telephone:  (401) 831-8900
                                          Facsimile:  (401) 751-7542
                                          Email:  jvc3@blishcavlaw.com

                                          Matthew S. Owen, P.C. (*pro hac vice* forthcoming)
                                          Meredith M. Pohl (*pro hac vice* forthcoming)
                                          KIRKLAND & ELLIS LLP
                                          1301 Pennsylvania Avenue N.W.
                                          Washington, D.C. 20004
                                          Telephone: (202) 389-5000
                                          Email: matt.owen@kirkland.com
                                                   meredith.pohl@kirkland.com

                                          *Counsel for Plaintiffs*