# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

ABBVIE INC.; ALLERGAN, INC.;   :
DURATA THERAPEUTICS, INC.;   :
ABBVIE PRODUCTS LLC;       :
PHARMACYCLICS LLC; and      :
ALLERGAN SALES LLC         :
        *Plaintiffs*,        :
                       :
v.                      :    C.A. No.: 1:25-cv-00388-JJM-AEM
                       :
                       :
PETER F. NERONHA, in his    :
official capacity as ATTORNEY  :
GENERAL OF RHODE ISLAND,  :
*et al.,*                  :
        *Defendants*,     :

## DEFENDANTS' MEMORANDUM IN OBJECTION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

I.      Federal Statutory Background ................................................................................... 4

II.     The Purpose of the 340B Program is to Increase Patient Access to Care...................... 6

III.    Contextualizing Recent Challenges to 340B Access ..................................................... 8

IV.     Rhode Island's Affordable Drugs Act ......................................................................... 10

ARGUMENT ...................................................................................................................... 15

I.      Standard of Review.................................................................................................... 15

II.     AbbVie Fails to Establish a Likelihood of Success on the Merits................................. 15

        A. AbbVie Fails to Overcome the Presumption Against Preemption as Chapter 288 is a
        Lawful Exercise of the State's Historic Police Powers.................................................. 16

                1.      Section 340B does not preempt Chapter 288 under field preemption.............. 17

                2.      Section 340B does not preempt Chapter 288 under conflict preemption ........ 24

                a."Rights Congress Conferred on Manufacturers" ............................................. 26

                b. "Congress's Desire for a Unified 340B Enforcement Scheme" ....................... 30

                c. "Restricting Manufacturers' Access to the Federal 340B Dispute-Resolution
                Scheme".............................................................................................................. 33

                d. McClain and Morrissey..................................................................................... 35

                e. AbbVie's Reliance on HRSA's Pilot Program is Premature and Illusory ......... 37

        B. Chapter 288 Does Not Effectuate an Unconstitutional Taking ................................ 39

                1.      Chapter 288 does not "force" AbbVie to transfer 340B drugs to contract
                pharmacies at discounted prices........................................................................... 40

                2.      Chapter 288 need not confer any "additional benefit" and, even if one were
                required, it allows continued access to the Rhode Island drug market and increased
                transparency through state-level reporting.............................................................. 42

                3.      Chapter 288 promotes access to public health and does not confer any
                "windfall" on Rhode Island's covered entities.......................................................... 46

        C. Chapter 288 Is Not Unconstitutionally Vague......................................................... 47

III.    AbbVie Fails to Demonstrate the Remaining Preliminary Injunction Factors ............. 55

        A.      No Irreparable Injury ..................................................................................... 55

        B.      The Balance of Equities and Public Interest Heavily Favor Defendants.............. 58

CONCLUSION................................................................................................................... 61

# TABLE OF AUTHORITIES

**Cases**

*AbbVie Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965 (S.D. Miss. July 22, 2024) ........ *passim*

*Abbvie v. Bailey*, No. 4:24-cv-00996-SRC, 2025 WL 1918948 (E.D. Mo. July 11, 2025) .......... 55

*AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519,
   2025 WL 1805271 (M.D. Tenn. June 30, 2025) ...................................................... 3, 4, 34, 35

*ACA Connects – Am.'s Communic'ns Ass'n v. Frey*, 471 F. Supp. 3d 318 (D. Me. 2020)............ 51

*Alharbi v. Beck*, 62 F. Supp. 3d 202 (D. Mass. 2014) .................................................................. 13

*Allen v. FamilyCare, Inc.*, 812 F. App'x 413 (9th Cir. 2020), as amended (May 7, 2020) ........... 21

*Am'ns for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)......................................................... 47

*American Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022).................................................................. 6

*American Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*,
   123 F.4th 27 (1st Cir. 2024) ................................................................................................. 26

*Andrus v. Allard*, 444 U.S. 51(1979)............................................................................................ 43

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................................ 17

*Astra U.S.A. Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011) ....................................................... 23

*AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024)................................... 4

*Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 3:23-cv-01103,
   2024 WL 3292657 (D. Conn. July 3, 2024), aff'd, No. 24-2092, 2025 WL 2248727 (2d Cir.
   Aug. 7, 2025) ......................................................................................................................... 41

*California v. ARC Am.Corp.*, 490 U.S. 93 (1989)......................................................................... 24

*Capron v. Attorney Gen.*, 944 F.3d 9 (1st Cir. 2019) .................................................. 17, 24, 29, 30

*Carolina Youth Action Project v. Wilson*, 60 F.4th 770 (4th Cir. 2023) ........................................ 50

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021)................................................................... 40

*Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011).......................................... 26, 30

*Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140 (1988) ............................................................... 31

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000). ...................................................................... 10

*Colautti v. Franklin*, 439 U.S. 379 (1979) .................................................................................... 50

*Delaney v. Kusminski*, No. C.A. 02-7096, 2005 WL 1109625 (R.I. Super. Ct. May 4, 2005)...... 53

*DiBiase v. SPX Corp*, 872 F.3d 224 (4th Cir. 2017) ................................................................... 56

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021)............................................................................... 58

*Donovan v. City of Haverhill*, 311 F.3d 74 (1st Cir. 2002) ........................................................... 50

*Eli Lilly & Co. v. United States Dep't of Health & Hum. Servs.*, No. 1:21-CV-00081, 2021 WL
   5039566 (S.D. Ind. Oct. 29, 2021)........................................................................................ 41

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................................. 44

*Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017) ......................................................................... 17

*Franks v. Coopersurgical, Inc.*, 722 F. Supp. 3d 63 (D.R.I. 2024)............................................... 19

*Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312 (D.S.C. 2023) ................................ 24

*Gent v. Mutual Ins. Soc'y*, 611 F.3d 79 (1st Cir. 2010) ................................................................ 13

*Grant's Dairy-Maine, LLC v. Commissioner of Maine Dep't of Agric.*, 232 F.3d 8 (1st Cir. 2000) ............................................................................................ 16

*Grasso v. Raimondo*, 177 A.3d 482 (R.I. 2018) .......................................................... 53

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .............................................. 51, 52

*Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002) ................... 53

*Hanson v. D.C.*, 120 F.4th 223 (D.C. Cir. 2024), cert. denied, No. 24-936, 2025 WL 1603612 (U.S. June 6, 2025) ............................................................................. 58

*Harris v. Wall*, 217 F. Supp. 3d 541 (D.R.I. 2016) .................................................... 57

*Haverford College v. Reeher*, 329 F. Supp. 1196 (E.D. Pa. 1971) ............................. 50

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ................... 18

*Hines v. Davidowitz,* 312 U.S. 52 (1941) ................................................................... 24

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................... 47

*Horne v. U.S. Department of Agric.*, 576 U.S. 350 (2015) ......................................... 40

*Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960) ..................................... 39

*In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) ..... 16

*Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506 (S.D.N.Y. 1993) ......... 57

*Kroske v. U.S. Bank Corp.*, 432 F.3d 976 (9th Cir. 2005), as amended (Feb. 13, 2006) ............. 17

*Laccinole v. Appriss, Inc.*, 453 F.Supp.3d 499 (D.R.I. 2020) ..................................... 13

*Maryland v. King*, 567 U.S. 1301 (2012) .................................................................. 57

*Mass. Med. Soc. v. Dukakis*, 815 F.2d 790 (1st Cir. 1987) ........................................ 16

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ..................................................... 16, 19

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ...................................... 26

*N. Wind, Inc. v. Daley*, 200 F.3d 13 (1st Cir. 1999) .................................................. 51

*N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) ............................... 19

*Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence,* No. CA 12-96-ML, 2012 WL 6128707 (D.R.I. Dec. 10, 2012) ......................................................... 50

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1(1s t Cir. 2002) ......... 15

*New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) ................ 57

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 15

*Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 737(S.D. Miss. 2024) .......................... 4

*Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024) ............... 2, 10, 27

*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022), affirmed, 95 F.4th 38 (1st Cir. 2024) ................................................................... 55

*OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100 (D. Me. 2010) ........ 55

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ...................................................... 24

*Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023 (3d Cir. 1987) ............................ 45

*Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1 (1st Cir. 2012) ........ 15, 60

*Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F. 4th 956 (8th Cir. 2021) ............................ 16

*Pharm. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881 (W.D. Mo. Feb. 24, 2025), appeal filed, (8th Cir. Mar. 28, 2025) ......................................................... 4

*PhRMA v. Concannon*, 249 F.3d 66 (1st Cir. 2001) ................................................................... 18

*PhRMA v. Walsh*, 538 U.S. 644 (2003) ...................................................................................... 18

*PhRMA v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365 (S.D. Miss. July 1, 2024), appeal filed,
(5th Cir. July 5, 2024) ............................................................................................................ 4, 49

*PhRMA v. McClain*, 645 F. Supp. 3d 890, 901 (E.D. Ark. 2022). aff'd, 95 F. 4th 1136 (8th Cir.),
cert. denied, 145 S. Ct. 768 (2024) ........................................................................................ 4

*PhRMA v. Morrissey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024), appeal filed, (4th Cir. Jan. 16,
2025) .................................................................................................................................... 4, 21

*PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) .................... 4

*Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380 (1st Cir. 1987). ................. 54

*Rapanos v. United States*, 547 U.S. 715 (2006) ....................................................................... 29

*Rhode Island Coalition Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867
(D.R.I. Aug. 8, 2025) .............................................................................................................. 15

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ......................................................... 17, 20

*Ruckelhaus v. Monsanto Co.*, 467 U.S. 986 (1984) ............................................................. 43, 45

*Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983) ...................................................... 55

*Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9, 18 (1st Cir. 2020) .............. 15, 54

*Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023) ........................................... *passim*

*Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543 (D.P.R. 1996)..... 56

*Stasiukevich v. Nicolls*, 168 F.2d 474 (1st Cir. 1948).............................................................. 13

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ...................................................................................... 31

*Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302 (2002) ................ 40

*Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82 (1st Cir. 2022)................................ 15, 56

*United States v. Lachman*, 387 F .3d 42 (1st Cir. 2004) ........................................................... 50

*United States v. Martínez-Felipe*, 687 F. Supp. 3d 282 (D.P.R. 2023) ....................................... 50

*URI Student Senate v. Town of Narragansett*, 631 F.3d 1 (1st Cir. 2011)........................... *passim*

*Valancourt Books, LLC v. Garland*, 82 F.4th 1222 (D.C. Cir. 2023)...................................... 42, 43

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .......... 50, 51, 52

*Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633 (E.D. Va. 2023) ................ 42

*Whiting v. Town of Westerly*, 942 F.2d 18 (1st Cir. 1991) ........................................................ 47

*Wine & Spirits Retailers, Inc. v. Rhode Island & Providence Plantations*, 364 F. Supp.2d 172
(D.R.I. 2005) ....................................................................................................................... 57

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 15

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................................. 16, 18

## Statutes

42 U.S.C. § 256b(a)(1)................................................................................................................ 1, 5

42 U.S.C. § 256b(a)(4).................................................................................................................... 5

42 U.S.C. § 256b(a)(5)(A)(i) .......................................................................................................... 7

42 U.S.C. § 256b(a)(5)(B) ........................................................................................................... 7, 9

42 U.S.C. § 1396r-8(a)(1), (5) ......................................................................... 5

Ark. Code Ann. § 23-92-604(c) (2021) ..........................................................11

La. Rev. Stat. Ann. §§ 40:2884-2885 (2023) ................................................11

Md. Code Ann. § 12-6C-09.1 (2024).............................................................11

Minn. Stat. Ann. § 62J.96 (2024)...................................................................11

Miss. Code Ann. § 41-149-7 (2024)...............................................................11

Mo. Ann. Stat. § 376.414 (2024)....................................................................11

R.I. Gen Laws § 5-19.3-1...............................................................................11

R.I. Gen. Laws § 5-19.3-3.......................................................................... 3, 47

R.I. Gen. Laws § 5-19.3-5................................................................................ 3

R.I. Gen. Laws § 5-19.3-5(a) .......................................................... 20, 40, 48, 49

R.I. Gen. Laws § 5-19.3-6.......................................................................... 35, 44

R.I. Gen. Laws § 5-19.3-7(1) ........................................................................ 53

R.I. Gen. Laws § 5-19.3-7(2) ........................................................................ 52

R.I. Gen. Laws § 6-13.1 ........................................................................... 12, 50

S.B. 28, 2023-2024 Leg., Reg. Sess. (Kan. 2024) ........................................11

W. Va. Code § 60A-8-6a(b)(1) (2024) ...........................................................11

## **Other Authorities**

A. Dobson et al., 340B DSH Hospitals Serve Higher Share of Patients with Low Incomes, at (Sept. 26, 2022) ............................................................................... 6

Black's Law Dictionary (11th ed. 2019) ....................................................... 49

D. McGowan, Layoffs hit Thundermist Health Center, salaries slashed for remaining staff, Boston Globe (Sept 13, 2024)............................................... 2

H.R. Rep. No. 102-384(II)...................................................................... 5, 6

J. Williams, Four changes coming to health care in Rhode Island from the General Assembly, Prov. J. (June 24, 2025)............................................... 12

## **Rules**

HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,273 (March 5, 2010) ................................. 8, 9

HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55,15 (Oct. 24, 1996)......................... 7

HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996) ......................... 9

HRSA, PPA Example, Article II, Section (a)................................................. 6

## **Treatises**

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed.) .......... 55

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 3531.12 (2d ed. 1984) ............................................................................... 54

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2409 (3d ed.) ............. 13

Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 93 (2012) ................................................................................................................................... .24

**<u>Regulations</u>**

61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996) .............................................................................. 8

89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) ............................................................................... 7

# INTRODUCTION

Every year, drug manufacturers like Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales LLC (collectively "AbbVie") voluntarily agree to participate in Medicare and Medicaid to receive billions of dollars in federal funds through the sales of their products. Congress has attached conditions to that lucrative arrangement, including requiring that manufacturers also participate in the 340B Drug Discount Program ("340B Program"), *see* 42 U.S.C. § 256b(a)(1), which "incentivizes pharmaceutical manufacturers to provide qualified health care providers, referred to as 'covered entities,' with pricing discounts on certain drugs prescribed to individuals and families whose incomes fall below the federal poverty level." *Pharmaceutical. Research. & Mfrs. of Am. (PhRMA) v. McClain*, 95 F.4th 1136, 1139 (8th Cir.), *cert. denied*, 145 S. Ct. 768 (2024). In turn, the savings from those discounted prices enable covered entities, many of which are safety-net hospitals that operate on razor-thin margins, to maintain or expand access to programs and services targeted to the unique needs of the patients and communities they serve.

Since the 340B Program began, "covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* Because many (perhaps most) covered entities cannot afford to establish and operate in-house pharmacies, contract pharmacies are an essential part of the Section 340B Program. *See id.* And by utilizing multiple contract pharmacy locations, covered entities enable "drug dispensation closer to where low-income patients reside." *Id.*

For years, pharmaceutical manufacturers, including AbbVie, honored covered entities' requests that the drugs they purchased through the 340B Program be delivered to the contract pharmacy locations of the covered entities' choice. But in 2020, AbbVie (and other manufacturers)

1

abruptly changed course, and have since imposed strict limitations on covered entities' ability to contract with outside pharmacies to deliver 340B drugs to patients. In the manufacturers' view, they have "a nearly unfettered ability" to "impose[] their own contractual terms on providers," including "limits on the number of pharmacies to which they will make shipments." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455, 459 (D.C. Cir. 2024).

