# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

ABBVIE INC.; ALLERGAN, INC.;
DURATA THERAPEUTICS, INC.; ABBVIE
PRODUCTS LLC; PHARMACYCLICS LLC;
and ALLERGAN SALES, LLC,

        *Plaintiffs*,

    v.

PETER NERONHA, in his official capacity as
Attorney General of the State of Rhode Island,
and DAVID BERGANTINO, in his official
capacity as Auditor General of the State of
Rhode Island,

        *Defendants*.

Case No. 1:25-cv-00388

---

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

I.     ABBVIE IS LIKELY TO SUCCEED ON THE MERITS............................ 1

     A.     Rhode Island's Law Is Preempted............................................. 1

     B.     Rhode Island's Law Effects An Unconstitutional Taking............... 11

     C.     Rhode Island's Law Is Void For Vagueness.................................. 15

II.    THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR ABBVIE. ........................................................................................... 16

CONCLUSION ...................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*,
123 F.4th 27 (1st Cir. 2024)............................................................................6

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................................1, 2

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*,
563 U.S. 110 (2011)..................................................................................7, 9

*AstraZeneca v. Fitch*,
766 F. Supp. 3d 657 (S.D. Miss. 2024).........................................................10

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)........................................................................................5

*Capron v. Office of Att'y Gen. of Mass.*,
944 F.3d 9 (1st Cir. 2019)...............................................................................4

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021).....................................................................................12

*City of Chicago v. Morales*,
527 U.S. 41 (1999).......................................................................................16

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,
743 F. Supp. 3d 325 (D.N.H. 2024)..............................................................17

*Condon v. Andino, Inc.*,
961 F. Supp. 323 (D. Me. 1997)...................................................................18

*Franks v. Coopersurgical, Inc.*,
722 F. Supp. 3d 63 (D. R.I. 2024)..................................................................5

*In re Harrison*,
992 A.2d 990 (R.I. 2010)..........................................................................8, 16

*Hillsborough Cnty., Fla. v. Automated Med. Laby's, Inc.*,
471 U.S. 707 (1985).......................................................................................4

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)................................................................................12, 14

*Knick v. Township of Scott*,
  588 U.S. 180 (2019) ..................................................................................... 15

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ..................................................................................... 14

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ......................................................................................... 5

*Me. Forest Prods. Council v. Cormier*,
  51 F.4th 1 (1st Cir. 2022) ..................................................................... 6, 7, 9

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ....................................................................................... 4

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
  413 U.S. 405 (1973) .................................................................................... 5, 6

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) ........................................................... 4, 5, 6, 9

*PhRMA v. McClain*,
  95 F.4th 1136 (8th Cir. 2024) ...................................................................... 10

*PhRMA v. Morrisey*,
  760 F. Supp. 3d 439 (S.D. W. Va. 2024) .................................................. 6, 18

*Rosario-Urdaz v. Rivera-Hernandez*,
  350 F.3d 219 (1st Cir. 2003) ........................................................................ 17

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*,
  58 F.4th 696 (3d Cir. 2023) ........................................................................ 4, 6

*Va. Hosp. & Healthcare Ass'n v. Roberts*,
  671 F. Supp. 3d 633 (E.D. Va. 2023) ........................................................... 14

*Valancourt Books, LLC v. Garland*,
  82 F.4th 1222 (D.C. Cir. 2023) .................................................................... 14

*Wang v. N.H. Bd. of Registration in Med.*,
  55 F.3d 698 (1st Cir. 1995) .......................................................................... 17

**Statutes**

42 U.S.C. § 256b ................................................................................................ 3

42 U.S.C. § 256b(a) ......................................................................... 4, 13, 15, 18

42 U.S.C. § 256b(d) ....................................................................................... 9, 18

42 U.S.C. § 1396r-8(a)(5)(A) ....................................................................................13, 15

42 U.S.C. § 1983 ....................................................................................................17

R.I. Stat. § 5-19.3-2(1) ...........................................................................................3

R.I. Stat. § 5-19.3-2(2) ...........................................................................................3

R.I. Stat. § 5-19.3-2(3) ........................................................................................3, 8

R.I. Stat. § 5-19.3-5(a) .............................................................................3, 8, 12, 15

R.I. Stat. § 5-19.3-5(b) .......................................................................................3, 15

R.I. Stat. § 5-19.3-5(c) .......................................................................................3, 4, 12

R.I. Stat. § 6-13.1-8 ...............................................................................................13

**Regulations**

42 C.F.R. § 10.21(a) ...........................................................................................9, 11

61 Fed. Reg. 43,549 (Aug. 23, 1996) .....................................................................11

61 Fed. Reg. 65,406 (Dec. 12, 1996) .......................................................................9

90 Fed. Reg. 36,163 (Aug. 1, 2025) .......................................................................10

**INTRODUCTION**

Defendants effectively concede that Rhode Island's new law is a price regulation, Doc. 18 at 16, that the State's enforcement scheme will overlap with the federal scheme, *id.* at 31–32, and that Rhode Island offers no additional benefit in exchange for the penny-priced sales that the law will compel, *id.* at 42–46. Those concessions confirm that Chapter 288 invades an exclusive federal field, creates a conflicting enforcement scheme, and works an unlawful taking. A preliminary injunction is not only appropriate but necessary.