Those policy changes directly "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139. The Department of Health and Human Services ("HHS") responded by attempting to prohibit pharmaceutical manufacturers from unilaterally imposing restrictions on covered entities' ability to have the drugs they ordered under the 340B program delivered to contract pharmacies; in turn, the manufacturers sued HHS, and two federal courts held that HHS had no authority to adopt such a prohibition because Section 340B does not explicitly mention delivery conditions or contract pharmacies. *See Johnson*, 102 F.4th at 460; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023). As one court put it, Section 340B is "silent about delivery conditions," and that statutory silence "did not impliedly prohibit otherwise lawful conduct" as a matter of federal law. *Johnson*, 102 F.4th at 460. Manufacturers' unilateral exploitation of this gap has caused health centers and hospitals in Rhode Island to cut staff and lose access to savings they rely on to fund essential health programs in the state. *See, e.g.*, D. McGowan, *Layoffs hit Thundermist Health Center, salaries slashed for remaining staff*, Boston Globe (Sept 13, 2024), https://www.bostonglobe.com/2024/09/13/metro/layoffs-thundermist-community-health-center-rhode-island-healthcare/; Ex. 4 (Letter from Merrill Thomas, President & CEO of Providence Community Health Centers).

Exercising their historic police powers over health and safety, multiple states, now including Rhode Island, have stepped in "to fill [that] 'silence'" through legislation designed to protect covered entities' ability to continue delivering 340B drugs to contract pharmacies for distribution to patients. *AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271, at *4 (M.D. Tenn. June 30, 2025). After considering extensive testimony from Rhode Island's covered entities regarding the devasting impact that drug manufacturers' recent policy changes have had on their ability to provide much-needed services to low-income Rhode Islanders, Rhode Island's General Assembly enacted the Defending Affordable Prescription Drug Costs Act as Chapter 288 of the 2025 Public Laws ("Chapter 288" or the "Act"),[1] which prohibits "certain discriminatory actions related to reimbursement of 340B covered entities and 340B contract pharmacies" and "certain discriminatory actions by a pharmaceutical manufacturer, agent, or affiliate of such manufacturer related to 340B entities." R.I. Gen. Laws §§ 5-19.3-3, -5. By its terms, the Act will go into effect on October 1, 2025; on August 12, 2025, AbbVie filed this suit against Defendants, Peter F. Neronha in his Official Capacity as Attorney General of Rhode Island (the "Attorney General"), and David Bergantino in his Official Capacity as Auditor General of Rhode Island (the "Auditor General"; collectively with the Attorney General, "Defendants"). Through its Motion for a Preliminary Injunction ("Motion"), AbbVie now asks this Court to enjoin the Defendants from enforcing the Act against it. *See* ECF 9-1.

---

[1] AbbVie's repeated references to Chapter 288 as "S. 114" are inapt; properly speaking, that designation refers to an earlier iteration of the bill introduced before the Rhode Island Senate in January 2025, not the amended and final version that was actually enacted by both chambers of the General Assembly and signed into law by the Governor. *Compare* https://webserver.rilegislature.gov/BillText/BillText25/SenateText25/S0114.pdf ("S 0114"), *with* https://webserver.rilegislature.gov/PublicLaws/law25/law25288.htm ("S 0114 SUBSTITUTE A AS AMENDED").

Given the overwhelming weight of recent authority against the arguments AbbVie attempts to resurrect in this Court, AbbVie cannot discharge its burden of demonstrating a likelihood of success on the merits of its federal preemption or commerce clause claims. Multiple federal courts confronting challenges to similar state laws have rejected the same legal arguments AbbVie presents in support of its Motion here.[2] Additionally, AbbVie fails to demonstrate any risk of irreparable harm attributable to Chapter 288's scheduled implementation on or after October 1, 2025. And any risk of potential harm is heavily outweighed by the public interest in ensuring that 340B covered entities caring for underserved communities in Rhode Island have the necessary resources to maintain their vital programs and services.

## BACKGROUND

### I. Federal Statutory Background

In 1992, Congress established the 340B Program through the Veteran's Health Care Act (Pub. L. 102-585) with the purpose of supporting our nation's critical safety net facilities. *See*

---

[2] *See, e.g.*, *McClain*, 95 F.4th at 1143-46 (rejecting manufacturer's federal preemption claim); *Skrmetti*, 2025 WL 1805271, at **11-18, n.8 and **22-23 (denying preliminary injunction based on manufacturer's failure to demonstrate likelihood of success on constitutional claims); *Novartis Pharm. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881 (W.D. Mo. Feb. 24, 2025) (same), *appeal filed*, (8th Cir. Mar. 28, 2025); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657,660 (S.D. Miss. 2024) (same); *PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting state's motion for summary judgment on manufacturer's federal preemption and other constitutional claims); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (denying preliminary injunction based on manufacturer's failure to demonstrate likelihood of success on constitutional claims); *PhRMA v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365 (S.D. Miss. July 1, 2024) (same), *appeal filed*, (5th Cir. July 5, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 753 (S.D. Miss. 2024) (same); *PhRMA v. McClain*, 645 F. Supp. 3d 890, 901 (E.D. Ark. 2022) (granting state's motion for summary judgment on manufacturer's federal preemption claim), *aff'd*, 95 F. 4th 1136 (8th Cir.), *cert. denied.*, 145 S. Ct. 768 (2024). The one exception, which AbbVie relies on, is *PhRMA v. Morrissey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024), *appeal filed*, (4th Cir. Jan. 16, 2025), an outlier that rests on questionable reasoning, and which other District Courts have expressly declined to follow. *See Skrmetti*, 2025 WL 1805271, at *18, n. 11; *Fitch*, 766 F. Supp. 3d at 668.

H.R. Rept. No. 102–384(II), at 12 (1992) ("In giving these 'covered entities' access to price reductions, the Committee intends to enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."). The 340B Program achieves this purpose by lowering the cost of covered outpatient drugs ("CODs") that qualifying facilities and clinics purchase from drug manufacturers. Section 340B defines "covered entities" to consist of a limited category of facilities and clinics, including federally qualified health centers and Ryan White HIV-AIDS clinics that tend to be reliant on federal grant funding, children's hospitals and critical access hospitals, and certain hospitals that are government- or non-profit owned and that serve a disproportionate share of Medicare/Medicaid patients or contract with state or local governments to provide services to low-income individuals not eligible for Medicare/Medicaid. *See* 42 U.S.C. § 256b(a)(4).

Drug manufacturers are not obligated to participate in the 340B Program – manufacturers are only required to participate in the 340B Program if they want their CODs reimbursed by Medicaid and Medicare Part B. *See Sanofi*, 58 F.4th at 699 ("The federal government ... uses that market power to get drug makers to subsidize healthcare"); 42 U.S.C. §§ 1396r-8(a)(1), (5). In this sense, a manufacturer's participation in the 340B Program is part of the calculus they make when deciding they want to market their products to federally insured patients.

HHS operationalizes the 340B Program by requiring manufacturers to execute a Pharmaceutical Pricing Agreement ("PPA"), which requires "that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b(a)(1). The statute applies this "340B ceiling price" to "covered outpatient drugs . . . purchased by a covered entity." 42 U.S.C. § 256b(a)(1). The standard terms of the PPA mirror these statutory provisions, making the 340B ceiling price available to covered entities and

outlining a series of "manufacturer responsibilities," including the manufacturer's obligation to "to charge covered entities a price for each unit of the drug that does not exceed an amount equal to [the 340B ceiling price]." *See* HRSA, PPA Example, Article II, Section (a), https://www.hrsa.gov/sites/default/files/hrsa/opa/pharmaceutical-pricing-agreement-example.pdf.

Importantly, neither Section 340B nor the PPA address the delivery of drugs or the method by which covered entities may acquire drugs subject to the 340B ceiling price. *See McClain,* 95 F.4th at 1143 ("[T]he text of 340B 'is silent about delivery' of drugs to patients.") (quoting *Sanofi,* 58 F.4th at 703).

## II. The Purpose of the 340B Program is to Increase Patient Access to Care

The 340B Program provides vital benefits to Rhode Island patients through the covered entities that are eligible to receive 340B pricing. By reducing the exorbitant cost of acquiring drugs for 340B-eligible patients, covered entities can use the savings to maintain or expand access to programs and services, or to cover the costs of uncompensated or undercompensated care. *See American Hosp. Ass'n v. Becerra*, 596 U.S. 724, 739 (2022) (striking down revised hospital payment rates that would have "eliminate[d] the federal subsidy that has helped keep 340B hospitals afloat"); H.R. Rep. No. 102-384(II), at 11 (observing an increase in outpatient drug prices in the run-up to enactment of Section 340B and noting that these increases had "reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources"). As a class, covered entities share one essential trait: they tend to treat needier communities, such as "low-income and rural communities," *id.* at 739, and focus their services on historically underserved populations. *See* A. Dobson et al., 340B DSH Hospitals Serve Higher Share of Patients with Low Incomes, at (Sept. 26, 2022), https://www.340bhealth.org/files/340B_and_Low_Income_Populations_Report_2022_FINAL.pd

f ("[T]he low-income share for 340B DSH hospitals in 2020 was 55.0% higher than the low-income share for non-340B hospitals.").

Rather than being divorced from patients as AbbVie claims, 340B discount eligibility is based on the identity of the patient because covered entities can only claim 340B discounts for dispenses to individuals who are "patients of the entity." 42 U.S.C. § 256b(a)(5)(B) ("[w]ith respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); *see also* HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility ("1996 Guidance"), 61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996) (defining eligible 340B "patients" based on a three-part test).[3] Contrary to AbbVie's portrayal of the 340B Program as unbounded absent its own unilaterally imposed restrictions, covered entities are required to ensure that 340B discounts are only claimed for qualifying "patients of the [covered] entity,"[4] and HRSA has acknowledged that covered entities' ability to use contract pharmacies can

---

[3] HRSA's 1996 guidance defining "patient" for 340B purposes states that an individual is a "patient" of the covered entity only if all of the following three prongs are satisfied: "(1) the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and (2) the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and (3) the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this [third] requirement." 61 Fed. Reg. 55,156, 55,157-58.

[4] Covered entities are subject to potential enforcement action from HRSA, including removal from the program, if they are found to have diverted 340B discounts or claimed duplicative discounts. *See* 42 U.S.C. § 256b(a)(5)(B) (defining diversion as "resell[ing] or otherwise transfer[ing] the drug to a person who is not a patient of the entity"); *id.* § 256b(a)(5)(A)(i). HRSA is authorized to audit covered entities for compliance with these provisions. *Id.* § 256b(a)(5)(C); 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) ("On average, HRSA conducts 200 covered entity audits each fiscal year including child/associate sites and contract pharmacies

play an important role in promoting patient access to the medications they need. *See* HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,273 (March 5, 2010) (observing that, because of obstacles to filling prescriptions, such as transportation barriers, "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities"). In short, impeding 340B-eligible patients' ability to fill their medications at pharmacies that have contracted with the covered entity for this purpose can have a very real adverse impact on patients – including burdening patients with having to travel to different pharmacies to receive their medications.

### III.    Contextualizing Recent Challenges to 340B Access

The arc of Section 340B caselaw shows that manufacturers have sought to chip away at the scope of the 340B Program, first by challenging federal agencies' authority to administer the program, then reversing course and complaining when states began using their traditional police powers to fill the gaps in the 340B statute exploited by manufacturers. 340B contract pharmacies provide a key example.

As the 340B statute makes no reference to pharmacies, HHS's longstanding policy in the face of this statutory silence has required manufacturers to offer the 340B ceiling price to a covered entity even when the covered entity fills the prescription through a contract pharmacy. In 1996, HRSA issued its first guidance on the use of contract pharmacies. *See* HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg.

---

associated with the covered entities."). Manufacturers may also utilize HRSA's administrative dispute resolution (ADR) process to contest compliance with 340B Program requirements, provided they first audit the covered entity. *Id.* § 256b(d)(3)(B)(iv). To initiate an audit, the manufacturer "must set forth a clear description of why it has reasonable cause to believe that a violation of section 340B(a)(5) (A) or (B) has occurred, along with sufficient facts and evidence in support of the belief;" HRSA then reviews this documentation and, if the agency finds "there is reasonable cause," it "will not intervene" in the audit. *See* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).

43,549 (Aug. 23, 1996). Observing that most covered entities had to rely on outside pharmacies to dispense the drugs ordered or prescribed to their patients, and that covered entities already had "an existing right ... under State law" to "contract with retail pharmacies for the purpose of dispensing 340B drugs[,]" HRSA endorsed covered entities' use of contract pharmacies as a mechanism to ensure access to 340B-discounted drugs. *Id.* at 43,550.[5] In 2010, HRSA reaffirmed its longstanding position on contract pharmacies, expressly authorizing a covered entity's existing right to choose multiple contract pharmacies to dispense its medications. *See* HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,273 (March 5, 2010). HRSA noted that "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities. This would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients served." *Id.*

But drug makers participating in the 340B Program have unilaterally sought to restrict covered entities' right to contract with and use contract pharmacies, thereby blocking health care providers' access to revenue associated with "patients of the [covered] entity", 42 U.S.C. § 256b(a)(5)(B), based solely on which pharmacy fills a script. Starting in 2020, manufacturers

---

[5] HRSA's 1996 contract pharmacy guidance was also partly justified by allusion to covered entities' preexisting rights under state law to engage contracted pharmacies, which HRSA agreed provided a legal foundation subject only to the federal law's restrictions on diversion and duplication. *See* 61 Fed. Reg. 43,550 ("*Comment*: As a matter of law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients . . . . By issuing guidelines in this area, [HRSA's Office of Drug Pricing] is not seeking to create a new right but rather is simply recognizing an existing right that covered entities enjoy under State law. *Response*: We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion of 340B drugs to individuals who are not patients of the covered entities. Further, the dispensing of drugs, purchased with a 340B discount, must not result in the generation of a Medicaid rebate.").

including AbbVie began to impose limitations on covered entities' use of contract pharmacies. *See Johnson*, 102 F.4th at 458. Manufacturers sued HHS in response to its advisory opinion and enforcement letters against manufacturers requiring the delivery of drugs to any contract pharmacy with which the covered entity chooses to partner. *See Johnson,* 102 F.4th 452; *Sanofi,* 58 F.4th 696. Two Courts of Appeals decisions later, they succeeded in forcing HHS/HRSA to abandon its guidance requiring manufacturers to honor covered entities' contract pharmacy arrangements. *Id.* Importantly, these decisions do not address preemption of state law, nor any of AbbVie's other legal claims here; rather, these decisions merely speak to what federal law does <u>not</u> do – prohibit manufacturers from adopting reasonable limitations on the use of contract pharmacies. *See Johnson*, 102 F.4th at 464 ("In sum, we hold that section 340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities. . . We do not foreclose the possibility that other, more onerous conditions might violate the statute."); *Sanofi*, 58 F.4th at 704 ("Unless Section 340B '*prohibits*' drug makers from adopting their policies, HHS cannot show that they have violated Section 340B. . . . Because Section 340B 'contains no such prohibition,' the drug makers' policies are lawful.") (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)). Yet, as discussed below, AbbVie attempts to convert Section 340B's silence into an affirmative authorization under federal law to restrict the use of contract pharmacies or impose data-submission requirements on covered entities as a condition of accessing 340B drugs.