**I.    ABBVIE IS LIKELY TO SUCCEED ON THE MERITS.**

**A.    Rhode Island's Law Is Preempted.**

By regulating the federal 340B Program—and only the federal program—Rhode Island's law intrudes on a purely federal field. And Rhode Island's methods—creating new obligations and enforcement mechanisms while at the same time blocking AbbVie from the federal dispute resolution process—conflict with Congress's own purposes and methods. Chapter 288 is thus preempted under both the field and conflict preemption doctrines.[1] *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012).

Defendants, likely realizing that their arguments cannot prevail on their own merit, try to tip the scales by repeatedly citing a "presumption against preemption" for state laws that regulate fields traditionally occupied by states. *See* Doc. 18 at 16–18, 20, 23–24, 27, 36 , 39; Doc. 19 at 1. Those efforts are unpersuasive because Chapter 288 does not operate in a field of traditional state regulation—it regulates only putative transactions undertaken pursuant to a federal program.

---

[1]    AbbVie originally referred to the challenged law by reference to its introducing legislation, S. 114. Defendants refer to the law by its post-enactment, pre-codification Public Law title, "Chapter 288." For the sake of consistent terminology, AbbVie will refer to the challenged law as Chapter 288.

A more fundamental problem is that Defendants cannot even settle on what field Chapter 288 regulates. Defendants sometimes describe Chapter 288 as "a health and safety regulation" flowing from "States' historic pharmaceutical regulation" authority. *See, e.g.*, Doc. 18 at 18. But nearly every state law arguably bears upon health or safety in some tangential sense. Allowing that definition to control would amount to a get-out-of-preemption-free card. That is why Courts deciding preemption questions define the relevant field narrowly. *See, e.g.*, *Arizona*, 567 U.S. at 400 (defining the field as "alien registration" based upon the text of the state law at issue). What is worse, Chapter 288 has no actual relation to health, safety, or the practice of pharmacy. The law does not bear upon the contents of a drug, how it must be labeled, how it must be transported (*e.g.*, in refrigerated trucks to prevent spoiling or in locked containers to avoid tampering), who may prescribe it, for what purposes it may be prescribed, or to whom it may be prescribed. Chapter 288 will change ***nothing*** about the ***practice*** of medicine or pharmacy in Rhode Island. Rhode Island's law affects only the ***price*** at which drugs will be acquired by 340B covered entities and their contract pharmacies.

Apart from the overgeneralized (and incorrect) "health and safety" description, Defendants contend that Rhode Island's new law is an anti-discrimination statute and that it is an act of "cooperative federalism." Doc. 18 at 16–18. It is unclear what discrimination Chapter 288 seeks to prevent. AbbVie will sell its drugs to any covered entity, so long as the covered entity agrees to AbbVie's reasonable terms. Doc. 9-2 at 65–66. AbbVie will also sell its drugs to any pharmacy, with or without Chapter 288—the only question is the price the pharmacy will pay. *Id.* ¶ 7(b) ("AbbVie will deliver its drugs (provided they are not in shortage) to any pharmacy, anywhere. … [T]he availability of 340B ***pricing*** has no bearing on patient access or a drug's availability."). Ironically, Rhode Island is the one drawing lines. Chapter 288 is not a law of general applicability.

It targets a specific class of entities to regulate and a specific class of entities to benefit. And, most troublingly for preemption purposes, it draws those lines entirely by referencing those entities' relationship to a federal program. Nor is Chapter 288 an act of cooperative federalism by any measure. Congress knows how to bring states into the administration of federal programs (*e.g.*, Medicare and Medicaid), and no such invitation was issued for the 340B Program.

Rather, the proper definition of the regulated field is transactions under the federal 340B Program. The statute's key terms are all defined by reference to the federal 340B statute. *See* R.I. Stat. § 5-19.3-2(1)–(3) (defining "340B contract pharmacy," "340B covered entity," and "340B drug").[2] The regulated conduct occurs entirely within the federal 340B Program. *See id.* § 5-19.3-5(a) (prohibiting denials, restrictions, prohibitions, or interferences with "the acquisition" or "delivery" of "a 340B drug"); *id.* § 5-19.3-5(c) (prohibiting imposition of "additional terms or limitations not required by federal law as a condition of 340B participation"). And the beneficiaries of the state law are identified by their connection to the federal 340B Program. *See id.* § 5-19.3-2(1)–(3); *id.* § 5-19.3-5(a), (b).