## IV.    Rhode Island's Affordable Drugs Act

Following the *Johnson* and *Sanofi* decisions, states began enacting their own legislation prohibiting pharmaceutical manufacturers from restricting a covered entity's reliance on contract

pharmacies to dispense 340B drugs to patients.[6]  Rhode Island is the most recent state to enact

such legislation.  On June 27, 2025, Governor Daniel McKee signed the Defending Affordable

Prescriptions Drug Costs Act into law.  2025 R.I. Pub. Laws ch. 288 (to be codified at R.I. Gen

Laws §§ 5-19.3-1 through 5-19.3-9).  Like legislation enacted in other states, Chapter 288 provides

that a manufacturer "shall not . . . [i]nterfere with, or limit, a 340B covered entity's choice to use a

contract pharmacy for drug distribution or dispensing." *Id.* § 5-19.3-3(a)(7). Section 5-19.3-5(a)

further states that:

> A pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not
> deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the
> acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is
> under contract with a 340B covered entity and is authorized under such contract to
> receive and dispense 340B drugs on behalf of the covered entity unless such receipt
> is prohibited by the United States department of health and human services.

Chapter 288 also prohibits manufacturers or their agents and affiliates from "impos[ing] additional

terms or limitations not required by federal law as a condition of 340B participation." *Id.* § 5-19.3-

5(c). Among other things, a manufacturer may not "require the submission of claims-level data or

documentation that identifies 340B drugs as a condition of reimbursement or pricing, unless it is

required by the Centers for Medicare and Medicaid Services." *Id.* § 5-19.3.-3(a)(5). To comply

with the new law, covered entities must separately submit annual reports to state officials,

including the Auditor General, detailing the "covered entity's participation in the program during

the previous calendar year." *Id.* § 5-19.3.-6.

The Auditor General may "[i]nvestigate complaints and take appropriate actions to ensure

compliance" with Chapter 288, as well as promulgate any necessary rules and regulations. *Id.* § 5-

---

[6] *See e.g.,* Ark. Code Ann. § 23-92-604(c) (2021); S.B. 28, 2023-2024 Leg., Reg. Sess. (Kan. 2024); La. Rev. Stat. Ann. §§ 40:2884-2885 (2023); Md. Code Ann. § 12-6C-09.1 (2024); Minn. Stat. Ann. § 62J.96 (2024); Miss. Code Ann. § 41-149-7 (2024); Mo. Ann. Stat. § 376.414 (2024); W. Va. Code § 60A-8-6a(b)(1) (2024).

19.3.-7. Violations of Chapter 288 constitute "unfair sales practices" under Rhode Island's Deceptive Trade Practices Act ("DTPA"), R.I. Gen. Laws § 6-13.1. The new law, which is scheduled to take effect on October 1, 2025, further specifies that "[n]othing in this chapter is to be construed or applied to be less restrictive than federal law for a person or entity regulated by this chapter," and "[n]othing in this chapter is to be construed or applied to be in conflict with . . . [a]pplicable federal law and related regulations." *Id.* §§ 5-19.3-9(a), (b).

Chapter 288 is part of a broader spate of bills that shore up Rhode Island's health care system by reducing administrative burdens associated with prior authorization, increasing Medicaid reimbursement for primary care and for the state's safety net facilities, and expanding the state's primary care workforce. *See* J. Williams, *Four changes coming to health care in Rhode Island from the General Assembly*, Prov. J. (June 24, 2025), https://www.providencejournal.com/story/news/healthcare/2025/06/24/changes-to-health-care-in-rhode-island-from-the-general-assembly/84323451007/. During floor debate on the legislation and in committee, testimony by members of the Rhode Island House and Senate as well as community stakeholders focused on the importance of allowing 340B covered entities the freedom to contract with contract pharmacies of their choice to conveniently deliver drugs to patients:

> We used to have a broad network of pharmacies, from Walgreens, Stop & Shop, and CVS. Through these [manufacturer-imposed contract pharmacy] restrictions, we have to select one pharmacy . . . . [T]he patients in our discount pharmacy prescription program can only go to one of those pharmacies. So, we had to pick one that was 'centralized.' Well, if you think where is there a central pharmacy between Burrillville and North Kingstown and Scituate and Foster, we ended up going to the pharmacy in Chepachet. Our patients from North Kingstown are not driving to Chepachet to get their $5 prescription, so that's one of the impacts.

Testimony of Peter Bancroft, CEO, WellOne Primary Medical and Dental Care, Regarding House Bill 5634, Before the House Committee on Health and Human Services (April 10, 2025), available at https://capitoltvri.cablecast.tv/show/11123?seekto=6911&site=1.

> These restrictions have not only limited our ability to expand federal dollars, which was the intent [of the 340B statute], we have had to cut positions and lay off staff. . . . [We have] 85,000 patients in Providence. We take care of about half of the city. 70% of those are Medicaid.

Testimony of Merrill Thomas, President/CEO, Providence Community Health Centers, Regarding House Bill 5634, Before the House Committee on Health and Human Services (April 10, 2025), available at https://capitoltvri.cablecast.tv/show/11123?seekto=6911&site=1.

> [I]t is the 340B program and the savings therefrom that allow [Landmark Medical Center in Woonsocket, RI] to not only continue providing that uncompensated care but to provide neonatal services, to provide psychiatric services – services that would otherwise be unavailable.

Floor Testimony of Rep. Jon Brien, 2025-H 5634 Sub A (June 18, 2025), available at https://capitoltvri.cablecast.tv/show/11464?seekto=3004&site=1.

The legislative record is replete with other examples of how pharmaceutical manufacturers' efforts to unilaterally restrict the use of contract pharmacies for drug delivery have detrimentally impacted covered entities providing medical services to some of Rhode Island's most vulnerable residents.[7] *See, e.g.*, Senate Health and Human Services Subcommittee, S0114, Agenda Date: March 20, 2025, https://www.rilegislature.gov/senators/SenateComDocs/Pages/Health%20and%20Human%20Ser v%202025.aspx. Brown University Health ("BUH"), for instance, noted that these restrictions have resulted in an "immediate $20 million loss" resulting in "direct adverse impacts to patient care." Ex. 1 at 1 (Letter from Christine Collins, SVP, Pharmacy and PeriOp Services, Brown

---

[7] Judicial notice is properly taken of matters of public record, including material maintained on government websites, such as, the legislative record found on the General Assembly's website. *Gent v. Mutual Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); *Laccinole v. Appriss, Inc.*, 453 F.Supp.3d 499, 502 n.2 (D.R.I. 2020); *see also Alharbi v. Beck*, 62 F. Supp. 3d 202, 209 (D. Mass. 2014) ("a legislative report is a public record properly subject to judicial notice") (citing *Stasiukevich v. Nicolls*, 168 F.2d 474, 479 (1st Cir. 1948)); Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2409 (3d ed.) (discussing judicial notice of legislative record).

University Health). This puts at risk the expansion of BUH's "healthy weight and nutrition programs, cardiac health, adult psychiatry, diabetes, early intervention for children and health education programs, and free naloxone for opioid overdose management." *Id.*

The Hospital Association of Rhode Island ("HARI") similarly noted that savings generated by the 340B Program enabled Rhode Island hospitals to offer "diverse programs and services directly benefiting patients, such as medication therapy management, diabetes education, behavioral health services, opioid treatment, and access to free or discounted drugs." Ex. 2 at 1 (Letter from Lisa P. Tomasso, Senior Vice President, HARI). Pharmaceutical manufacturers' restrictions on the use of contract pharmacies "undermine the program's purpose, resulting in more than $30 million in financial losses for hospitals and health centers." *Id.*

East Bay Community Action Program ("EBCAP") likewise observed that "limiting the number of pharmacies eligible to disburse prescribed medications to our patients" has had a "devastating financial impact on EBCAP, resulting in a revenue loss of more than $3 million over the last three years." Ex. 3 at 1 (Letter from Rilwan K. Feyisitan Jr. President & CEO, EBCAP). This loss of 340B savings threatens EBCAP's ability to "reinvest savings into essential clinical services, including primary care, behavioral health, and substance use treatment." *Id.*

Other community health providers have been forced to reduce staff. Providence Community Health Centers ("PCHC"), for instance, "incurred over $9 million in financial losses from the 340B program" due to restrictions imposed by pharmaceutical manufacturers like AbbVie. Ex. 4 at 1 (Letter from Merrill Thomas, President & CEO, PCHC). This required PCHC to "reduce staff" and scale back programs for "free medication access for our most at-risk patients, a consequence that directly affects the health and well-being of our community." Chapter 288 aims to prohibit manufacturers from arbitrarily limiting 340B savings to a single pharmacy when a

covered entity's patients need to fill prescriptions at other contract pharmacies, thereby enabling covered entities to fund needed investments in care throughout Rhode Island.

## ARGUMENT

### I.    Standard of Review

The issuance of a preliminary injunction is "an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge when, as here, the Government is the opposing party." *Rhode Island Coalition Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867, *10 (D.R.I. Aug. 8, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigration & Customs Enforcement,* 974 F.3d 9, 18 (1st Cir. 2020). "If the movant 'cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity.'" *Id.* (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

### II.    AbbVie Fails to Establish a Likelihood of Success on the Merits

AbbVie's request for a preliminary injunction enjoining Rhode Island from enforcing Chapter 288 should be denied because it fails to demonstrate any likelihood of success on the merits of its federal preemption, takings, and vagueness claims.

### A. AbbVie Fails to Overcome the Presumption Against Preemption as Chapter 288 is a Lawful Exercise of the State's Historic Police Powers

"Congressional intent is the touchstone of preemption analysis." *Grant's Dairy-Maine, LLC v. Commissioner of Maine Dep't of Agric.*, 232 F.3d 8, 14–15 (1st Cir. 2000). Moreover, "in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). That presumption against preemption applies with full force in this case because "the practice of pharmacy is an area traditionally left to state regulation." *McClain*, 95 F. 4th at 1143 (quoting *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F. 4th 956, 972 (8th Cir. 2021)); *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (recognizing "the historic primacy of state regulation of matters of health and safety"); *see also Wyeth*, 555 U.S at 578-79 ("In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation ... [and] long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation."). "[T]he regulation of medicine and its associated costs also 'seems by tradition to be one of state concern.'" *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 177 n.14 (quoting *Mass. Med. Soc. v. Dukakis*, 815 F.2d 790, 791 (1st Cir. 1987)); *see Mass. Med. Soc.,* 815 F.2d at 791 ("The field of medical fee regulation seems by tradition to be one of state concern."). "A state's passage and enforcement of laws that prohibit discrimination is [also] an exercise of a state's historic police powers." *Figueroa v. Foster*, 864 F.3d 222, 232 (2d Cir. 2017); *see Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005), *as amended* (Feb. 13, 2006) ("[A]lthough we recognize that there is a significant federal presence in the regulation

of national banks, ... [the state law] was enacted pursuant to the State's historic police powers to prohibit discrimination on specified grounds. ... Thus, we begin with the presumption that Congress did not intend the National Bank Act to preempt the [state law].")

AbbVie has the burden of overcoming the presumption against preemption. *See Capron v. Attorney Gen.*, 944 F.3d 9, 21 (1st Cir. 2019). Here, Section 340B contains no explicit clause preempting state law, so AbbVie must show either: (1) field preemption, where federal legislation pervasively occupies a regulatory field, or (2) conflict preemption, where a federal statute conflict with state law. *Arizona v. United States,* 567 U.S. 387, 399-400 (2012). It fails to demonstrate a likelihood of success under either theory.

### 1. *Section 340B does not preempt Chapter 288 under field preemption*

AbbVie's field preemption argument fails because it cannot show that Congress enacted such comprehensive legislation through Section 340B that it has fully "occupied" the relevant field to the exclusion of Rhode Island's traditional police powers. *Arizona,* 567 U.S. at 401. Congress's intent to completely displace state law through field preemption can only be inferred from its enactment of a federal regulatory scheme "'so pervasive . . . that [it] left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). The presumption against allowing the "strong medicine" of federal preemption displacing the "historic police powers of the States" holds "especially true when the federal statute creates a program, such as Medicaid, that utilizes 'cooperative federalism': 'Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for

federal preemption becomes a less persuasive one.'" *PhRMA v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), *aff'd sub nom. PhRMA v. Walsh*, 538 U.S. 644 (2003) (citations omitted).

Here, Chapter 288 is plainly a health and safety regulation within Rhode Island's traditional police powers that prevents AbbVie from limiting covered entities' ability to work with contract pharmacies and, as such, is entitled to the presumption against preemption. "Pharmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *McClain*, 95 F.4th at 1144. Indeed, courts have long viewed federal law as a mere complement to the States' historic pharmaceutical regulation. *See Wyeth,* 555 U.S. at 567 ("As it enlarged the FDA's powers to 'protect the public health' and 'assure the safety, effectiveness, and reliability of drugs,' Congress took care to preserve state law.").

AbbVie cannot sidestep the presumption against preemption (which its Motion fails to address) by defining the relevant "regulatory field" as the 340B Program itself and making the conclusory assertion that "[a]ny state regulation—such as by imposing new 340B-specific obligations—unlawfully encroaches upon the federal preempted field." ECF 9-1 at 10. The Supreme Court has soundly rejected preemption arguments that myopically fixate on federal law to the complete exclusion of states' police powers and the rest of the broader context in which Congress legislated. *See, e.g.*, *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717-19 (1985) ("Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law."); *Franks v. Coopersurgical, Inc.*, 722 F. Supp. 3d 63, 90 (D.R.I. 2024) ("This maximalist [preemption] position, however, has no basis in Supreme Court or First Circuit precedent[.] .... [T]he Supreme Court rejected the very notion that Congress, when it passed the [Medical Device

Amendments], intended to preempt all state law claims against medical device manufacturers that engaged in wrongdoing.") (citing *Lohr*, 518 U.S. at 487-88). Moreover, "the mere fact that a state law implicates the interests of persons who are the subject of federal regulation ... does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law, at least when it concerns a matter of such quintessentially local concern" such as pharmacy, medicine, and public health. *Capron*, 944 F.3d at 24 (holding that creation of federal Au Pair Program did not impliedly occupy the field of employment regulation even though it rested on Congress's dominant powers over immigration). "The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem[.]" *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973).