Defendants concede two points that confirm Chapter 288 regulates solely within the field of 340B transactions. ***First***, Defendants describe Chapter 288 as a "medical fee regulation." Doc. 18 at 16. If that is true (and it is), the case is over: The only "medical fees" contemplated by Rhode Island's law are the ***prices*** paid for drugs under the 340B Program. *See* R.I. Stat. § 5-19.3-2(3) (defining a "340B drug" as one "subject to any offer for reduced prices" under the federal 340B statute). And no one seriously contends that Congress, in 42 U.S.C. § 256b, did not occupy the field of 340B pricing and eligibility. ***Second***, Defendants acknowledge that Chapter 288 is an

---

[2]  Citations to Rhode Island's law are to the provisions at which the law will be codified. *See* Ch. 288 of the 2025 Public Laws, available at https://webserver.rilegislature.gov/PublicLaws/law25/law25288.htm.

attempt to leverage the federal 340B statute's "silence" as to terms and conditions on a manufacturer's 340B offer—specifically, to prevent manufacturers from attaching any conditions to those offers.  *See* Doc. 18 at 3; *see also* R.I. Stat. § 5-19.3-5(c).  But the field of 340B transactions ***as such*** is, of course, not one traditionally occupied by the states.  Rhode Island offers not one example of its previous attempts to regulate the terms of a 340B transaction before now— because it never has.

    ***Field Preemption***.  With the field properly defined as 340B transactions, Chapter 288's intrusions upon that field—in particular, by regulating the terms of a 340B offer—become clear. A manufacturer's agreement with the federal government under the 340B Program to ***offer*** drugs at discount prices is the key criterion for eligibility to participate in that program.  *See* 42 U.S.C. § 256b(a)(1).  Congress created that the notion of a "340B offer" and necessarily defined its scope. In doing so, Congress ***preserved*** manufacturers' ability to attach reasonable conditions to those offers.  *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463–64 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*, 58 F.4th 696, 703–06 (3d Cir. 2023). By eliminating manufacturers' ability to attach those conditions, Rhode Island enters federal territory to change the rules that apply to participants in the federal 340B Program.

    Defendants cannot point to any authority—apart from recent and flawed decisions on this very subject—supporting the notion that a state may unilaterally alter the requirements for participation in a federal program.  Instead, Defendants make the uncontroversial observation that federal and state law sometimes regulate the same subject matter.  *See* Doc. 18 at 18–19.  But that is not what is happening here.  In Defendants' cases, the state law at issue was generally applicable—*i.e.*, it had relevance and effect regardless of any federal activity.[3]  In other words, the

---

[3]    *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 474 (1996) (medical devices); *Hillsborough Cnty., Fla. v. Automated Med. Laby's, Inc.*, 471 U.S. 707, 709 (1985) (blood plasma collection); *Capron v. Office of Att'y Gen. of Mass.*,

federal government could have exited the field and there would still be something for the state law to do. If Congress repealed the 340B Program tomorrow, Chapter 288 would regulate nothing and benefit no one. The federal government not only occupies the entire 340B field—it created the field. Chapter 288 thus regulates "inherently federal" subject matter that "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001). The Supremacy Clause has always barred State laws like that. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. 316 (1819).

*Conflict Preemption*. At the outset, Defendants appear to think they can evade conflict preemption because, they say, "[c]ontext" "shows that the 'purpose of the 340B Program was to provide a means to make 340B entities profitable'" and unlimited contract pharmacies serve that purpose. Doc. 18 at 24–25. But "no legislation pursues its purposes at all costs" and "[u]nder the section 340B scheme, … wider distribution is not necessarily better." *Novartis*, 102 F.4th at 462. So gestures to 340B's alleged "purpose" cannot prevent Chapter 288's inevitable conflict with federal law. Rather, as explained in AbbVie's opening brief, Rhode Island's law conflicts with the federal 340B Program in three key respects: (1) it restricts rights that federal law confers upon manufacturers; (2) it competes with the exclusive federal ADR process; and (3) it frustrates manufacturers' access to that exclusive federal ADR process.[4] *See* Doc. 9-1 at 12–16. Each of

---

944 F.3d 9, 12 (1st Cir. 2019) (wage-and-hour laws); *Franks v. Coopersurgical, Inc.*, 722 F. Supp. 3d 63, 73 (D. R.I. 2024) (medical devices); *see also N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 413 (1973) (noting that federal and state programs at issue only partially overlapped).

[4]    AbbVie urged its participation in HRSA's Rebate Model Pilot Program as a fourth ground for preempting Rhode Island's law. *See* Doc. 9-1 at 16. Defendants concede that if AbbVie participates in the program, they cannot bring a Chapter 288 enforcement action based on claims data requests related to that program. Doc. 18 at 38–39. AbbVie has submitted its application for the program and there appears to be no question whether AbbVie will participate. *See* Ex. 26 (Second Scheidler Decl.) ¶ 4.