Here, the 340B Program is hardly "so pervasive . . . that Congress left no room for the States to supplement it[.]" *McClain*, 95 F.4th at 1143 (quoting *Sanofi*, 58 F.4th at 703) (other quotation marks and citation omitted). In fact, Section 340B is conspicuously "silent about delivery conditions" and covered entities' ability to contract with outside pharmacies for the distribution of 340B drugs. *Johnson*, 102 F.4th at 460. As HRSA's 1996 Guidance on contract pharmacy dispensation observes, "[d]uring the early months following enactment, it became clear that there were many gaps in the legislation." August 1996 Guidance at 43,549; *see* H.R. Rep. No. 102–384(II), at 16 (1992) ("The Committee bill does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism.").

Importantly, Congress's silence with respect to the distribution of 340B drugs cannot be interpreted as an implied ban on any additional state regulation: "Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 607 (1991) (citing *Rice,* 331 U.S. at 230). To the contrary, given the strong presumption against preemption in the areas of pharmacy and public health, Congress's silence regarding "how covered entities or manufacturers must deliver discounted drugs to patients of covered entities" means that "Section 340B contemplates concurrent state regulation"—as multiple federal courts have recently held. *AbbVie v. Fitch*, 2024 WL 3503965 at **1, 15.

In *McClain*, the Eighth Circuit squarely held that "the 340B Program is not so pervasive that Congress left no room for the States to supplement it" and that "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field." *McClain,* 95 F.4th at 1143. Similarly, in rejecting AbbVie's attempt to enjoin enforcement of Mississippi's H.B. 728, the Southern District of Mississippi held that the Congressional silence identified in *Sanofi* and *Johnson* "does not *implicitly mandate* that manufacturers deliver to any contract pharmacy [but] does not, on the other hand, show that Congress clearly intended to *preclude states* from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients." *AbbVie v. Fitch*, 2024 WL 3503965 at *10; *see Novartis v. Fitch,* 738 F. Supp. 3d at 742, 748, 751 (same); *compare* H.B. 728 § 2(a) *with*. R.I. Gen. Laws § 5-19.3-5(a).

In sum, while federal law regulates the determination of *prices* on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with those requirements, Congress has not precluded Rhode Island or any other state from enacting

its own policy governing *delivery* of Section 340B drugs, or the other terms and conditions on which covered entities may contract with pharmacies. *See Skrmetti*, 2025 WL 18095271, at *12-13 (collecting cases rejecting argument that state regulation of delivery of drugs was preempted because Section 340B is "silent about delivery"). Accordingly, AbbVie's assertion that Congress's decision to set the price of 340B "offers" implicitly indicates a decision to exempt all other "terms" of manufacturers' 340B offers from future state regulation fails. ECF 9-1 at 10.

Nor is Chapter 288 preempted simply because some of its definitions come "by reference to the federal 340B statute." ECF 9-1 at 10. As AbbVie well knows, "the Supremacy Clause's text does not indicate that states cannot regulate by reference to pre-existing federal programs. . . [t]his language indicates federal law governs despite a conflict with state law, but not that states lack the power to enact regulations by reference to federal law." *AbbVie v. Fitch,* 2024 WL 3503965, at *9; *see Allen v. FamilyCare, Inc.*, 812 F. App'x 413, 418 (9th Cir. 2020), as amended (May 7, 2020) ("[T]hat the Medicaid Act had no private enforcement mechanism says nothing about a Congressional intent to preclude a state from imposing its own sanctions for violating federal requirements.").

Rather than attempting to address and refute the reasoning of *AbbVie v. Fitch* and other recent cases rejecting similar field preemption arguments, AbbVie relies on *Morrisey* to argue that Chapter 288 "actually regulates drug *prices*, not drug delivery." ECF 9-1 at 11 (emphasis in original) (citing *Morrisey,* 70 F. Supp. 3d at 455-56). That argument lacks merit. Nothing in Chapter 288 changes the price of 340B drugs, which is set by federal law. By their terms, Chapter 288's substantive provisions protect covered entities' ability, when they purchase drugs from manufacturers at those federally set 340B prices, to utilize multiple contract pharmacies to deliver and distribute those drugs. And to the extent that Chapter 288 (and similar state laws) affects the

*volume* of drugs that covered entities are able to purchase at 340B prices, again, Congress declined to set any specific balance in that area; in the House Report introducing the bill that became Section 340B, the Committee on Energy and Commerce "emphasize[d] that the bill does not limit the amount of drugs that a 'covered entity' may procure for purposes of receiving price reductions under this agreement." H.R. Rep. No. 102–384(II), at 16 (1992).

Additionally, the *Morrissey* decision stands as an outlier and its questionable reasoning has been rejected by multiple courts. *See supra* note 2; *see also Skrmetti,* 2025 WL 1805271, at *15 ("To the court's knowledge, *Morrisey* stands thus far as the sole judicial opinion ruling in favor of drug manufacturers challenging state laws seeking to limit the manufacturers' ability to impose delivery conditions on 340B drugs."). The *Skrmetti* court "t[ook] issue with *Morrisey's* characterization of [West Virginia's law] as controlling price rather than delivery[,]" and found that "*Morrisey's* analysis of the potential conflict focused on the replenishment model and the procedure for enforcing the West Virginia provision equivalent" rather than the language of the statute itself. 2025 WL 1805271, at *17. Like Rhode Island's Chapter 288, "Tennessee['s] statute says nothing about price, and, even under the replenishment model, covered entities are the only entities entitled to the 340B discount." *Id.* Accordingly, like Tennessee's law, Chapter 288 "would prohibit [AbbVie] from imposing restrictions on where it is willing to *deliver* drugs that have been purchased by covered entities under the 340B discount[,]" but "[t]he amount of the discount is not at issue and is not affected by the state scheme." *Id.* (emphasis in original).

In *AstraZeneca Pharms. LP v. Fitch,* the Southern District of Mississippi directly refuted *Morrisey*'s analysis of *AbbVie v. Fitch*. *See AstraZeneca v. Fitch,* 766 F. Supp. 3d at 667–68. On the "potential impact" of the Supreme Court's opinion in *Astra U.S.A. Inc. v. Santa Clara County, Cal.,* 563 U.S. 110 (2011), the court "distinguished the *Astra* decision because '[t]he Supreme

Court's rejection of a right of action for covered entities under PPAs has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs[,]'" and "a presumption against preemption applied in *Abbvie*, while no presumption applied in *Astra*." *AstraZeneca v. Fitch,* 766 F. Supp. 3d at 667 (quoting *AbbVie v. Fitch,* 2024 WL 3503965, at *16). The *Fitch* court also "rejected [AbbVie]'s argument that the replenishment model of distribution was grounds for finding preemption because the text of the federal 340B statute 'does not prohibit distribution through contract pharmacies, and ... distribution has long been understood not to constitute diversion.'" *Id.* (citing *Abbvie v. Fitch,* 2024 WL 3503965, at *5–6, *13–15). Finding that "the analysis and reasoning in *Abbvie* [*v. Fitch*] are the more persuasive[,]" the court noted that "a majority of courts considering the issue have reached the same conclusion[,]" and "the United States Supreme Court has recently denied certiorari of the Eighth Circuit's decision in *McClain,* rejecting a manufacturer's assertions of 340B preemption." *Id.* at 668. "[I]t would be imprudent to disregard mainstream decisions and the Eighth Circuit's ruling in *McClain* without clear precedential support." *Id.*

The same logic applies here. The majority of courts have held that Congress's decision not to legislate the issue of pharmacy distribution should not be taken as an implied ban on further state regulation. This Court should not, as AbbVie does, disregard the mainstream majority of decisions and the Eight Circuit's ruling in favor of the one outlier that validates AbbVie's cynical view of the 340B program. Chapter 288 does not change the discounted price AbbVie agreed to under the 340B program, it prohibits AbbVie from interfering with a covered entity's agreement with a contract pharmacy. Congress's decision not to legislate the issue of pharmacy distribution should not be taken as an implied ban on further state regulation. *See* Antonin Scalia & Bryan A.

Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) ("a matter not covered is not covered").

### 2. *Section 340B does not preempt Chapter 288 under conflict preemption*

AbbVie fares no better with its conflict preemption challenge to Chapter 288. Conflict preemption only arises "where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373, 377 (2015) (quoting *California v. ARC Am.Corp.,* 490 U.S. 93, 100-01 (1989)). However, "[t]he presumption against federal preemption of a state statute designed to foster public health ... has special force when it appears, and the [federal government] has not decided to the contrary, that the two governments are pursuing 'common purposes[.]'" *Walsh*, 538 U.S. at 666 (citations omitted). Because AbbVie has not argued that compliance with both state and federal law is impossible, its arguments "concern only obstacle preemption." *Capron*, 944 F.3d at 26.

Divining the objectives underlying federal law is an inherently "contextual" inquiry. *Grant's Dairy*, 232 F.3d at 15 (citing *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941)). Context here shows that the "purpose of the 340B program was to provide a means to make 340B entities profitable in order for those 340B entities to 'stretch scarce Federal resources as far as possible[,]'" thereby "reaching more eligible patients and providing more comprehensive services." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) (quoting H.R. Rep. No. 102-384(II) (1992) at 12). Indeed, "Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress ... created the Medicaid Drug Rebate Program[,]" with the "goal" of "protect[ing] covered entities from such price increases because they 'reduced the level of services and the number of individuals that these

hospitals and clinics" could serve. *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *2 (quoting H.R. Rep. No. 102-384(II) (1992) at 12); *see* H.R. Rep. No. 102-384(II) (1992) at 11 ("In the view of the Committee, the Federal government simply cannot continue to allow the [Department of Veterans Affairs], Federally-funded clinics, and their patients to remain unprotected against manufacturer price increases.").

Context also confirms that most covered entities that 340B was intended to aid must rely upon contract pharmacies to deliver pharmacy services to their patients. *See, e.g.*, *AbbVie v. Fitch*, 2024 WL 3503965 at *19 ("[W]hen Congress enacted Section 340B, ... the potential for contract pharmacy dispensation was foreseeable."); *id.* at *14 ("[P]harmaceuticals distribution often relies on [drugs]' fungibility to facilitate efficiency. So, Section 340B presumably contemplates that efficient distribution of fungible drugs to covered-entity patients might utilize a replenishment model."). As a result, and as HRSA explicitly recognized in 1996, "[i]t would defeat the purpose of the 340B program if [the] covered entities could not use their affiliated pharmacies in order to participate in the 340B program." 1996 Guidance, 61 Fed. Reg. at 43,550. And because many covered entities' "patients currently face transportation barriers or other obstacles that limit their ability to fill their prescriptions[,]" the "use of more easily accessible, multiple contract pharmacy arrangements by covered entities ... permit[s] covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities[.]" 2010 Guidance, 75 Fed. Reg. at 10,273.

As a result, and as the Eighth Circuit held in *McClain,* state laws regulating "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to manufacturers' ability to comply with 340B, and are "simply deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements." 95 F.4th

at 1145. Laws like Chapter 288 "d[o] not require manufacturers to provide 340B pricing discounts to contract pharmacies[,]" "d[o] not set or enforce discount pricing[,]" and their "penalties are aimed at activity that falls outside the purview of 340B" *Id.* In fact, laws like Chapter 288 "assist[] in fulfilling the purpose of 340B," by facilitating the distribution and dispensation of discounted 340B drugs and protected covered entities' ability to meaningfully participate in the 340B Program. *Id.*

Against that backdrop, AbbVie's various conflict preemption arguments fall short.[8] *See Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("Our precedents 'establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.' ... That threshold is not met here.") (citation omitted).

### a. "Rights Congress Conferred on Manufacturers"

First, AbbVie argues that Chapter 288 "frustrates Congress's judgment by restricting rights Congress conferred on manufacturers." ECF 9-1 at 12. In support, AbbVie asserts that "Congress required only that manufacturers offer their drugs to covered entities at the 340B discount price, and the 340B statute allows manufacturers to place reasonable conditions on their 340B offers."

---

[8] AbbVie's conflict preemption arguments challenge separate substantive portions of Chapter 288; as such, in the event that this Court agrees with AbbVie that any particular provision is preempted or otherwise unconstitutional (and that the other prerequisites for injunctive relief have been met), any injunction should be solely limited to the provision of Chapter 288 at issue. Severability "is a matter of state law[,]" and under Rhode Island law, "a court may sever an unconstitutional provision when it is not indispensable to the rest of the statute and can be severed without destroying legislative purpose and intent." *American Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 51 (1st Cir. 2024) (citations and quotation marks omitted). Here, that test is clearly met, as the various substantive prohibitions AbbVie challenges represent distinct means by which the General Assembly hoped to advance the critical goal of protecting Rhode Island's covered entities, and AbbVie cannot show that the General Assembly "would have forgone" Chapter 288 "altogether" if any single provision were removed. *Id.* at 52; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382-83 (1992) (vacating multiple portions of an overbroad injunction against future enforcement of state laws).

ECF 9-1 at 12-13 (citing *Johnson*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703). "The upshot of Plaintiffs' argument that Section 340B and [Chapter 288] conflict is that Congress deliberately left to pharmaceutical manufacturers the discretion to refuse to ship 340B discounted drugs to contract pharmacies simply because it was silent in the statute about delivery." *AbbVie Inc. v. Fitch,* 2024 WL 3503965, at *11.

Again, Congress's silence on that issue is fatal to AbbVie's preemption argument. "Pre-emption law ... cautions us against finding that a congressional act pre-empts a state law through silence." *Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 6 (1st Cir. 1994) (Breyer, C.J.) (citing *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). To the contrary, "and particularly in [cases] in which Congress has legislated in a field which the States have traditionally occupied," such as "medicine and its associated costs[,]" courts proceed on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act[.]" *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173, 177 n.14. That "negative presumption is even stronger when the state law at issue creates a remedy unavailable under federal law[,]" as Chapter 288 does here. *Schafer*, 20 F.3d at 6 (citations omitted).

This is simply "not a case" where either the text or history of the federal law and its enforcement "provides support for drawing the inference that [Congress] had deliberately intended to set both a floor with which the private actors would have to comply and a ceiling on the additional regulatory burdens that a state could impose on them." *Capron*, 944 F.3d at 40. "Rather, neither the text nor the regulatory history affirmatively indicates that the federal government made such a deliberate, ceiling-setting choice, and, other provisions indicate the opposite." *Id.* "Since the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs. ... For 25 years, drug

manufacturers ... distributed 340B drugs to covered entities' contract pharmacies." *McClain,* 95 F.4th at 1139. The 340B's statutory silence as to drug distribution makes "clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities[,]" especially given that, "[a]s a matter of State law," covered entities already "possessed the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients." 1996 Guidance at 43,549-50. Since 2010, HRSA has "opined that covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies" and recognized "that contract pharmacies enable covered entities to 'create wider patient access by having more inclusive arrangements in their communities.'" *Johnson*, 102 F.4th at 462; *see* 1996 Guidance at 43,550 ("It would defeat the purpose of the 340B program if these covered entities could not use their affiliated pharmacies in order to participate in the 340B program.").

Accordingly, nothing in the text or history of Section 340B indicates that Congress, through its silence, intended to endow drug manufacturers with the affirmative right to unilaterally throttle covered entities' ability to obtain 340B pricing for the drugs they dispense through contract pharmacies. Instead, the fact that Section 340B "does not control how covered entities or manufacturers must deliver discounted drugs to patients of covered entities" shows that Congress intentionally left "room for states to impose their own regulations" addressing that conduct. *AbbVie Inc. v. Fitch*, 2024 WL 3503965 at * 15; *see Murrill*, 2024 WL 4361597, at *8 ("If Section 340B does not address contract pharmacies or the relationship between covered entities and their contract pharmacies, a state statute that specifically addresses contract pharmacies cannot conflict with Section 340B.").