5

these is an independent ground upon which to grant AbbVie preliminary injunctive relief, and Defendants have no persuasive answer to any of them.[5]

1.   The First Circuit has established a clear conflict-preemption rule: If federal law grants a right that a state law takes away, then the state law is preempted. *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022).  Two federal circuit courts have held that the federal 340B statute gives manufacturers like AbbVie the right to impose the reasonable conditions on 340B offers at issue in this case. *See Novartis*, 102 F.4th at 463–64; *Sanofi*, 58 F.4th at 703–04.  Rhode Island's law takes that right away from manufacturers and is therefore preempted.

Defendants gratuitously chant "silence" throughout their opposition brief as if the word itself were talismanic. *See* Doc. 18 at 2, 19–21, 27–29, 32, 35, 45.  But Defendants misunderstand the meaning and import of the 340B statute's "silence with respect to the distribution of 340B drugs." *Id.* at 20.  Congress's silence does not reflect agnosticism as to conditions on a 340B offer. Rather, the D.C. and Third Circuits reasoned that Congress's silence on non-price terms, combined with its use of the term ***offer*** (as opposed to "sell") "***preserves*** … the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703–06 ("Congress's use of the singular 'covered entity' in the 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies.").  Another way to phrase it would be that Congress "implicitly

---

[5]   Defendants argue in a footnote that the Court should make its injunction provision-specific because each provision of Chapter 288 is severable from the rest of the statute. *See* Doc. 18 at 26 n.8.  But Defendants fail their own severability test: The provisions AbbVie challenges are plainly "indispensable to the rest of the statute" and could not "be severed without destroying legislative purpose and intent." *Id.* (quoting *Am. Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 51 (1st Cir. 2024)).  AbbVie challenges the substantive provisions of the law and its enforcement mechanism.  If successful in invalidating the former, there is nothing for the latter to enforce; if successful in invalidating the latter, there is no way for the former to be given teeth. *See PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 460–61 (S.D. W. Va. 2024) (granting preliminary injunction against law similar to Chapter 288 and rejecting severability argument).

conferred a right to" attach commercially reasonable conditions to 340B offers, "thus a state law" prohibiting "that conduct conflict[s] with this federal right." *Me. Prods. Council*, 51 F.4th at 8 (citation omitted). Defendants cannot resist this straightforward application of First Circuit precedent and, indeed, do not even try to distinguish *Maine Forest Products Council*.

**2.** Rhode Island's law conflicts with the 340B Program's exclusive federal enforcement regime. Defendants' responses on this point are confused. Sometimes, Defendants not only concede but defend the fact that Rhode Island state courts will be adjudicating issues such as 340B eligibility and unlawful diversion. Doc. 18 at 31–32. Defendants think that is not a problem because state courts are "presumptively competent to resolve" those issues of federal law. *Id.* at 32 (quotation marks and citation omitted). But that presumption of competence is inapplicable when Congress has provided for exclusive federal enforcement, as Congress did with the 340B Program. *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 119–22 (2011).

At other times, Defendants seem to accept that if state courts will be adjudicating federal 340B issues, then the state law is preempted. That is, Defendants concede that "federal law regulates the determination of ***prices*** on Section 340B drugs and provides robust enforcement mechanisms" for pricing disputes, but then contend that "Congress has not precluded Rhode Island or any other state from enacting its own policy governing ***delivery*** of Section 340B drugs, or the other terms and conditions on which covered entities may contract with pharmacies." Doc. 18 at 20–21. So Defendants believe that the federal and state laws govern different conduct, such that there will never be overlapping federal and state adjudications of common issues. *See id.* at 30–33.

There are two fundamental misconceptions underlying this "no overlap" theory. Defendants' first misconception is that Rhode Island's law regulates the delivery of drugs already

purchased rather than the prices of the drugs themselves. *See id.* at 21–22. But even Defendants do not really believe that: As noted above, they describe Chapter 288 as a "regulation of medicine and ***its associated costs***" and as a "***medical fee regulation***." *Id.* at 16 (emphases added); *see also id.* at 28 (stating that laws like Chapter 288 prevent manufacturers from "throttl[ing] covered entities' ***ability to obtain 340B pricing*** …."). The text of Rhode Island's law focuses on "340B drug[s]," which are defined solely by their price. R.I. Stat. § 5-19.3-2(3). And Chapter 288 plainly extends beyond mere delivery of those 340B drugs. The law prohibits manufacturers from denying "the ***acquisition*** of a 340B drug by, ***or delivery*** of a 340B drug to" contract pharmacies. R.I. Stat. § 5-19.3-5(a) (emphases added). Defendants either overlook the word "acquisition" or hope this Court reads it as synonymous with "delivery." But Chapter 288 must be read in its entirety, with each term given effect. *See, e.g.*, *In re Harrison*, 992 A.2d 990, 994 (R.I. 2010) ("[N]o construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage."). And practical reality cements what the text makes plain: Rhode Island's law operates on AbbVie's ***offer*** to sell at the 340B price, not on post-sale conduct. AbbVie's contract-pharmacy policy is a condition that covered entities must accept, otherwise "AbbVie would deny 340B pricing to the covered entity—***before the order is completed***" and covered entities would have to pay commercial price. Ex. 26 (Second Scheidler Decl.) ¶ 8. Rhode Island's law is designed to make it unlawful for AbbVie to enforce its policy and, accordingly, Rhode Island is compelling 340B-priced sales that would not occur under federal law. *Id.* ¶¶ 9–10.