Nor can AbbVie show that the Act is barred by conflict preemption by arguing that the Act's effect on drug manufacturers' revenues "rudely interfere[s] with a careful balance struck by Congress." ECF 9-1 at 13 (citation omitted). Congress set no specific balance as to the cumulative financial impact of 340B discounts on covered entities or manufacturers, and statutory silence cannot pass as evidence that "protecting manufacturers" (or their bottom lines) was "'no less a part' of Congress's 'purpose' than its substantive end goal of drug discounts." *Id.* (quoting *Rapanos v. United States*, 547 U.S. 715, 752 (2006)); *see* H.R. Rep. 102-384(II) at 11 ("Those price increases have in turn reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources. ... In the view of the Committee, the Federal government simply cannot continue to allow ... Federally-funded clinics, and their patients to remain unprotected against manufacturer price increases."); *id.* at 16 ("emphasiz[ing] that the bill does not limit the amount of drugs that a 'covered entity' may procure for purposes of receiving price reductions under this agreement").

"[U]nfounded speculation about the federal government's implicit intentions ... may not ground a finding of obstacle preemption." *Capron,* 944 F.3d at 27-28. And by asking this Court to infer that Chapter 288 has impermissibly tipped the scales of an imperceptible balance between "benefitting particular providers" and "compel[ling] drug manufacturers to participate in the ostensibly voluntary [340] Program[,]" ECF 9-1 at 13, AbbVie is "necessarily asking [the Court] to engage in precisely the sort of 'freewheeling judicial inquiry'" courts "are supposed to avoid in evaluating an obstacle preemption claim." *Capron,* 944 F.3d at 39 (quoting *Whiting*, 563 U.S. at 607).

### b. *"Congress's Desire for a Unified 340B Enforcement Scheme"*

Next, AbbVie recycles another argument unsuccessfully raised in a previous action, asserting that Chapter 288's enforcement scheme conflicts with Section 340B's own. *Compare* ECF 9-1 at 14 ("Rhode Island tramples on Congress's choices by installing its own parallel enforcement scheme to police 340B transactions.") with *AbbVie Inc. v. Fitch,* 2024 WL 3503965, at *12 ("Plaintiffs argue that H.B. 728 'conflicts with' Section 340B's enforcement provisions 'by creating its own enforcement scheme entirely separate and apart from federal law.'"). In *AbbVie v. Fitch,* the court disagreed, correctly holding that "H.B. 728 addresses delivery and Section 340B does not, so adjudications under H.B. 728 will not interfere with federal enforcement of Section 340B's compliance mechanisms." 2024 WL 3503965, at *12. As previously discussed, *AbbVie v. Fitch* also rejected AbbVie's attempt to argue that Mississippi's law was preempted by "*Astra*'s holding that covered entities cannot bring overcharging claims as third-party beneficiaries to PPAs." *Id.* at *16 (citing *Astra*, 563 U.S. at 117-19).

AbbVie does not identify any legal error in that analysis or distinguish the case. Nor could it: yet again, its argument rests on a blatant misreading of Chapter 288. As multiple courts have recognized, state laws like Chapter 288 do not alter the contents of the federal 340B enforcement program or run afoul of *Astra*'s holding by creating a new private right to enforce Section 340B itself. Instead, state laws like Chapter 288 create separate and complementary state law obligations, complete with their own state enforcement schemes. *See, e.g.*, *Novartis v. Fitch*, 738 F. Supp. 3d at 751 ("[Mississippi's law] addresses delivery and Section 340B does not, so adjudications under [Mississippi's law] will not interfere with federal enforcement of Section 340B's compliance mechanisms."); *McClain*, 645 F. Supp. 3d at 901 ("[T]he penalties that may be assessed for violations of [Arkansas' law] relate to activities outside the scope of the 340(B) Program's

enforcement procedures[.]"). Under our federal system of dual sovereignty, that is entirely permissible. "Ordinarily, the mere existence of a federal regulatory or enforcement scheme," even ones far more "detailed" than Section 340B, "does not by itself imply pre-emption of state remedies." *English,* 496 U.S. at 87. Nor are state remedies "pre-empted solely because they impose liability over and above that authorized by federal law." *Id.* at 89 (quoting *ARC Am. Corp.,* 490 U.S. at 105).

Nor may AbbVie conjure a conflict through its pearl-clutching prediction that Rhode Island officials must interpret and apply federal 340B law in executing [Chapter 288]." ECF 9-1 at 14. Yet again, that argument misrepresents the contents of Chapter 288 and rests on a profound misconception of how our federal system functions. AbbVie's umbrage at the notion that state courts might consider questions of federal law is unavailing; "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990); *see Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149-50 (1988) ("[W]hen a state proceeding presents a federal issue, even a pre-emption issue, the proper course is to seek resolution of that issue by the state court.").

Suppose, as AbbVie does, that it "might defend itself in a[] [Chapter 288] proceeding by arguing that the entity who ordered drugs was engaging in unlawful diversion or was otherwise ineligible for 340B discounts." ECF 9-1 at 14. Chapter 288 contemplates enforcement through the state-law mechanism of the DTPA. *See* R.I. Gen. Laws § 5-19.3-8. Under the DTPA, the Attorney General would need to bring that enforcement proceeding, and any petition to obtain civil penalties for violations, in Rhode Island Superior Court. *See* R.I. Gen. Laws §§ 6-13.1-5, -1.8. Because a potential violation of Chapter 288 could only occur if the manufacturer had engaged in prohibited conduct "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," R.I. Gen.

Laws § 5-19.3-3(a), or the prohibited discriminatory actions specified at R.I. Gen. Laws § 5-19.3-5, the questions of whether 340B covered entities and 340B drugs were involved or whether "the entity who ordered drugs was engaging in unlawful diversion or was otherwise ineligible for 340B discounts" under federal law, ECF 9-1 at 14, would represent threshold issues that the Superior Court would be "presumptively competent" to resolve by reference to the controlling federal law incorporated in Chapter 288. *Tafflin*, 493 U.S. at 458. AbbVie's prediction that Chapter 288 will spawn "a hodgepodge of state and federal adjudicators deciding the same purely federal questions in potentially inconsistent ways[,]" ECF 9-1 at 15, is further refuted by the Act's provision that "[n]othing in this chapter is to be construed or applied to be in conflict with ... [a]pplicable federal law and related regulations[.]" R.I. Gen. Laws § 5-19.3-9(b).

More importantly, after any such threshold issues of federal law are resolved, the Superior Court's substantive decision as to whether a manufacturer's conduct violated the specific provisions of Chapter 288 would ultimately represent a determination of *Rhode Island* law; conversely, any determination by HHS as to whether the same conduct by the manufacturer was a violation of Section 340B's separate requirements would ultimately be a determination of a distinct *federal* question. The fact that Defendants would be enforcing state law, not federal law, distinguishes this case from *Astra*—which, as discussed, involved the lack of a private right of action under federal law and which did not address preemption or states' ability, through legislation, to create distinct but complementary regulatory regimes. Any so-called "inconsistency" between findings that the same conduct violated Chapter 288 but not Section 340B would stem from the fact that the Act, by design, regulates private conduct about which Congress was silent. Notwithstanding its attempt to concoct a nightmare scenario out of the routine workings

of our federal system, AbbVie thus fails to show that separate proceedings to enforce the Act will create an insurmountable obstacle to Section 340B's own federal enforcement scheme.

### c. *"Restricting Manufacturers' Access to the Federal 340B Dispute-Resolution Scheme"*

Next, AbbVie alleges that Chapter 288 conflicts with Section 340B by prohibiting manufacturers from requiring "claims data" from covered entities as a condition for receiving 340B discounts. ECF 9-1 at 15; *see* R.I. Gen. Laws § 5-19.3-3(a)(5) (prohibiting drug manufacturers from "[r]equir[ing] submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing, unless it is required by the Centers for Medicare and Medicaid Services"). According to AbbVie, this restriction creates an insurmountable obstacle to its ability to effectively access HRSA's Administrative Dispute Resolution ("ADR") process and bring claims against covered entities for alleged violations of Section 340B's prohibitions on "duplicative discounts" and diversion. ECF 9-1 at 15. Citing federal law requiring a manufacturer's audit of a covered entity pursuant to section 340B as a precondition for bringing an ADR claim, and HRSA guidance requiring "reasonable cause" to suspect a violation, AbbVie concludes that it "effectively forecloses manufacturers' only avenue to pursue claims against covered entities for violations of the 340B Program's requirements." *Id.* (citing 42 U.S.C. § 256b(d)(3)(B)(iv); Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996)).

That argument is pure sleight of hand. As another district court recently held in denying AbbVie a similar conflict preemption challenge, "nothing in the federal program has ever *required* covered entities to provide claims data (or 'clarification') or other documentation to drug manufacturers upon demand, yet the ADR system has nonetheless been in place and functioning

adequately for many years in the absence of any such requirement."[9] *Skrmetti*, 2025 WL 1805271, at *16 (emphasis in original). Just as in that case, AbbVie has "not actually shown that [it] need[s] claims data and the other documentation they purport to need in order either to request an audit or to attempt to resolve a dispute in good faith before proceeding to ADR[,]" and has "presented no evidence that [it] or other drug manufacturers have ever been denied the ability to conduct an audit upon request or that they have been required to submit the kind of claims data they claim to need in order to substantiate a request for an audit." *Id.* "Rather, claims data is more likely to be precisely the documentation that would be reviewed *in the course of conducting an audit.*" *Id.* (emphasis in original).

Under federal law, "only 'reasonable cause' is required to support a manufacturer's request for an audit, to 'ensure that the audits are performed where there are valid business concerns.'" *Id.* (quoting 1996 Guidance at 65,406). "HRSA itself observed in April 2024 that the standards for initiating a manufacturer audit 'are *not overly burdensome* [and do not] present any barriers to a manufacturer's ability to perform an audit of a covered entity.'" *Id.* (quoting ADR Rule at 28,646) (emphasis in original). "Significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." 1996 Guidance at 65,406. Chapter 288 also

---

[9] Indeed, it seems AbbVie only implemented its policy requiring covered entities to supply claims data as of April 17, 2023. ECF 9-2 at ¶ 4. Evidently, AbbVie either could not access any part of Congress's enforcement scheme throughout almost the entire lifetime of the 340B program, or else it did not actually need the claims data that it now claims is critical. ECF 9-1 at 15. In either case, AbbVie has not shown that a state law prohibition on extracting claims data from covered entities poses any obstacle to the functioning of the 340B Program or the ADR process. *See Skrmetti*, 2025 WL 1805271, at *16 ("Consequently, a state law that prohibits drug manufacturers from imposing upon covered entities a requirement that they submit claims data or other documentation as a precondition to allowing them to purchase drugs at the 340B discount price does not substantially alter the federal system.").

affirmatively provides for a potential source of information through the detailed (and public) annual reports that covered entities must submit to Rhode Island's Auditor General regarding each "340B covered entity's participation in the program during the previous calendar year[.]" R.I. Gen. Laws § 5-19.3-6. And "a good faith request by the manufacturer for documents from a covered entity—again, so long as it has an articulable basis for believing that the entity is not in 'compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer'—would satisfy its obligation to 'attempt in good faith to resolve the matter' before accessing the dispute resolution system." *Skrmetti*, 2025 WL 1805271, at *16 (quoting 1996 Guidance at 65,406, 65,410).

As for its assertion that "the 340B Program contemplates manufacturers demanding claims data" from covered entities, AbbVie (once again) improperly seeks to transmute Congressional silence into an affirmative intent to displace any state regulation. ECF 9-1 at 15. Nothing in the text of Section 340B affirmatively "authorizes" drug manufacturers to extract claims data from covered entities as a condition of providing 340B pricing. In no sense did Congress's silence affirmatively authorize drug manufacturers to impose a claims data condition on covered entities— let alone render drug manufacturers' ability to impose such a condition on covered entities sacrosanct against any exercise of the States' traditional authority over medicine and pharmacy. *See Sanofi* 58 F.4th at 699 ("[C]ourts must resist the urge to fill in words that Congress left out.").

### d. *McClain* and *Morrissey*

Rather than identifying a specific conflict between Chapter 288 and Section 340B, AbbVie preemptively asserts that "Rhode Island cannot excuse" any such conflicts by "leaning on the Eighth Circuit's conclusion that federal law does not preempt Arkansas's contract-pharmacy statute." ECF 9-1 at 16 (citing *McClain*, 95 F.4th at 1145). Asserting that *McClain* is neither

"binding or persuasive"—but is "distinguishable" because it relied on "assumptions that covered entities maintain title to drugs held at contract pharmacies and enjoy principal agent-relationships with those pharmacies"—AbbVie instead (and once again) champions the Southern District of West Virginia's decision in *Morrissey. Id.*

Defendants have already addressed *McClain* and *Morrissey*, *supra*, and the other flaws in AbbVie's argument were ably summarized in *AstraZeneca v. Fitch*. For one thing, a "covered entity's retention of title" is less significant to the preemption analysis than the presumption "that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *AstraZeneca v. Fitch,* 766 F. Supp. 3d at 667 (quoting *McClain*, 95 F.4th at 1144). For another, to the extent that covered entities' contract pharmacy arrangements actually violate 340B, "there is no indication that the [General Assembly] intended to authorize, ratify, or otherwise condone contract pharmacy services agreements that violate 340B[,] … [and] if the language in any contract pharmacy services agreements violates 340B, HRSA can take enforcement action pursuant to the federal statute." *Id.* at 666-67; *cf.* R.I. Gen. Laws §§ 5-19.3-5(a), -9(a).  And to the extent that the issues of title and agency relationships are at all relevant to the preemption analysis, the "available evidence" cited by AbbVie amounts to *ipse dixit* declarations on industry-wide practices or what AbbVie's employees "understand" about the general practices of covered entities; as such, there is no discernable connection between that "evidence" and the Rhode Island covered entities that Chapter 288 actually implicates. *See* ECF 9-1 at 16, n.3; ECF 9-2 at ¶¶ 13, 16; *cf. AstraZeneca v. Fitch*, 766 F. Supp. 3d at 666 ("[T]he Walgreens Agreement is not evidence supporting preemption of Mississippi's H.B. 728 because it is an eight-year-old Arizona contract.").

### e.   AbbVie's Reliance on HRSA's Pilot Program is Premature and Illusory

Lastly, AbbVie points to "HRSA's Rebate Pilot Program" which they claim "explicitly contemplates that manufacturers can collect claims data" as evidence that Chapter 288 "interferes with AbbVie's ability to participate in the federal program." ECF 9-1 at 16 (citing 90 Fed. Reg. 36,163 (August 1, 2025)). That argument is a red herring.