Defendants' second misconception is that the federal ADR system is limited to "pricing" issues in a narrow sense, such that a dispute between a manufacturer and covered entity about terms of the sale could not be addressed in an ADR proceeding. *See* Doc. 18 at 30–31. That is incorrect. The federal ADR system provides a forum for claims that a covered entity "has been

overcharged by a manufacturer," which is defined to include "claims that a manufacturer has *limited the covered entity's ability to purchase* … drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a) (emphasis added). The contract-pharmacy policy that AbbVie seeks to apply in Rhode Island is, by definition, a "limit" on covered entities' ability to purchase AbbVie's drugs at the 340B price. Ex. 26 ¶ 7 ("AbbVie's contract-pharmacy policy limits the conditions under which AbbVie will make the 340B price available[.]"). If the lawfulness of AbbVie's policy is to be litigated, it must be challenged under federal law, by covered entities, and in the federal ADR system. *See Astra*, 563 U.S. at 119–22. Rhode Island making a state law cause of action for its state officials to pursue in state proceedings is in direct conflict with Congress's decision to grant HRSA exclusive adjudicative authority of 340B Program disputes. *See id.*

**3.** Rhode Island's prohibition on claims-data conditions is also conflict preempted for both reasons just discussed. Claims-data conditions are commercially reasonable, "minimal[ly] burden[some]" terms for manufacturers to attach to a 340B offer and are authorized under federal law. *Novartis*, 102 F.4th at 463. Rhode Island's law eliminates manufacturers' ability to engage in that federally authorized conduct, rendering the state law preempted. *Me. Forest Prods. Council*, 51 F.4th at 10.

Rhode Island's claims-data prohibition also impedes manufacturers' ability to access the exclusive federal ADR system. Federal law requires an audit of the covered entity before AbbVie can institute a federal ADR proceeding. 42 U.S.C. § 256b(d)(3)(B)(iv). And obtaining permission to conduct an audit comes only when the manufacturer already "has documentation" indicating there is "reasonable cause" to believe the covered entity violated Section 340B. 61 Fed. Reg. 65,406, 65,409–10 (Dec. 12, 1996). Defendants therefore get things out of order when they say

9

that claims data is the sort of information that would be reviewed once an audit is commenced. *See* Doc. 18 at 34.

Defendants also seem to imagine a world in which covered entities willingly deliver claims data to manufacturers and where publicly available information is sufficient to identify unlawful activity. *See id.* at 34–35. But the only evidence before this Court is to the contrary: "[c]overed entities do not generally provide claims data voluntarily or upon request," and "[w]ithout conditioning receipt of claims data on AbbVie's 340B offers, it would have no ability to otherwise identify … overbilling" by covered entities. Doc. 9-2 ¶¶ 23–24. The structure of HRSA's Rebate Model Pilot Program, which contemplates manufacturers receiving claims data to implement a rebate model, further underscores the importance of claims data to ensuring proper 340B administration. *See* 90 Fed. Reg. 36,163, 36,165 (Aug. 1, 2025). Neither can AbbVie reasonably comply with Chapter 288's overarching claims-data prohibition and still fully participate in the Rebate Model Pilot Program (to which AbbVie has already applied).

**4.** Defendants try but fail to rehabilitate the analytical shortcomings that AbbVie identified in *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024). Defendants contend that "a 'covered entity's retention of title' is less significant to the preemption analysis than the presumption" against preemption. Doc. 18 at 36 (quoting *AstraZeneca v. Fitch*, 766 F. Supp. 3d 657, 667 (S.D. Miss. 2024)). Given that the presumption against preemption does not apply here, *see supra* at pp. 1–4, Defendants cannot sidestep the title issue. More fundamentally, it is just wrong to say that a covered entity retaining title and responsibility for 340B-priced drugs is irrelevant to the preemption analysis. The assumption that covered entities would retain title to drugs at contract pharmacies was a key part of the Eighth Circuit's reasoning in holding that the Arkansas law at issue did not invade the field. *See McClain*, 95 F.4th at 1144 (rejecting argument that Arkansas's