For one thing, and despite AbbVie's attempt to conflate the "rebate models" contemplated by the HRSA's Rebate Pilot Program (hereinafter, the "Rebate Pilot Program") with the replenishment model that (according to AbbVie) covered entities and contract pharmacies currently use, HRSA's notice announcing the Rebate Pilot Program plainly states that rebate models represent a material change to the way that the 340B Program has functioned since its inception. 90 Fed. Reg. 36,163. "Whereas the 340B program has traditionally operated as an upfront discount program" in which covered entities purchase 340B drugs from manufacturers at the discounted price, "under a rebate model, a covered entity would pay for the drug at a higher price upfront and then later receive a post-purchase rebate that reflects the difference between the higher initial price and the 340B price." *Id.* Because the adoption of rebate models requires "Secretarial approval" and "could fundamentally shift how the 340B Program has operated for over 30 years," HHS proposed a limited pilot program focused on a very narrow subset of ten high-priced drugs in 2026 for which there may be novel discount-nonduplication considerations.[10] *Id.* at 36,163-64. AbbVie cannot persuasively rely on the announcement of a fledgling regulatory pilot program, for which HHS has not yet authorized a single rebate model, as evidence that

---

[10] The list includes only one drug from AbbVie's affiliate, Pharmacyclics LLC for 2026. *See* 90 Fed. Reg. 36164; CMS, Medicare Drug Price Negotiation Program: Manufacturer Agreements for Selected Drugs for Initial Price Applicability Year 2026, https://www.cms.gov/files/document/fact-sheet-manufacturer-agreements-selected-drugs-ipay-2026.pdf.

Section 340B itself implicitly protects AbbVie's recent practice of requiring claims data as a condition of 340B discounts for *all* of its drugs.

The illusory nature of any purported conflict between Chapter 288 and the rebate models contemplated by the Rebate Pilot Program is further confirmed by two key facts. First, AbbVie currently does not, and is not authorized to, employ a "rebate model" because it has not received approval from the Secretary to do so. *See Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *11 (D.D.C. May 15, 2025) (rejecting APA challenge by drug makers regarding HRSA's non-approval of manufacturers' 340B rebate policies). If AbbVie wishes to implement a new rebate model consistent with the Rebate Pilot Program, it must submit a satisfactory plan to HHS by the deadline of September 15, 2025; HHS would then make any approvals by October 15, 2025, "for a January 1, 2026 effective date." 90 Fed. Reg. at 36,164.  AbbVie can hardly show an actual or imminent risk of conflict arising from its hypothetical participation in a pilot program that is not yet off the ground.

Second, and even more crucially, if AbbVie *does* eventually participate in the Rebate Pilot Program, covered entities will then be *required* by HHS to submit a limited set of pharmacy claims data elements for certain drugs to AbbVie to obtain 340B rebates on those drugs. *See* 90 Fed. Reg. at 36,165 (requiring any "data requested" as part of a proposed rebate model "be limited to only" certain specified "readily available pharmacy claim fields"). Importantly, the Act's prohibition on requiring the submission of "claims-level data or documentation" expressly exempts "data or documentation" that covered entities are "required" to provide under federal law; by its own terms, the Act will pose no obstacle to AbbVie's ability to participate in the Rebate Pilot Program. R.I. Gen. Laws § 5-19.3-3(a)(5); *see id.* § 5-19.3-5(c) (prohibiting only the imposition of "additional terms or limitations not required by federal law"); *id.* § 5-19.3-9(b) ("Nothing in this chapter is to

be construed or applied to be in conflict with ... [a]pplicable federal law and related regulations[.]"); *see also AbbVie v. Fitch*, 2024 WL 3503965 at *13 ("[Mississippi's law] state's that it should not be construed to conflict with federal law, … and the Court must apply the presumption against preemption to construe state laws not to conflict with federal law when possible, … [and] will not read [Mississippi's law] to accidentally conflict with federal law."). There is no current or even *potential* conflict between the Act and the conditions of any rebate model AbbVie may adopt under the Rebate Pilot Program, and the announcement of that limited-scope program cuts against AbbVie's claims about the conditions manufacturers are currently authorized to impose on covered entities under federal law.

The "teaching" of the Supreme Court's preemption decisions "enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists." *English,* 496 U.S. at 90 (quoting *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446 (1960)). AbbVie mechanically "chants the conventional 'obstacle to accomplishment' mantra, [but] it does not point to the kind of clear conflict that would warrant such a finding," and has not shown a likelihood of success on its preemption challenge to Chapter 288. *Grant's Dairy*, 232 F.3d at 18.

### B. Chapter 288 Does Not Effectuate an Unconstitutional Taking

AbbVie next challenges Chapter 288 as an unconstitutional *per se* taking.[11] But district courts in Mississippi, Louisiana, and Missouri have already rejected nearly identical takings challenges. Those courts uniformly concluded that state laws prohibiting manufacturers from

---

[11] Although AbbVie's complaint pleads regulatory taking in the alternative, *see* ECF 1 at ¶172, its motion for a preliminary injunction addresses only a *per se* physical taking of its property. ECF 9-1 at 17-18. Accordingly, for the purposes of this Motion, it has waived any argument that Chapter 288 is a regulatory taking (which would fail on the merits in any event). *See AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *19-20 (holding that no regulatory taking occurred in part because state regulations like Chapter 288 were foreseeable to AbbVie).

restricting the number of contract pharmacies to which they will deliver 340B-discounted drugs purchased by covered entities do not constitute an unconstitutional taking and that, even if they did effect a taking, it was a taking for public use, not private use. *See AbbVie Inc. v. Fitch*, 2024 WL 3503965, at \*19–20 (denying AbbVie's preliminary injunction motion and finding no likelihood of success on takings claim); *Bailey*, 2025 WL 644285, at \*\*5–6 (dismissing manufacturer's takings claim); *Murrill*, 2024 WL 4361597, at \*15 (granting state's motion for summary judgment on manufacturer's takings claim); *see also Skrmetti*, 2025 WL 1805271, at \*19–20 (collecting cases rejecting similar takings claims but finding that AbbVie lacked standing based on grandfather provision contained in state law). Repeating the same arguments already heard and rejected by other district courts demonstrates no likelihood of success before this Court.

The Takings Clause, which is "applicable to the States through the Fourteenth Amendment," *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021), provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The "classic taking [is one] in which the government directly appropriates private property for its own use." *Horne v. U.S. Department of Agric.*, 576 U.S. 350, 357 (2015) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)). The Takings Clause does not distinguish between personal property and real property. *Id.* at 358. Thus, an appropriation of either type of property "is a *per se* taking that requires just compensation." *Id.*

1. ***Chapter 288 does not "force" AbbVie to transfer 340B drugs to contract pharmacies at discounted prices***

Chapter 288 effectuates no taking of the drugs AbbVie manufactures and sells to covered entities in Rhode Island. AbbVie's contrary argument is grounded on the false assertion that Chapter 288 forces "AbbVie to transfer its pharmaceutical products to private third parties [e.g. contract pharmacies] for discounted prices." ECF 9-1 at 17-18. But Chapter 288 does no such

thing. It only requires manufacturers like AbbVie to offer 340B drugs for purchase by covered entities, regardless of whether those entities want those drugs delivered and dispensed to their patients at a contract pharmacy. R.I. Gen. Laws § 5-19.3-5(a). It does not "force" AbbVie to sell 340B drugs to anyone if it does not want to. *See AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *16– 20 (rejecting similar takings challenge to Mississippi's law).

Nor does Chapter 288 force any sort of "A-to-B" transfer of 340B drugs from AbbVie to contract pharmacies. *See* ECF 9-1 at 18 (alleging that Chapter 288 "reflects the sort of private A-B takings that are inherently unconstitutional"). Regardless of whether a covered entity contracts with a pharmacy, AbbVie is "still only required to sell at 340B discounts to covered entities, and [the covered entity] can still only have drugs dispensed to their patients." *Fitch,* 2024 WL 3503965, at *19.

Chapter 288, in short, does not "compel[] direct, confiscatory sales from them to private pharmacies." *Id.* There simply is no *per se* physical taking. *Id.* AbbVie cannot manufacture one by pointing to the financial impact or supposed "windfall private gains" stemming from Chapter 288's effect on the volume of AbbVie's 340B sales to covered entities. ECF 9-1 at 17. Medical price control "regulations of this sort do not effect a per se taking" even when they are creatively framed as transfers of wealth from one party to another. *Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 126 (1st Cir. 2009); *see Yee v. City of Escondido, Cal.*, 503 U.S. 519, 529-30 (1992).

AbbVie's argument ignores another fundamental point. The obligation to sell drugs to covered entities at discounted prices is a consequence of AbbVie's voluntary participation in the 340B Program, not Chapter 288. Voluntary government programs like the 340B Program do not give rise to unconstitutional takings; courts have "rejected Takings Clause challenges to the 340B Drug Price Program" on exactly this basis. *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of*

*Health & Hum. Servs.*, No. 3:23-cv-01103, 2024 WL 3292657, at \*13 (D. Conn. July 3, 2024) (collecting cases), *aff'd,* No. 24-2092, 2025 WL 2248727 (2d Cir. Aug. 7, 2025). As one court explained, drug manufacturers

> have voluntarily chosen to participate in the 340B program and are thus free to terminate their participation if and when they may choose to do so . . . . We concede that in withdrawing from the 340B program [AbbVie] would no longer receive coverage or reimbursement for its products under Medicaid and Medicare Part B, which would result in a significant financial impact . . . , but 'economic hardship is not equivalent to legal compulsion for purposes of takings analysis.'"

*Id.* (quoting *Eli Lilly & Co. v. United States Dep't of Health & Hum. Servs.*, No. 1:21-CV-00081, 2021 WL 5039566, at \*21 (S.D. Ind. Oct. 29, 2021)). Courts have applied the same rationale to reject Takings Clause challenges to analogous state laws protecting covered entities' use of contract pharmacies for the delivery of 340B drugs to patients. *E.g. Murrill*, 2024 WL 4361597, at \*15 (explaining that Louisiana's contract pharmacy statute "does not compel drug manufacturers to transfer Section 340B discounted drugs either to the government or to a private party" because it "only applies to drug manufacturers who voluntarily participate in the Medicaid and Medicare programs"). Thus, any alleged compulsion to "transfer its pharmaceutical products" at "discounted prices" results entirely from AbbVie's choice to participate in the 340B Program. If AbbVie withdrew from the 340B Program, Chapter 288 would not apply to AbbVie. Accordingly, AbbVie fails to establish any likelihood of success on its unconstitutional takings claim. *See id.* (no unconstitutional taking where state law required delivery of 340B drugs to contract pharmacies because manufacturer's participation in 340B Program and its discounted pricing was voluntary).

### 2. *Chapter 288 need not confer any "additional benefit" and, even if one were required, it allows continued access to the Rhode Island drug market and increased transparency through state-level reporting*

Although AbbVie largely concedes that voluntary participation in a government program like the 340B Program cannot give rise to an unconstitutional taking, it wrongly asserts that

Chapter 288 "imposes additional state burdens with no additional benefit." ECF 9-1 at 19 (citing *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023) and *Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 666 (E.D. Va. 2023)). But neither *Valancourt Books* nor *Roberts* supports the idea that states must give an additional benefit to impose conditions on a voluntary federal program. In fact, *Roberts* did not address this issue at all. *Roberts* said only that a Virginia law "necessarily mandate[d] . . . participation in Medicare, and as a result, participation in [the Emergency Medical Treatment and Active Labor Act]," was compelled by state law. *Id*. at 666-67. *Roberts* rejected that argument because state law "requirements have no bearing on whether providers' participation in Medicaid and Medicare are voluntary as a matter of federal law." *Id*. AbbVie does not argue that Chapter 288 similarly compels participation in the 340B Program or otherwise compels its continued participation in the Program so *Roberts* has no bearing here.

AbbVie's reliance on *Valancourt Books* is likewise misplaced. That case involved a due process challenge to a statute requiring the owner of a copyrighted work to "deposit two copies of the work with the Library of Congress within three months of its publication." *Valancourt Books, LLC*, 82 F.4th at 1226. The D.C. Circuit found that this statute was an unconstitutional taking because "[c]opyright 'subsists' as soon as one 'fixe[s]' a work 'in any tangible medium.'" *Id.* at 1236 (quoting 17 U.S.C. § 407(a)). Thus, the plaintiff had copyright protection regardless of whether it made the deposit mandated by the statute. *Id.* Here, in contrast, AbbVie's provision of discounted pricing under the 340B Program is *in exchange for* coverage of their products under Medicaid and Medicare Part B.

Even if continued participation in Medicaid and Medicare Part B were not alone sufficient, compliance with Chapter 288 extends the additional benefit of allowing AbbVie and other

manufacturers to sell 340B drugs to Rhode Island covered entities. Pharmaceuticals are an area "that has long been the source of public concern and the subject of government regulation." *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984). So especially in that field, state regulation is a necessary burden in exchange for "the advantage of living and doing business in a civilized community." *Andrus v. Allard*, 444 U.S. 51, 67 (1979). *Horne*, another case on which AbbVie mistakenly relies (ECF 9-1 at 17), bears this out. In *Horne*, the Supreme Court was clear that the sale of property in that case, raisins, was basic "interstate commerce" that could not have heavy conditions placed on market participation because of the product's innocuous nature. 576 U.S. at 366. In contrast, the Supreme Court observed that sales of more volatile products such as "hazardous chemicals" or "dangerous pesticides" would permit much greater regulatory burdens in exchange for the ability to sell these sorts of products. *Id.* And while raisins "are a healthy snack," *id.*, "virtually every drug . . . poses dangers under certain conditions," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 (2000). Thus, Chapter 288's prohibition on manufacturer restrictions on the use of contract pharmacy arrangements in a heavily regulated industry like pharmaceuticals is permissible in exchange for Rhode Island extending AbbVie and other manufacturers access to its market, which "can hardly be called a taking." *Monsanto*, 467 U.S. at 1007.

Enforcement of Chapter 288 also provides increased transparency. Chapter 288 imposes new public reporting and audit requirements on covered entities in Rhode Island, including the submission of annual reports to be posted on the Auditor General's website detailing the aggregate cost and payment amounts associated with 340B drugs, amounts paid to contract pharmacies or other vendors, use of 340B savings for community benefit, and a description of the covered entity's internal compliance measures. R.I. Gen. Laws § 5-19.3-6(1)-(9). These new reporting and audit

requirements promote increased transparency on the scale and impact of the 340B Program in Rhode Island that benefits not only the general public but manufacturers like AbbVie that may access the information. *See id.*

AbbVie's complaint that it did not "sign up for Rhode Island's scheme" rings hollow. *See* ECF 9-1 at 19. Since the 340B Program began, covered entities relied on contract pharmacies for the "distribution and dispensation of 340B drugs." *McClain*, 95 F.4th at 1139. Only after manufacturers like AbbVie abruptly changed course did states, including Rhode Island, step in to fill the "gap" resulting from Section 340B's silence regarding delivery of 340B drugs to patients. *See* supra pp 2, 9-11(discussing state legislation in response to manufacturer conduct). In "an industry" such as pharmaceuticals "that long has been the focus of great public concern and significant government regulation," enhanced regulation where the legislature was previously silent is foreseeable, which cuts against finding a regulatory taking. *Monsanto*, 467 U.S. at 1008–09. Likewise, because Section 340B does not preempt state laws requiring delivery of 340B drugs to contract pharmacies, AbbVie could have foreseen that states might enact policies requiring 340B drugs to be dispensed at contract pharmacies as had long been the practice. *See id.; see also Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987) ("[I]nvestment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest.").