10

law "add[ed] pharmacies to the enumerated list of covered entities eligible to receive 340B pricing" because "[c]overed entities purchase and maintain title to the 340B-discounted drugs"); *see also* 61 Fed. Reg. 43,549, 43,552 (Aug. 23, 1996) ("Title to the drugs passes to the covered entity"); *id.* at 43,553 ("Because the covered entity purchases the drug, retaining title, and directs shipment to its contractor, it retains responsibility for the drug."); *id.* at 43,554 ("[I]t is clearly stated in the guidelines that the covered entity must purchase the drug (not the contractor), which would give to the covered entity title to and responsibility for the drug[.]").  Defendants' effort to downplay the record evidence on this point is similarly unpersuasive.  AbbVie's uncontested submissions establish that contract-pharmacy arrangements typically involve pharmacies that are not agents of covered entities and that take title to and exercise control over 340B drugs.  For preliminary injunction purposes, that means AbbVie is likely to succeed in proving that Rhode Island's law protects, and requires AbbVie to facilitate, conduct that federal law forbids.[6]

### B.    Rhode Island's Law Effects An Unconstitutional Taking.

Rhode Island's law effects a physical taking without just compensation and for no public use.  AbbVie only sells its drugs at the 340B price to covered entities ***provided that*** the entity submits claims data, and its single, designated contract pharmacy is within 40 miles of the covered entity. Doc. 9-2 at 65.  "AbbVie would deny 340B pricing to the covered entity—***before the order is completed***—if the at-issue medication was or will be transferred anywhere other than the covered entity's in-house pharmacy or its single, designated contract pharmacy."  Ex. 26 ¶ 8. Chapter 288 nevertheless coerces a sale by requiring AbbVie to transfer its property to unlimited contract pharmacies whenever a covered entity demands it, and without any of the conditions

---

[6]    The decision in *McClain* also did not consider the potential conflicts between a state law enforcement scheme for contract-pharmacy limitations and the federal ADR scheme, 42 C.F.R. § 10.21(a)(1), which did not exist at the time of the decision.  It therefore has nothing to say about AbbVie's arguments on that point.

contained in AbbVie's contract-pharmacy policy. *See* R.I. Stat. § 5-19.3-5(a), (c). Because Chapter 288 requires AbbVie to transfer possession of its drugs to covered entities and contract pharmacies, it works a physical taking. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015); *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) (acknowledging that a physical taking occurs when the government appropriates property "for itself ***or a third party***" (emphasis added)).

Defendants open their Takings Clause argument with a self-defeating contradiction that concedes Chapter 288 takes AbbVie's property. They argue that Chapter 288 does not "force" AbbVie to sell its drugs, "[i]t only requires manufacturers like AbbVie to offer 340B drugs for purchase by covered entities, regardless of whether those entities want those drugs delivered and dispensed to their patients at a contract pharmacy." Doc. 18 at 40–41. Defendants thus concede AbbVie's central premise in this case—Chapter 288 eliminates the conditions on AbbVie's 340B offer to covered entities, resulting in sales that otherwise would not occur absent threatened prosecution under Rhode Island law. *See id.* at 21–22 (admitting that Chapter 288 "affects the volume of drugs that covered entities are able to purchase at 340B prices" (emphasis omitted)). "Forced" is the only accurate way to describe those additional sales.

Having established that Chapter 288 takes AbbVie's property, the remaining questions are whether that taking is for a public use and if AbbVie is provided just compensation. The answer to both questions is no. AbbVie has submitted a voluminous record to show the Court that 340B profits are not put to any cognizable public use. Defendants dismiss much of the evidence because it is not entirely specific to Chapter 288 or Rhode Island. *See* Doc. 18 at 46. Defendants miss the point: By demonstrating the typical results of 340B arbitrage nationwide, AbbVie previews what discovery in this specific case is likely to prove. *See* Ex. 24 ¶¶ 15–17 (Dr. Chen explaining that

available data demonstrates that 340B statistics in Rhode Island are on par with national trends); Ex. 25 ¶¶ 48–51, 63–64 (Dr. Chandra explaining the same).

Defendants' arguments with respect to just compensation are similarly unmoving. Defendants contend that Rhode Island has no obligation to provide a benefit in exchange for Chapter 288's taking because AbbVie voluntarily participates in the 340B Program.  *See, e.g.*, Doc. 18 at 42.  That is not quite right.  As a condition of coverage under Medicaid and Medicare Part B, Congress requires that AbbVie opt into the 340B Program.  *See* 42 U.S.C. § 256b(a)(1); 42 U.S.C. § 1396r-8(a)(5)(A).  Rhode Island is not a party to that exchange and never has been. Instead, the State recently adopted a freestanding statute, requiring AbbVie to permit the "acquisition" of its drugs at a particular price, enforceable by civil penalties.  *See* R.I. Stat. § 6-13.1-8.  AbbVie was never given a choice to opt in, and there is no way to opt out, either.  AbbVie could only avoid operation of the State law by withdrawing from the 340B Program, and Medicaid, and Medicare Part B, on a ***nationwide*** basis.  That is not a serious offer.