Lastly, there is no merit to the lament that there allegedly is no "mechanism for AbbVie to opt out of the 340B program in Rhode Island alone." ECF 9-1 at 19. AbbVie can either comply with Chapter 288's requirements by continuing the longstanding practice of pharmaceutical manufacturers to deliver 340B drugs to all contracted pharmacies or it can withdraw from the 340B

Program and stop selling 340B drugs to covered entities. Either way, this is a voluntary choice that effectuates no unconstitutional taking.

### 3. *Chapter 288 promotes access to public health and does not confer any "windfall" on Rhode Island's covered entities*

As noted at the outset, the 340B Program was created to support critical safety net health care providers in accessing drugs at reduced prices, thereby enabling these providers to "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." *See* H.R. Rept. No. 102–384(II), at 12. The legislative record is filled with examples of how covered entities in Rhode Island have contributed to this goal. *See supra* pp 12-15.

AbbVie casts a shadow over those contributions by baldly asserting that "neither covered entities nor pharmacies pass those windfall discounts onto needy patents or have any duty to use 340B revenue for charity or uncompensated care." ECF 9-1 p. 18. The "examples" AbbVie cites, however, are not drawn from Rhode Island. *See id.* They also are based largely on opinions or, more accurately, critiques of the 340B Program with no discussion at all of Chapter 288 or comparable state laws. *See, e.g., id.* at Exs 18-24. As AbbVie has repeatedly stated, the 340B Program has its own enforcement mechanisms to prevent any program abuses. There is no showing that Section 340B's remedial scheme is insufficient to address any abuses it alleges may have occurred in administration of the federal program. In all events, none of the studies or reports AbbVie cites detracts from the substantial record compiled by the General Assembly in its consideration of Chapter 288. That record shows commendable efforts by Rhode Island's safety net providers to deliver quality healthcare to vulnerable communities, notwithstanding the challenges posed by rapidly increasing drug prices and razor thin operating budgets. And, contrary to the baseless aspersions cast by AbbVie, Rhode Island's covered entities have re-invested 340B

Program savings into expanding access to health care and medical services in the state's most vulnerable communities.[12] *See supra* pp 12-15; *infra* pp 59-61.  Moreover, by enacting Chapter 288, the General Assembly imposed new state-level reporting obligations on covered entities in Rhode Island to ensure that savings attributable to the 340B Program continue to benefit patients and local communities throughout the state.  *Supra* pp 44-45.

### C.   Chapter 288 Is Not Unconstitutionally Vague

AbbVie also cannot show a likelihood of success on its claim that Chapter 288 "offends AbbVie's due process rights because it is unconstitutionally vague." ECF 9-1 at 1.  "To comport with the strictures of due process, a law must define an offense '[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13-14 (1st Cir. 2011) (citation omitted).  AbbVie challenges Chapter 288 as vague on its face but has not asserted that Chapter 288 implicates conduct protected by the First Amendment; "[f]or such a facial challenge to succeed," AbbVie "must demonstrate that the law is impermissibly vague in all of its applications." *Whiting v. Town of Westerly*, 942 F.2d 18, 22 (1st Cir. 1991); *see Am'ns for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (noting distinct standards for facial challenges in First Amendment context and otherwise).

---

[12] Because no taking has occurred, Defendants need not show that Chapter 288 satisfies the strictures of the Takings Clause that any taking must be for a public purpose; however, if any such showing were required, it would be easily satisfied by the evidence before the General Assembly of the strong public interest in protecting covered entities' ability to effectively utilize the 340B Program. *See AbbVie v. Fitch*, 2024 WL 3503965, at *20 ("If condemning Ms. Kelo's [New London] home so that a pharmaceutical company could build a facility served the public purpose of economic development, then so would facilitating Mississippians' access to medications for which manufacturers have already agreed to provide a discount.").

AbbVie has not made that showing; in fact, its own submissions in this case amply demonstrate that Chapter 288 "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (citation omitted). As phrased by AbbVie employee Edward Schiedler in his signed Declaration, whereas AbbVie previously informed covered entities that "it would no longer indiscriminately accept requests to transfer or otherwise ship 340B discounted drugs to an unlimited number of contract pharmacies[,]" Chapter 288 "requires AbbVie to cooperate" with covered entities and ship 340B discounted drugs to "an unlimited number of contract pharmacy arrangements." ECF 9-2 at ¶¶ 4, 20, 27; *see* ECF 1 at ¶ 123 ("The statute prohibits AbbVie from enforcing its contract pharmacy policy, which otherwise conditions the sale or transfer of 340B-discounted drugs."); *cf.* R.I. Gen. Laws §§ 5-19.3-3(a)(7), -5(a). "In addition," says Schiedler, he "understand[s] that Rhode Island's law prohibits manufacturers' policies that, like AbbVie's, condition their 340B offers on receipt of claims data." ECF 9-2 at ¶ 21; *cf.* R.I. Gen. Laws § 5-19.3-3(a)(5).

Because AbbVie and its agents are thus demonstrably aware that Chapter 288's substantive provisions implicate multiple, specific instances of their own prior and preferred conduct, they cannot seriously assert that "the conduct prohibited by S. 114 is unknown and unknowable to manufacturers like Abbvie[.]" ECF 9-1 at 21. That fact alone dooms the vagueness claim: "a plaintiff who engages in conduct that is clearly proscribed by the statute cannot complain that the statute is vague on its face nor challenge the vagueness of the law as applied to the conduct of others." *Whiting*, 942 F.2d at 22. Unsurprisingly, multiple courts have recently rejected vagueness challenges to similar state laws "targeted at precisely the conduct in which AbbVie and other drug manufacturers want to engage in order to limit the expansion of the 340B program." *Skrmetti*, 2025 WL 1805271, at *21; *see id.* ([T]hese provisions, read in the context of the statute as a whole and

considered from the perspective of a reasonable business person—and, more specifically, a reasonable drug manufacturer—provide adequate notice of what conduct is prohibited and do not invite arbitrary enforcement."); *PhRMA v. Fitch*, 2024 WL 3277365, at *14 ("The statute plainly requires manufacturers to deliver 340B drugs to contract pharmacies and prohibits manufacturers from obstructing contract pharmacies in their dispensation of 340B drugs.").

AbbVie cannot overcome that reality by zooming in on § 5-19.3-5(a), which "prohibits manufacturers from 'interfer[ing] with' contract pharmacies acquisition of a manufacturer's drugs at the 340B discount price[,]" plucking the single term "interfere" out of context, and then asserting that the challenged "provision is unconstitutionally vague because the law provides no guidance on what 'interfere' means[.]" ECF 9-1 at 20. Despite AbbVie's obfuscatory efforts, the word interfere "do[es] not appear in a vacuum." *URI Student Senate*, 631 F.3d at 14. AbbVie's assertion that "the term 'interfere'—as used in S. 114—is not even part of a list that could provide context clues as to its meaning" is refuted by the plain text of the provision from which it cherry-picked that term. ECF 9-1 at 20 (citing "S. 114 § 5-19.3-5(a)"); *cf.* R.I. Gen. Laws § 5-19.3-5(a) (providing in relevant part that manufacturers "shall not *deny, restrict, prohibit, or otherwise interfere with*, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to," a covered entity's contract pharmacy) (emphasis added).

That context also informs any reasonable interpretation of the Act's separate prohibition on interference with contract pharmacies "actively contracted with a 340B covered entity." R.I. Gen. Laws § 5-19.3-5(b).  The General Assembly's "plainly articulated purpose" of protecting covered entities' ability to contract with multiple pharmacies is another "significant contextual clue" that "helps to inform the meaning of the contested language" in both § 5-19.3-5(a) and § 5-19.3-5(b). *URI Student Senate*, 631 F.3d at 14.  Additional "concrete guidance as to the behavior that [Chapter

288] prohibits and the circumstances in which it can be enforced[,]" *id.*, is provided by Chapter 288's specific prohibition of eleven (11) "certain discriminatory actions related to reimbursement of 340B covered entities and 340B contract pharmacies[.]" R.I. Gen. Laws § 5-19.3-5(a). And even when examined on their own, terms like "interfere" and "interference" have well-recognized and easily understood meanings: "Black's Law Dictionary defines 'interference' as '[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others.'" *PhRMA v. Fitch*, 2024 WL 3277365, at *14 (quoting Interference, *Black's Law Dictionary* (11th ed. 2019)); *see id.* ("House Bill 728 thus prohibits manufacturers from 'obstructing [the] normal operations' of, 'or intervening or meddling in the affairs' of a contract pharmacy receiving and dispensing 340B drugs to 340B patients.").

As a result, AbbVie cannot rely on its dire prediction that it will be "impossible for AbbVie to operate its pharmaceutical business and interact with pharmacies" without bumbling into accidental violations of the Act. ECF 9-1 at 21. "'[T]he mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague,' particularly where 'the statute deals with economic regulation and is addressed to sophisticated businessmen and corporations.'" *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, No. CA 12-96-ML, 2012 WL 6128707 at *13 (D.R.I. Dec. 10, 2012) (quoting *United States v. Lachman*, 387 F .3d 42, 57 (1st Cir. 2004)). AbbVie has sufficiently deciphered similar laws in Mississippi, Missouri, and other states to be able to comply with those laws by revising its restrictive contract pharmacy policy. *See* ECF 9-2 at ¶ 27, Ex. E at 11. Future proceedings to enforce the Act through the DTPA will take place in Rhode Island Superior Court, and "[w]here a standard is not so vague that reasonably intelligent people 'must necessarily guess at its meaning,' [federal courts] must presume that state courts will give it a limiting construction that will preserve its facial constitutionality." *Donovan v. City of*

*Haverhill,* 311 F.3d 74, 78 (1st Cir. 2002) (citation omitted); *see* R.I. Gen. Laws § 6-13.1-5.  And because "[a]ny statute is 'susceptible to clever hypotheticals testing its reach[,]'" the due process vagueness analysis "does not demand[] … that [the State] account for every conceivable application of a law." *United States v. Martínez-Felipe*, 687 F. Supp. 3d 282, 289 (D.P.R. 2023) (citation omitted).

AbbVie's argument that Chapter 288 is unconstitutionally vague because it has "no apparent scienter requirement" also does not move the needle. ECF 9-1 at 21.  Due process does not "mechanically" mandate such a requirement in every case—especially not for economic regulation and when only "civil rather than criminal penalties" are at stake (as with Chapter 288). *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 489, 498-99 (1982).[13] "Context matters when evaluating a plaintiff's facial void-for-vagueness challenge[:] … the Supreme Court has applied a 'less strict vagueness test' to commercial regulation … [a]nd vagueness review is less exacting still where the law at issue carries no criminal penalties." *ACA Connects – Am.'s Communic'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 330 (D. Me. 2020) (quoting *Hoffman Estates*, 455 U.S. at 498); *see also N. Wind, Inc. v. Daley*, 200 F.3d 13, 19 (1st Cir. 1999)

---

[13] AbbVie's reliance on *Colautti v. Franklin*, 439 U.S. 379 (1979), is thus wildly inapposite. *See* ECF 9-1 at 21.  *Colautti* involved a vagueness challenge to a criminal abortion law that contained a "viability-determination provision" that was "void on its face" for vagueness, and which would also have held physicians "criminally responsible for an erroneous determination of [the] viability" of "a particular fetus" because it lacked a "requirement of *mens rea*." 439 U.S. at 394-96.

AbbVie's reliance on *Carolina Youth Action Project v. Wilson* ("*CYAP*"), 60 F.4th 770 (4th Cir. 2023), or *Haverford College v. Reeher*, 329 F. Supp. 1196 (E.D. Pa. 1971) is similarly unavailing; far from being "no different" from this matter, those cases involved vagueness challenges to disorderly conduct statutes that potentially criminalized broad swaths of speech, association, and other protected by the First Amendment, and therefore implicated a materially different standard of review. ECF 9-1 at 20; *see Murrill*, 2024 WL 4361597, at *11 ("Act 358 does not pose the same danger to constitutionally protected activities as the statute at issue in *CYAP*. Act 358 … does not invoke criminal penalties in contrast to the law at issue in *CYAP*.").

("As a general matter, scienter is not required to impose civil penalties for regulatory violations when the regulation is silent as to state of mind.") (citing *Tart v. Massachusetts*, 949 F.2d 490, 502 (1st Cir. 1991)). "Given this 'particular context,'" even without an explicit scienter requirement, Chapter 288 "gives 'fair notice to those to whom (it) is directed.'" *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (citation omitted).

Lastly, AbbVie gets nowhere with its baseless claim that Chapter 288 gives Defendants "free rein to selectively and arbitrarily prosecute a wide variety of conduct that could potentially be considered 'interference.'" ECR 9-1 at 21. In "reviewing a business regulation for facial vagueness" on a pre-enforcement challenge, "the principal inquiry is whether the law affords fair warning of what is proscribed." *Hoffman Estates*, 455 U.S. at 503. As discussed, AbbVie's obtuse assertion that "the conduct prohibited by S. 114 is unknown and unknowable to manufacturers like AbbVie" is belied by the text of the Act, its surrounding context, and AbbVie's own recognition that the Act will prevent it from unilaterally imposing the onerous terms of its contract pharmacy policy on Rhode Island's covered entities. ECF 9-1 at 21. The Act's substantive contents are thus "sufficiently clear that the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness." *Hoffman Estates*, 455 U.S. at 1196; *see URI Student Senate*, 631 F.3d at 12 ("[A]ppellants have brought a facial challenge, not an as-applied challenge, and the ... mere possibility of misuse is insufficient to invalidate an ordinance on a facial attack.") (citation omitted).

AbbVie's cavil that Chapter 288's "potential methods of enforcement and accompanying punishments are a mystery[,]" ECF 9-1 at 21, is thus ultimately besides the point: the vagueness doctrine requires that laws "define an *offense* … with sufficient definiteness … [and] in a manner that does not encourage arbitrary and discriminatory enforcement[,]" not that every procedural

detail of that potential enforcement be spelled out in the four corners of the statute. *URI Student Senate*, 631 F.3d at 13-14 (emphasis added, citation omitted); *see Grayned*, 408 U.S. at 108 ("It is a basic principle of due process that an enactment is void for vagueness if its *prohibitions* are not clearly defined.") (emphasis added). Chapter 288's substantive provisions set out sufficiently "explicit standards" for Defendants and other persons, such as Rhode Island's state court judges, who will be tasked with "apply[ing] them." *Grayned*, 408 U.S. at 108.