Obviously, the fact that AbbVie has agreed with the federal government to an exchange of offering low-cost drugs to covered entities for access to federal healthcare programs does not mean a state can compel additional transfers of AbbVie's discounted property.  Defendants' argument to the contrary is circular:  They contend that "because Section 340B does not preempt state laws" like Chapter 288, "AbbVie could have foreseen that states might enact policies" like Rhode Island's when AbbVie decided to participate in the 340B Program.  Doc. 18 at 45.  But laws like Chapter 288 ***are*** preempted.  And more fundamentally, it is quite a stretch to say that laws like Chapter 288 were foreseeable when it took more than twenty years of legal developments for state legislatures to decide to even try regulating 340B participants.

13

Recognizing they need to come up with something—anything—to identify as consideration for Chapter 288's forced transfers, Defendants suggest that Rhode Island provides AbbVie with "continued participation in Medicaid and Medicare Part B," "access to its market," and "increased transparency through state-level reporting." *Id.* at 42–45. Not one saves Chapter 288.

First, Rhode Island is obviously not the government entity providing AbbVie with the opportunity to continue participating in Medicaid and Medicare Part B. Whether AbbVie will remain in those programs is a choice that lies with the federal government—and AbbVie does not take Defendants to seriously dispute that fact. Rather, Defendants appear to confuse leveraging a benefit for one's own purposes with actually extending the benefit in the first instance. *See Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023); *see also Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 666 (E.D. Va. 2023). Call that what you will—it is not a voluntary exchange.

Next, Rhode Island claims that in exchange for Chapter 288's forced transfer, it extends to AbbVie the opportunity "to sell 340B drugs to Rhode Island covered entities." Doc. 18 at 43–44. To the extent Rhode Island thinks it can leverage mere access to commerce, it is wrong. Participating in commerce is not "a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protection." *Horne*, 576 U.S. at 366. "[P]roperty rights cannot be so easily manipulated." *Id.* at 365 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439 n.17 (1982)); *Valancourt Books*, 82 F.4th at 1232 ("[T]he right to sell" is "a basic and familiar use of property" that AbbVie "already enjoy[s] and [is] entitled to exercise."). To the extent Rhode Island thinks that it can gatekeep the market to covered entities, in particular, its position becomes even more absurd. Congress **requires** AbbVie

to offer its drugs to covered entities as a condition of participation in Medicare and Medicaid.  42 U.S.C. § 256b(a)(1); *id.* § 1396r-8(a)(5)(A).  Rhode Island identifies no authority for the proposition that it can unilaterally revoke that requirement.

Finally, Rhode Island grasps at a "benefit" in the form of Chapter 288's limited public-data provisions.  Doc. 18 at 44.  But it is unclear how covered entities submitting reports to the Auditor General is a benefit that flows to AbbVie—especially when the 340B Program itself already creates similar reporting and compliance measures.  *See* 42 U.S.C. § 256b(a)(5)(C).  Even more confusing is how these reporting measures comprise part of a voluntary exchange.  Rhode Island has not suggested that AbbVie can forgo these reporting requirements if it is allowed to retain its contract-pharmacy policy.  Thus, Rhode Island's law amounts to a proverbial offer you can't refuse.[7]

### C.    Rhode Island's Law Is Void For Vagueness.

Defendants carry on for eight pages about the vagueness of Chapter 288, but they really make just one argument: because everyone knows Chapter 288 prohibits policies like AbbVie's, the law cannot be impermissibly vague.  *See* Doc. 18 at 47–54.  That is not the case.  On top of a provision instructing that AbbVie may not "deny, restrict, prohibit, or otherwise interfere with … the acquisition of a 340B drug by" a contract pharmacy, R.I. Stat. § 5-19.3-5(a), Chapter 288 contains an altogether separate provision broadly instructing that AbbVie or its "agent[s]" or "affiliate[s]" may not "interfere with a 340B contract pharmacy," *id.* § 5-19.3-5(b).  And while everyone knows and agrees that subsection (a) targets AbbVie's contract-pharmacy policy,

---

[7]    Although Chapter 288's private wealth transfer serves no public use, even if this Court disagrees, an injunction is still warranted.  *Contra* Doc. 28-1 at 23.  Rhode Island has provided no compensation for Chapter 288's taking.  Where, as here, the State takes property without paying for it and there is no mechanism for compensation, a property owner may obtain injunctive relief.  *See Knick v. Township of Scott*, 588 U.S. 180 (2019).

15

absolutely no one knows—or has even attempted to explain—the effect of subsection (b). Defendants opaquely suggest that its meaning can be discerned from surrounding provisions, but obviously subsection (b) must do something *other* than subsection (a), lest it be rendered a nullity by interpretation. *See In re Harrison*, 992 A.2d at 994. So no one knows or can articulate what conduct subsection (b) reaches that subsection (a) does not.