Even if AbbVie's 'mystery methods' assertion *was* relevant, it would fail on its own terms as yet another instance of willful blindness; in the next sentence, AbbVie betrays its awareness that the Act empowers the Attorney General to bring "suits" and seek "financial penalties" under the DTPA. ECF 9-1 at 21. With respect to the Auditor General, AbbVie's attempt to transmute his authority to "'promulgate rules and regulations' implementing the new law" into an admission by the General Assembly that the Act "is inscrutable" is foreclosed by Supreme Court precedent recognizing that the potential for clarifying regulations weighs against finding that a prohibition is facially vague. *Id.* (quoting R.I. Gen. Laws § 5-19.3-7(2)); *see Hoffman Estates*, 455 U.S. at 504 ("The village may adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the ordinance. In economic regulation especially, such administrative regulation will often suffice to clarify a standard with an otherwise uncertain scope."). And given the context of the Act's substantive provisions, its explicit reference to DTPA enforcement proceedings, and the Auditor General's limited, pre-existing statutory role of "perform[ing] auditing services to the legislature and other state agencies[,]" *Delaney v. Kusminski*, No. C.A. 02-7096, 2005 WL 1109625, at *1 (R.I. Super. Ct. May 4, 2005) (citing R.I. Gen. Laws § 22-13-1 *et. seq.*), AbbVie cannot plausibly twist a modest grant of authority to "[i]nvestigate complaints and take appropriate actions to ensure compliance with this chapter" into a blank check of unbridled

enforcement power. R.I. Gen. Laws § 5-19.3-7(1); *see* Ex. 5 (Bergantino Aff.) at ¶ 2 ("[T]he Auditor General conducts financial and performance audits to provide independent and reliable information to the General Assembly on a variety of topics, including the State's financial condition, its use of federal funds in compliance with federal law, and whether programs are operating efficiently and effectively.").[14] "[A] legislature, in enacting statutes, is not wont to 'hide elephants in mouseholes[,]'" and there is "no reason to infer in the instant case that the General Assembly hid an elephant in a mousehole and intended an otherwise quite unlikely result in such an important context when no language in the statute clearly evinces such an intent." *Grasso v. Raimondo*, 177 A.3d 482, 491 (R.I. 2018) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

"The bottom line is that, viewed in context, it is clear what conduct" the Act "as a whole forbids" and "[o]ne can envision many permissible applications" of the Act. *URI Student Senate*, 631 F.3d at 15. "No more is exigible to ward off a facial challenge premised on vagueness grounds." *Id.*

---

[14] As also stated in his Affidavit, the Auditor General "has not yet determined whether any rules or regulations are necessary[,]" the "annual reports filed by 340B covered entities will be the focus of any audit conducted by [the] office[,]" and "absent any external complaints [the] office may receive," the Auditor General does "not presently anticipate commencing any Chapter 288 audits until after the first annual reports are filed on April 1, 2026." Ex. 5 (Bergantino Aff.) at ¶¶ 5, 6. Accordingly, AbbVie's challenge to *any* future enforcement of the Act by the Auditor General is also defeated by "the doctrine of ripeness, which 'asks whether an injury that has not yet happened is sufficiently likely to happen' to warrant judicial review." *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002) (quoting Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 3531.12, at 50 (2d ed. 1984)); *see id.* ("Alleging that the Act is unconstitutionally vague, the plaintiffs complain about the threat of enforcement, but not any particular instances of enforcement. Such facial challenges raise special justiciability concerns.").

### III.     AbbVie Fails to Demonstrate the Remaining Preliminary Injunction Factors

AbbVie's failure to show a likelihood of success on the merits of its federal preemption, takings, and vagueness claims dooms its request for a preliminary injunction. *Ryan,* 974 F.3d at 18. Even apart from that, AbbVie's motion should be denied because (1) it fails to demonstrate any risk of irreparable injury and (2) the public interest weighs heavily in favor of allowing Chapter 288 to take effect without delay to avoid further harm to the health care safety net that the 340B Program was intended to strengthen.

### A.     No Irreparable Injury

AbbVie fails to show that it will suffer an irreparable injury without the requested relief. Although AbbVie invokes the looming specter of consitutional violations arising from the State's enforcement of Chapter 288, AbbVie cannot make "a sufficient showing of irreparable harm" by simply "alleging a deprivation of constitutional right[s]" without demonstrating why that allegedly imminent harm is in fact irreparable. *Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). "Courts have largely rejected presumptions of irreparable harm except in the very narrow context of first amendment challenges." Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.); *see id.* ("An exception is that when there is an alleged deprivation of a constitutional right to free speech or freedom of religion, many courts find that no further showing of irreparable injury is necessary. This principle has not (for the most part) and ought not be extended beyond the first amendment context."). Indeed, even "the fact that [a plaintiff] is asserting First Amendment rights does not automatically require a finding of irreparable injury." *Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983).

AbbVie has not adequately shown how its constitutional claims translate into real-world irreparable harm. Nor can it; "the essence of the injury here is clearly economic." *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 399 (D.R.I. 2022), *affirmed*, 95 F.4th 38 (1st

Cir. 2024). "It is a longstanding axiom that 'economic harm in and of itself is not sufficient to constitute irreparable injury.'" *OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74 (D. Me. 1993)).

AbbVie admits that its alleged injury is purely economic. "AbbVie estimates that compliance with [Chapter 288] will cost approximately $35.3 million in the next year . . . [t]he lost revenue will undercut AbbVie's business model." ECF 9-1 at 23. While AbbVie bolsters its "guesstimate" by citing the costs of compliance with similar laws in Mississippi and Missouri, they conspicuously leave out the fact that they also challenged those laws and lost. *See id.*; *AbbVie Inc. v. Fitch*, 2024 WL 3503965 (Denying preliminary injunction based on AbbVie's failure to demonstrate likelihood of success on constitutional claims.); *Abbvie v. Bailey,* No. 4:24-cv-00996-SRC, 2025 WL 1918948 (E.D. Mo. July 11, 2025) (dismissing AbbVie's claims for lack of standing). While AbbVie might prefer to reinvest that money into their own research and development, *see* ECF 9-1 at 23, that supposed injury boils down to a prediction of "lost revenue" and is thus an "entirely economic" harm that cannot support a finding of irreparable injury. *Ocean State Tactical, LLC*, 646 F. Supp. 3d 368, at 399; *see id.* at 400 (discussing "retail plaintiff['s]" predictions of the "loss of business revenue" and other "economic injuries" from being unable to sell large-capacity magazines and holding that "[n]one of [those] feared consequences constitutes irreparable harm"); *see also Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) ("Appellants attempt to classify their injuries as irreparable by reframing the harm they suffer as the loss of things they can no longer afford. But artful pleading cannot not transform ordinary harm into the basis for an injunction.").

While "even economic harm may be irreparable when it looms so large as to create a credible threat to the existence of the moving party's business[,]" *Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 550 (D.P.R. 1996), that is not the case here; AbbVie reached total net revenues of "$56.3 billion" in 2024, and in 2025 delivered first and second quarter net Revenues of "$13.343 billion," and "$15.423 billion," respectively. AbbVie 2024 annual report available at https://investors.abbvie.com/static-files/62df4b7e-2544-4d8b-88cd-c863e8f23003; AbbVie Reports First-Quarter 2025 Financial Results, available at https://investors.abbvie.com/news-releases/news-release-details/abbvie-reports-first-quarter-2025-financial-results; AbbVie Reports Second-Quarter 2025 Financial Results, available at https://investors.abbvie.com/news-releases/news-release-details/abbvie-reports-second-quarter-2025-financial-results. Because the sheer scale of those revenues eclipse the projected "lost revenue" of "$35.3 million in the next year" or any potential civil penalty AbbVie speculates may befall it should it violate Chapter 288, AbbVie cannot actually show that it will be unable "to invest in future products" without an immediate injunction. ECF 9-2 at ¶¶ 27, 29. Nor can AbbVie establish irreparable harm through the alleged financial or administrative costs of complying with the Act, which are likely to be minimal—and especially given that AbbVie has not provided any detail whatsoever as to what, apart from lost revenue, the costs of compliance would entail. *See DiBiase v. SPX Corp*, 872 F.3d 224, 230 (4th Cir. 2017) ("[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.").

AbbVie was also presumably aware of Chapter 288 long before it was signed into law on June 27, 2025, especially given that its Motion refers exclusively to "S. 114," an earlier version of Chapter 288 that was introduced in January 2025. *See supra,* note 1. Yet, AbbVie inexplicably waited until August 19, 2025—nearly eight months after S. 114 was introduced—to update the

arguments it previously advanced in other cases and file this request for injunctive relief—nearly two months after the law signed by the Governor. AbbVie's lackadaisical approach to seeking injunctive relief smacks of a manufactured urgency at this late hour before Chapter 288 goes into effect, and "'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Wine & Spirits Retailers, Inc. v. Rhode Island & Providence Plantations*, 364 F. Supp.2d 172, 182 (D.R.I. 2005) (quoting *Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F. Supp. 506, 521 (S.D.N.Y. 1993)).

### B.    The Balance of Equities and Public Interest Heavily Favor Defendants

Finally, the balance of the equities and the public interest weigh heavily in favor of the Defendants and the State of Rhode Island. In this inquiry, the Court must consider the "risk of irreparable harm to the party seeking the injunction, as balanced against the harm to the party opposing it, and the public policy interests implicated by the issuance (or not) of an injunction." *Harris v. Wall*, 217 F. Supp. 3d 541, 560 (D.R.I. 2016).

As previously discussed, AbbVie has failed to show that it would suffer irreparable harm if enforcement of Chapter 288 is not enjoined; conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). And again, the "mere fact" that AbbVie seek an injunction "on constitutional grounds does not decide [the] balance-of-the-equities inquiry[,]" particularly given the fact that AbbVie has not shown a likelihood of success on the merits. *Hanson v. D.C.*, 120 F.4th 223, 247 (D.C. Cir. 2024), *cert. denied*, No. 24-936, 2025 WL 1603612 (U.S. June 6, 2025); *see id.* ("To the contrary,

this court must balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law.").

The public policy interests at stake also heavily favor the State. Rhode Island's General Assembly passed Chapter 288 "to protect a critical discount pharmaceutical program that enables safety-net hospitals, clinics and other health care agencies to provide care to the most vulnerable Rhode Islanders." *Assembly protects 340B discount prescription program* (June 20, 2025), https://www.rilegislature.gov/pressrelease/_layouts/15/ril.pressrelease.inputform/DisplayForm.as px?List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&ID=375735. In the public interest calculus, Rhode Island's "interest in safeguarding its residents is paramount." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). AbbVie has not shown—and cannot show—that the public interest would be advanced by an injunction allowing AbbVie to continue to engage in the same harmful conduct that both Chapter 288 *and* the 340B program were intended to address.

Contrary to its glib conclusion that "[t]here is no evidence that needy patients—in Rhode Island or elsewhere—benefit from the unlimited use of contract pharmacies[,]" the actions that AbbVie and other drug manufacturers have taken to throttle covered entities' ability to effectively utilize the 340B program have already had a materially detrimental impact on Rhode Island's covered entities and their patients. ECF 9-1 at 23-24. For example, and as the General Assembly noted after it passed Chapter 288, "Providence Community Health Centers, the state's largest community health center, announced in May [2025] it would lay off 70 staff members due to low Medicaid reimbursements and a $9 million loss in 340B funding over the last three years." *Assembly protects 340B discount prescription program* (June 20, 2025); *see* Ex. 4 (Letter from Merrill Thomas, President & CEO of Providence Community Health Centers) ("Another effect of [drug manufacturers'] restrictions has been the reduction of free medication access for our most

at-risk patients, a consequence that directly affects the health and well-being of our community.  If these restrictions persist, we will be left with no choice but to make further painful reductions to both staffing and critical services.").

Another Rhode Island covered entity, Comprehensive Community Action Program, Inc., ("CCAP") has suffered ongoing financial harm that "directly affects [its] capacity to provide comprehensive care to underserved patients[;] ... [a]s an example, many patients refuse referrals or testing due to transportation issues and [340B] revenue allows CCAP to offer ride share options to eliminate this barrier and connect these patients to necessary care and potential life saving testing." Ex. 6 (Letter from Chris Mansfield, President & CEO, CCAP). Due to drug manufacturers' recent, "coordinated effort[s] to restrict" covered entities' ability to participate in the 340B program, many other covered entities in the State faced similar predicaments. Ex. 3 (Letter from Rilwan K. Feyisitan, Jr., President & CEO, EBCAP); *see, e.g.*, Ex. 7 (Letter from Chuck Jones, President and CEO of Thundermist Health Center) ("Thundermist lost more than $7 million in 2024 which contributed to the fiscal crisis we experienced at the end of 2024 and led to 125 people in Rhode Island losing their jobs. … Thundermist and our patients cannot wait. … [I]f [the Act] does not pass, we will continue to struggle to meet the needs of the most vulnerable residents of the State."); Ex. 1 (Letter from Christine Collins, SVP, Pharmacy and PeriOp Services, Brown University Health) ("[P]harmaceutical manufacturers have imposed unlawful restrictions in the contract pharmacy space … caus[ing] increased financial losses to a degree that safety-net providers are simply not positioned to continue absorbing without risking negative impacts on patient care and services.  Current restrictions result in approximately an immediate $20 million loss annually to Brown University Health[.] … All of these losses result in direct adverse impacts to patient care.").

The General Assembly passed Chapter 288 as a direct response to the damage that drug manufacturers' recent 340B policies have already inflicted on Rhode Island; as a result, AbbVie—which waves away the real-world crises facing Rhode Island's covered entities and their patients as "imagined harm"—cannot seriously represent to this Court that an injunction against Chapter 288's enforcement would serve the public interest and "not harm the State or the public at large." ECF 9-1 at 23. For covered entities, and thus for the disadvantaged patients and communities those safety-net hospitals serve, the loss of several millions of dollars a year in 340B discount pricing can quite literally mean the difference between life and death; for AbbVie, sums like that amount to rounding errors on its balance sheet. *See* https://investors.abbvie.com/news-releases/news-release-details/abbvie-reports-second-quarter-2025-financial-results ("AbbVie ... announced financial results for the second quarter ended June 30, 2025. ... Worldwide net revenues were $15.423 billion, an increase of 6.6 percent on a reported basis, or 6.5 percent on an operational basis.").

## CONCLUSION

For all of these reasons, AbbVie fails to establish that the "extraordinary and drastic remedy" of enjoining enforcement of a newly enacted state law aimed at protecting public health and safety is warranted. *See Peoples Fed. Sav. Bank*, 672 F.3d at 8–9. Consistent with the reasoning of multiple other federal courts that have rejected substantively identical challenges to similar state laws, the Court should deny AbbVie's motion for a preliminary injunction.

Respectfully Submitted,

Defendants,

**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island; DAVID A. BERGANTINO, in his official capacity as Auditor General of the State of Rhode Island**

**By:**

**PETER F. NERONHA**
**ATTORNEY GENERAL**

*/s/ Lionel Dutreix*
Lionel Dutreix (#10728)
James J. Arguin (#10972)
Jeff Kidd (#10416)
Lee Staley (#11049)
R.I. Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Facsimile: (401) 222-3016
ldutreix@riag.ri.gov

## <u>CERTIFICATION</u>

I, the undersigned, hereby certify that I have filed the *Objection to Plaintiff's Motion for Preliminary Injunction* within via the ECF System and that it is available for viewing and downloading on this 12th day of September, 2025.

*/s/Abigail Clark*