This creates a fundamental vagueness problem: A law promotes arbitrary enforcement and violates the Due Process Clause "if it necessarily entrusts lawmaking to the moment-to-moment judgment" of an executive officer. *City of Chicago v. Morales*, 527 U.S. 41, 60–61 (1999). In other words, subsection (b)'s incredibly "broad sweep … violates the requirement that a legislature establish minimal guidelines to govern law enforcement." *Id.* at 60. It leaves to Defendants the ad hoc power to define new offenses never before considered. Perhaps "interference" occurs whenever a manufacturer applies a rebate system to 340B entities; or initiates an audit under the 340B statute; or restricts certain of the covered entity's child sites; or requires covered entities to apply a particular definition of "patient"; or insists upon a particular inventory management system; or lobbies Congress or HRSA to reform the 340B Program's contract-pharmacy landscape. It is anyone's guess. The inquiry is governed by nothing other than Defendants' future whims.

Thus, if Chapter 288 goes into effect and AbbVie is forced to abandon its current policy, AbbVie will have no way of knowing how to conform its conduct to the new law going forward.

## II.    THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR ABBVIE.

The remaining preliminary-injunction factors likewise favor AbbVie. Contrary to Defendants' confused argument, AbbVie has established that it will *certainly* suffer irreparable harm absent a preliminary injunction. AbbVie's compliance with Chapter 288 will cost "approximately $35.3 million in the next year" alone, and that figure is attributable to forced sales

"at steeply discounted 340B prices to an unlimited number of contract pharmacy arrangements[.]" Doc. 9-2 ¶ 27.

Defendants contend, wrongly, that "AbbVie has not adequately shown how its constitutional claims translate into real-world irreparable harm" because "the essence of the injury here is clearly economic." Doc. 18 at 55–56 (citations omitted). But the reason that economic harm is not usually considered irreparable is because a victorious plaintiff will receive compensatory damages at the conclusion of the litigation. That is not true here, where the Eleventh Amendment and binding precedent interpreting 42 U.S.C. § 1983 forbids this Court from awarding AbbVie a monetary judgment against state officials sued in their official capacities. *E.g.*, *Wang v. N.H. Bd. of Registration in Med.*, 55 F.3d 698, 700 (1st Cir. 1995). AbbVie clearly explained in its opening brief that in these circumstances, its monetary injuries are irreparable. Doc. 9-1 at 22–23; *see also Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221–22 (1st Cir. 2003); *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 362 (D.N.H. 2024) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future … financial loss can constitute irreparable injury." (citation omitted)). Defendants do not even address that point. Unless Defendants are waiving Rhode Island's immunity from monetary damages, the money AbbVie will lose from forced sales at pennies on the dollar will be irreparable. *See* Ex. 26 ¶ 12 ("For many of AbbVie's 340B-priced medications, the sale price … represents pennies on the dollar …, [a]nd … the average mandated discount across AbbVie's portfolio is over sixty percent of the drug's commercial price.").

If AbbVie ultimately succeeds on the merits of its claims, which it has demonstrated is likely, the absence of preliminary injunctive relief would mean Rhode Island enforced an unconstitutional law during this litigation—something the State wisely does not claim an interest

17

in doing.  The public certainly has no interest in enforcement of an unconstitutional law.  *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997).  Moreover, Rhode Island's law **harms** the public interest by making it more difficult to identify diversion and duplicate discounting, *see* Doc. 9-2 ¶¶ 21–24, which is so against the public interest that there is a comprehensive federal enforcement system specifically intended to root out and discipline those who commit such offenses, *see* 42 U.S.C. § 256b(a)(5)(A)–(B); *id.* § 256b(d); *cf. PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 452 (S.D. W. Va. 2024) (noting the "twin federal purposes" of "providing discounts to covered entities only and prohibiting fraud through duplicate discounts" (emphasis omitted)).  And practically speaking, it is not the public that benefits from enforcement of Chapter 288: Rhode Island's law simply takes money from patients (or their insurers) who pay full price for AbbVie's drugs no matter what and gives the windfall from compelled 340B prices to hospitals and their contract pharmacies (and their private, for-profit administrators).

## CONCLUSION

The Court should grant AbbVie's motion for a preliminary injunction.

Dated: September 22, 2025          Respectfully submitted,

*/s/ Joseph V. Cavanagh, III*
Joseph V. Cavanagh, III (#6907)
Blish & Cavanagh, LLP
30 Exchange Terrace
Providence, RI  02903
Telephone:  (401) 831-8900
Facsimile:  (401) 751-7542
Email:  jvc3@blishcavlaw.com

Matthew S. Owen, P.C. (admitted *pro hac vice*)
Meredith M. Pohl (admitted *pro hac vice*)
Nick Bell (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Email: matt.owen@kirkland.com
      meredith.pohl@kirkland.com
      nick.bell@kirkland.com

*Counsel for Plaintiffs*

19

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court via the Court's CM/ECF system, which sent notification of such filing to all counsel of record by electronic means.

*/s/ Joseph V. Cavanagh, III*
Counsel of Record