1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF RHODE ISLAND

3

4

   * * * * * * * * * * * * *    C.A. No.  1:25-cv-00387-JJM
5                            *
   NOVARTIS PHARMACEUTICALS  *
6  CORPORATION               *
                             *
7       VS.                  *    SEPTEMBER 30, 2025
                             *
8  PETER F. NERONHA, et al.  *
                             *    COURTROOM 3
9  * * * * * * * * * * * * *     PROVIDENCE, RHODE ISLAND

10

11 * * * * * * * * * * * * *    C.A. No.  1:25-cv-00388-JJM
                             *
12 ABBVIE INC., et al.       *
                             *
13      VS.                  *    SEPTEMBER 30, 2025
                             *
14 PETER F. NERONHA, et al.  *
                             *    COURTROOM 3
15 * * * * * * * * * * * * *     PROVIDENCE, RHODE ISLAND

16

17        BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

18                      CHIEF JUDGE

19           Motion of Preliminary Injunction

20

21 APPEARANCES:

22 FOR THE PLAINTIFF:    SUSAN M. COOK, ESQUIRE
   (Novartis)           JACOB T. YOUNG, ESQUIRE
23                       HOGAN LOVELLS US LLP
                         555 Thirteenth St. NW
24                       Washington, D.C.  20004

25

```
 1    APPEARANCES (Continued):

 2

 3    FOR THE PLAINTIFF:      PAUL M. KESSIMIAN, ESQUIRE
       (Novartis)             JAMES PAUL McGLONE, ESQUIRE
 4                            PARTRIDGE, SNOW & HAHN, LLP
                             40 Westminster Street, Suite 1100
 5                            Providence, Rhode Island  02903

 6

 7    FOR THE PLAINTIFF:      MEREDITH M. POHL, ESQUIRE
       (AbbVie, Inc.)         LUCAS H. FUNK, ESQUIRE
 8                            KIRKLAND & ELLIS, LLP
                             1301 Pennsylvania Avenue, N.W.
 9                            Washington, D.C.  20004

10    FOR THE PLAINTIFF:      JOSEPH V. CAVANAGH, III, ESQUIRE
       (AbbVie, Inc.)         BLISH & CAVANAGH, LLP
11                            30 Exchange Terrace
                             Providence, Rhode Island  02903

12

13    FOR THE DEFENDANTS:     JAMES J. ARGUIN, ESQUIRE
       (Neronha, Bergantino)  LEE B. STALEY, ESQUIRE
14                            JEFF KIDD, ESQUIRE
                             LIONEL JOSEPH DUTREIX, IV, ESQUIRE
15                            RI DEPARTMENT OF ATTORNEY GENERAL
                             150 South Main Street
16                            Providence, Rhode Island  02903

17

18

19    Court Reporter:         Denise A. Webb, RPR
                             One Exchange Terrace
20                            Providence, RI  02903

21

22

23

24

25
```

```
 1    30 SEPTEMBER 2025 -- 1:30 P.M.

 2    1:25-cv-00387-JJM and 1:25-cv-00388-JJM

 3            THE COURT:  Good afternoon, everyone.

 4            (All respond)

 5            THE COURT:  We're here for arguments on a motion

 6    for preliminary injunction by the Plaintiffs in two cases:

 7    Novartis Pharmaceuticals Corporation versus Peter Neronha,

 8    Civil Action 25-387 and AbbVie -- did I say that right,

 9    somebody from AbbVie?

10            MR. CAVANAGH:  AbbVie.  I believe AbbVie, your

11    Honor.

12            THE COURT:  -- AbbVie, Inc. et al. versus Peter

13    Neronha, Civil Action 25-388.

14        Would counsel for each party identify themselves.

15            MR. KESSIMIAN:  Sure.  Paul Kessimian on behalf of

16    Novartis Pharmaceuticals Corporation.

17            THE COURT:  Great.  Good afternoon.

18            MS. COOK:  Susan Cook from Hogan Lovells, also on

19    behalf of Novartis.

20            THE COURT:  Great.

21            MR. YOUNG:  Jacob Young for Novartis.

22            THE COURT:  Great.  Welcome.

23            MR. CAVANAGH:  Good afternoon, your Honor.  Joseph

24    Cavanagh for the AbbVie Plaintiffs with Meredith Pohl

25    admitted pro hac vice, as well as Lucas Funk.
```

1          THE COURT:  Great.  Welcome, all, from out of state

2     and welcome back to local friends.

3          MR. ARGUIN:  Good afternoon, your Honor.  Special

4     Assistant Attorney General James Arguin on behalf of

5     Defendants Peter Neronha, Attorney General of the State of

6     Rhode Island, and the Auditor General, David Bergantino.

7          MR. DUTREIX:  Special Assistant Lionel Dutreix,

8     also for the Defendants.

9          THE COURT:  Great.

10          MR. KIDD:  Good afternoon, your Honor.  Special

11     Assistant Attorney General Jeff Kidd, also for the

12     Defendants.

13          THE COURT:  Great.

14          MR. STALEY:  Good afternoon.  Special Assistant

15     Lee Staley, also for the Defendants.

16          THE COURT:  Great.  Welcome.  I don't know how the

17     Defendants want to proceed.  I assume you've worked that

18     out.  So whoever is going to come up, first come on up, she

19     or he.  She and he are coming up.

20          MR. KESSIMIAN:  Just briefly, Judge.

21          THE COURT:  Yes.  That's fine.  Just to put on the

22     record, and for anyone that's watching, the law in question

23     here goes into effect tomorrow, and the parties have asked

24     the Court to rule before the implementation.  I had

25     suggested that perhaps the parties would want me to have a

1    little longer and be able to be a little more thoughtful

2    about the opinion, and that didn't seem to be able to be

3    done given the short time frame involved here.

4        So, unfortunately, I don't like doing this, but we've

5    had to limit the amount of oral arguments, and, again, I had

6    to switch again this morning when I foolishly was convinced

7    that there would be no federal government shutdown.  I

8    became more convinced over the night that I had to start

9    dealing with it as the Chief Judge here, and it poses all

10   sorts of administrative problems.

11       We will be open until at least Friday in the court

12   system, so that's not the problem, but how that all gets

13   implemented is yet to be determined, and I've got to get

14   right to that when we're done here.  So I've told Defendants

15   each -- I'm sorry -- each of the Plaintiffs to have 20

16   minutes or 40 minutes total and 20 minutes for the State.

17   Ryan will let you know when there's three or five minutes

18   left.  Ryan, which are you going to go with?

19            THE CLERK:  Whichever the counsel prefer.

20   Five-minute warning or three-minute warning.

21            MS. COOK:  Five is good.

22            THE COURT:  Great.  Just know that, of course, I

23   have read all of the briefs extensively, actually a couple

24   of times, and we're ready to go.

25            MR. KESSIMIAN:  Judge, I'll be very brief.  I just

1    want to introduce that Susan Cook will be arguing on behalf

2    of Novartis.  I won't consume any more of that time.

3              THE COURT:  Great.  Thanks.

4              MS. COOK:  Good afternoon, your Honor.

5              THE COURT:  Good afternoon.  How are you?

6              MS. COOK:  Would you be amenable to reservation of

7    time for rebuttal or would you prefer we speak?

8              THE COURT:  Yes.  This is -- yes.  I like to let

9    lawyers determine how they want to present their case within

10   the parameters of the rules and the ones that we have come

11   up with here.  So if you want some time to rebut, perfectly

12   fine.

13             MS. COOK:  I think three minutes would suffice.

14             THE COURT:  Great.  Thanks.

15             MS. COOK:  Novartis's legal challenge to Chapter

16   288 is focused squarely on two legal issues:  Federal

17   preemption and the Dormant Commerce Clause.  I'd like to

18   start with federal preemption.

19        This is a highly unusual preemption case because the

20   relationship between the federal law and the state law is

21   neither subtle nor indirect.  Chapter 288 attaches

22   parasitically to the federal 340B program.  It forces

23   manufacturers who agree to participate in the federal

24   program to provide the 340B discounted price on a larger

25   universe of transactions that are required under federal

1    law.

2         In doing so, the state law forbids that which is

3    allowed under federal law.  Federal law allows manufacturers

4    to recognize a single contract pharmacy.  State law forbids

5    them from doing so, and, instead, requires that the discount

6    be provided on an unlimited number of contract pharmacy

7    arrangements.  Because some of the courts that have

8    addressed this issue to date have missed the mark on what

9    exactly the state laws at issues do, I want to spend just a

10   little of my precious time discussing the context for this

11   dispute.

12        The Rhode Island legislature here has done us a favor.

13   It has said very explicitly what the state law does in a key

14   provision, and I want to talk about what that provision says

15   and compare it to some of the other states.  But before

16   doing so, I want to give you just a tiny background

17   discussion, because I think it helps frame the state law.

18        Federal law requires manufacturers to give the 340B

19   discount as a condition of having their products covered by

20   Medicare Part B and Medicaid.  The federal statute requires

21   manufacturers to offer their drugs at the discounted price

22   to covered entities.

23             THE COURT:  You don't contest, Ms. Cook, do you,

24   that that is a voluntary program that the pharmaceutical

25   companies choose to enter?  Medicaid.  You don't challenge

1    that fact, do you?

2         MS. COOK:  It is a spending clause program.  They

3    choose to participate pursuant to the terms that are spelled

4    out under federal law.  Yes.  Correct.

5         Some covered entities don't have an in-house pharmacy,

6    so over time they started claiming the 340B discount on

7    dispenses that were made at third-party pharmacies.  So

8    that's where the contract pharmacies come about.

9         In contrast to the way the state has phrased the issue,

10   covered entities don't order their drugs and ask that they

11   be delivered to the pharmacy for dispensing to their

12   patients there.  It works backwards.  It starts with a

13   third-party administrator that sifts through the pharmacy

14   data, looks for a customer of the pharmacy that looks like

15   it ever was a patient of the covered entity, and then

16   identifies that person as a match.

17        THE COURT:  But you don't argue, do you, that as

18   unique as that may be a procedure from what folks originally

19   thought of under 340B, you don't argue that that's

20   prohibited by the federal statute, the language of the

21   federal statute or the procedure of the federal statute, do

22   you?

23        MS. COOK:  For purposes of our argument here, our

24   challenge to the state law, we don't contest that.  There's

25   a separate question about whether it's lawful under federal

1    law, but we don't need to prove it's unlawful under federal

2    law.

3        I think the reason I'm explaining this background

4    though is it does explain -- gives more context for why the

5    state law does interfere with the federal law.

6        THE COURT:  Okay.

7        MS. COOK:  And the reason that it does is that this

8    ordering of drugs for delivery at the discounted price is

9    not a distribution mechanism.  It's a delivery mechanism.

10   What it is is an accounting fiction.  It's an after-the-fact

11   identification of dispenses as though they trigger the

12   discount when they didn't.

13       The reason that matters is because when the state law

14   steps in and requires distribution of discounted prices to

15   these third-party pharmacies, it's trying to undermine

16   decisions that the D.C. Circuit and Third Circuit rendered

17   regarding the scope of federal law.  Both the D.C. Circuit

18   and the Third Circuit held that manufacturers don't have to

19   recognize an unlimited number of contract pharmacy

20   arrangements.

21       THE COURT:  But that's how our system works, right,

22   is that when someone doesn't like a court ruling, they go to

23   the legislature and have it changed.

24       MS. COOK:  They go to the federal legislature if

25   they don't like the scope of a federal program.

1          THE COURT:  Correct.  There's nothing nefarious --

2          MS. COOK:  I agree with you.  That would have been

3     an appropriate avenue.  The state legislature is trying to

4     step in that scope in addressing what covered entities

5     didn't like about federal law is what creates the field and

6     conflict preemption here.

7          The Rhode Island statute has five provisions that are

8     relevant to analyzing preemption.  I'm going to try to go

9     through them quickly, because I know time is short.  It

10    prohibits manufacturers from interfering with the

11    acquisition or delivery of a 340B drug.  That is a defined

12    term under the state statute.  And it means a drug that has

13    been subject to an offer for reduced prices.  This is one of

14    the key provisions I wanted to focus on, because in that

15    provision, the State of Rhode Island is saying the quiet

16    part out loud.  It is defining 340B drugs in a mechanism

17    that triggers the 340B discount.  It's a reduced price that

18    defines a 340B drug.  It's the same drug, whether it gets

19    the discount or not.  It looks the same, it's available to

20    patients in the exact same way.  The difference under the

21    state law for a defined term 340B drug is that it gets a

22    reduced price.

23         So when it requires delivery of a reduced price drug,

24    the state is actually stepping into the field of the pricing

25    of the drugs and the manufacturers' obligations to give the

1    discount in certain circumstances.

2        The second way that the state law interferes or

3    involves some of the issues covered by federal law is that

4    it prohibits manufacturers from interfering with a 340B

5    contract pharmacy.  That's broader, it's not limited to

6    delivery, it's a broader, don't interfere with contract

7    pharmacy arrangements.

8        It has a unique provision in Rhode Island in the state

9    340B law.  It says, (reading) Manufacturers can impose

10   additional terms or limitations not required by federal law.

11   Again, not limited to delivery.  That is a provision that I

12   don't remember seeing in any other state program.  And it

13   essentially tries to freeze the language in the federal

14   statute not as a floor but as an entirety of the obligations

15   that states are allowed to provide.

16       So if the states are correct that -- if the State of

17   Rhode Island is correct that federal law is narrow in scope,

18   the state law now swallows it whole by saying, you're not

19   allowed to take any actions not specifically required by

20   federal law.

21       It doesn't allow manufacturers to request claims data,

22   and it also disallows manufacturers from changing

23   adjudication of a claim after the fact.  You can't reverse

24   or resubmit.  Both of those provisions are not about

25   delivery; they're about identifying drugs and how the

1    discount is provided.

2        The state law exists solely for one purpose:  For the

3    financial benefits of hospitals and for-profit pharmacies.

4    It increases the number of transactions that trigger the

5    340B discount given to covered entities, not to patients,

6    and the State of Rhode Island admits as much on page one of

7    its Notice of Supplemental authority.

8        That also is somewhat unique, because now we don't have

9    a dispute factually about whether the terms of participation

10   are broader under state law.  The state has admitted that

11   they are.  Manufacturers have to give a higher volume of

12   discounts under state law.

13       To be clear, this is not about patient access, this

14   isn't about patient pricing; they pay the same price.  I

15   think there's no dispute about that in this case.

16       I'll start with field preemption.  We have two flavors

17   of preemption at play.  State statutes that diminish federal

18   control over enforcement and that detract from a unified

19   federal field are deemed to be especially likely to be

20   preempted under field preemption principles.

21       The federal 340B statute is exactly such a statute.  It

22   implements a comprehensive federal remedial scheme; it

23   provides its own enforcement pathways.  Congress had

24   mandated that the program be overseen exclusively by HRSA

25   through an ADR process and an enforcement process.  We know

1    all of these things from the Supreme Court's decision in

2    *Astra*.  There, the Supreme Court acknowledged that in

3    creating 340B, Congress intended a unitary administrative

4    enforcement scheme.  This is at pages 119 through 120.  It

5    also recognized that alternative enforcement pathways were

6    incompatible with the agency's efforts to administer both

7    Medicaid and the 340B statute, quote, harmoniously and on a

8    uniformed nationwide basis.  That's at 120.

9         *Astra* was not a preemption case, but it does provide

10   the uniform national enforcement goals.  It very clearly

11   spells out from the Supreme Court's perspective that this is

12   exactly that kind of statute.  And the preemption work is

13   done by the First Circuit's decisions.  So in *French V. Pan*

14   *Am Express*, this is a First Circuit case from 1989, the

15   Court said, (reading) Field preemption can be inferred from

16   the goal of a federal statute to, quote, create a single

17   uniform system of regulation.  That's exactly what *Astra*

18   tells us the federal 340B statute does.

19        Any good preemption analysis will start with a

20   discussion of the field.  Here, the field is manufacturers'

21   obligations under the 340B program.  Chapter 288 regulates

22   directly into that field.  It grasps onto a carefully

23   crafted federal program, it creates new obligations for

24   manufacturers who participate in 340B, and it, therefore,

25   walks into the field of federal law.

1          THE COURT:  But it doesn't -- the 340B doesn't

2   explicitly deal with distribution, you'd agree?

3   Distribution or the distribution of the drugs doesn't

4   appear.  There's no requirement that they go to a licensed

5   pharmacy, there's no requirement they go to covered entities

6   themselves or whatnot.  The single focus of the plain

7   language of the statute is a pricing issue.

8          MS. COOK:  There is a provision in the federal 340B

9   statute that covers delivery.  It's the prime vendor

10  provision.  It provides for a prime vendor program to

11  oversee wholesaler distributions.  So it does speak to

12  distribution.  It doesn't speak to contract pharmacies.  The

13  D.C. Circuit and Third Circuit told us what that silence

14  means, and that silence on the issue of delivery means that

15  manufacturers preserve the ability to make flexible

16  decisions with regard to delivery.

17         THE COURT:  Doesn't presumption require more of an

18  affirmative aspect for the Court to find preemption?

19  Preemption is not a favored concept when the issue isn't

20  clear from the federal statute.

21         MS. COOK:  If it's a conflict preemption case,

22  we're not in the express preemption world, so we're not

23  going to find language in the statute to supply the very

24  clear express desire to preempt.

25         THE COURT:  Right.  But we don't even have the

1    clear desire to show that the field is preempted.

2         MS. COOK:  Because the field here is federal 340B

3    law.  The field is what, as a manufacturer, do I have to do

4    to comply with the program requirements.  There was no

5    preexisting state of law that states were already regulating

6    and that had anything to do with 340B.  The word 340B comes

7    from the federal statutory provision that set up the

8    program.

9        So this is a field that only exists because of federal

10   law.  And states' participation in the federal field should

11   be presumed not to be allowable for a couple of reasons.

12   One, the suspending clause legislation.  So Congress has an

13   obligation to lay out the specific terms and requirements of

14   participation.  That was part of the bargain manufacturers

15   struck when they decided to participate.  Even Congress had

16   to be very clear about the requirements.  States were not

17   presumed to have the ability to come in and add terms to

18   that bargain, to require more of the manufacturers in the

19   State of Rhode Island than they're required to provide

20   nationwide.

21        THE COURT:  Do you know how many covered entities

22   have in-house pharmacies?

23        MS. COOK:  I do not know.  And I think it probably

24   varies state to state or year to year.  So I don't know in

25   the State of Rhode Island.

1    THE CLERK:  That's five minutes without counting

2    your rebuttal time.

3    MS. COOK:  Okay.  I do want to make one more point

4    on this silence point.  I think this suggestion that the

5    state law is only about delivery really falls apart when you

6    look at the language of the statute, particularly in Rhode

7    Island, because its delivery of a 340B drug.  So it is about

8    drug pricing and it is a discounted price that's required.

9    That's the key part of the law.

10    There are also other provisions in Rhode Island that I

11    mentioned earlier that don't have anything to do with

12    delivery.  You can't reverse your claims data; you can't

13    impose new conditions.  All of those are not limited to the

14    field of delivery.  So even if one were to assume the

15    federal statute allowed for some delivery scheme to be

16    added, we disagree that it does, there's still many aspects

17    of the law that are about pricing and that are about

18    interfering with contract pharmacies divorced from delivery.

19    I want to quickly talk about conflict preemption.  The

20    first conflict is one that's similar to the field argument,

21    which is, Congress was balancing objects when it decided to

22    lay forth the requirements for the 340B program.  It didn't

23    want to dis-incentivize manufacturers from participation.

24    If the discount requirement was too heavy, manufacturers can

25    withdraw from Medicare and Medicaid to avoid the obligation,

1    and it didn't want to encourage that.  That's bad for

2    manufacturers.  That's bad for the public health.

3         THE COURT:  But the only ones it's applying to

4    under state law are to patients of covered entities who

5    receive their drugs through contract pharmacies, right?  So

6    the breadth of who you are going to be required to give the

7    discounted price to was a known -- a number of people; it

8    was capped, right, it's capped at patients of covered

9    entities.  And how those patients of covered entities get

10   their drugs while being a patient of a covered entity is

11   what the state law deals with that 340B doesn't.  Right?

12   Isn't that --

13        MS. COOK:  It's a great question.  It's very

14   important, so let me make sure I address it carefully.  The

15   best way to explain this is through an example.  The way the

16   federal law is set up, if I go and I visit a covered entity

17   in the State of Rhode Island and I get a prescription and I

18   go down in the basement and they have an in-house pharmacy

19   and I fill the prescription, everyone agrees, that is

20   subject to the 340B pricing.

21        What we're talking about here is not me walking across

22   the street and finding a CVS and filling a prescription and

23   saying, hey, I'm a patient of this covered entity, make sure

24   you give them the discount.

25        THE COURT:  Well, we are actually.  This is

1    actually one of the things that the state law allows that

2    you're reading of -- or that your elimination of the state

3    law would have prohibited.

4          MS. COOK:  It almost never happens that way.

5          THE COURT:  I know, but --

6          MS. COOK:  Right.  So the way it typically happens

7    is that somebody, after the fact, would say, this person

8    happened to have been a patient of this covered entity five

9    years ago for a totally unrelated medical issue condition.

10   They may also have been the patient of six other covered

11   entities in the State of Rhode Island, and I want to

12   identify all of them as getting the discount.

13         THE COURT:  I hear you, Ms. Cook.  I will give you

14   a couple of minutes, because I'm going to just talk here for

15   a minute with you.  It does seem clear to me that the scope

16   of 340B is likely beyond what the pharmaceutical industries

17   thought when they entered 340B, and that the covered

18   entities, through third-party administrators and others,

19   have figured out within the system how to maximize the

20   number of prescriptions that would fall under 340B.  They do

21   it through this, you called it a look-back provision, which

22   they do for a lot of different programs, and I'm guessing

23   that when the covered entities nationwide began using this

24   third party look-back provision, your clients, number of

25   340B priced drugs probably went through the roof, and you

1    quickly realized that the money which was meant to be a

2    discount to, for lack of a better term, lower income

3    patients was actually going to usually nonprofit --

4    oftentimes nonprofit entities, for instance, in Rhode Island

5    is Thundermist, which you may or may not have read about,

6    and that's where your clients rub with the way this is being

7    applied seems to me to be, and from a practical point of

8    view, is legit.  I understand why they're like, whoa, this

9    isn't what we were thinking, this isn't the way it went.

10   The question I've got for you is, isn't your real beef with

11   this whether the 340B statute itself applies to this kind of

12   program, not whether the state can mandate the distribution

13   of it in that fashion?

14        MS. COOK:  That was exactly our concern when

15   Novartis filed an APA lawsuit against HRSA and DDC and went

16   up on appeal in the D.C. Circuit.  And both federal courts

17   told us, under federal law, you don't have to give the

18   discount on those transactions.  We were enabled, we were

19   given flexibility, we were given a right and a power by

20   those court decisions.  And now the states are saying, never

21   mind, we're taking that away.  And this is both the way that

22   the state law walks in the field and it's the conflict that

23   has evolved between the state law and the federal law.

24        THE COURT:  Okay.  I just wanted to ask that.  When

25   you understand the practical, for me at least, it's easier

1    to understand the legal arguments of how the two play

2    together.  But I don't think anyone would dispute that the

3    amount of discounted drugs that your clients have had to

4    under the 340B paid -- expended expedientially because of

5    the way the system has been used, I won't talk pejoratively,

6    the way it's been used, and, therefore, whether now that's

7    appropriate for the states to protect or not.

8            MS. COOK:  I'm very glad you asked the question,

9    because this is an issue that tripped up some of the other

10   courts that have looked at it.  They think that we're just

11   fighting about the same federal dispute.  And here we have a

12   very different issue, which is, this is not an area that

13   states should be mucking with in the first place.  This is

14   something that should be between us and our federal

15   regulator.

16       So there's a field preemption argument -- there's a

17   very clear conflict problem, because we are being told by

18   federal law that we are allowed to impose these restrictions

19   and state law is forbidding.  And the case law backs that up

20   as a very clear conflict preemption problem.

21       I know I'm running out of time.  For the Dormant

22   Commerce Clause, I would just suggest that your Honor look

23   at both the *Ellison* decision and the *Frasch* decision,

24   because they speak very clearly to the facts here.

25            THE COURT:  Thanks a lot, Ms. Cook.

1          MS. COOK:  Thank you, your Honor.

2          THE COURT:  We'll see you back up.

3          MS. COOK:  Okay.

4          THE COURT:  Good afternoon, Mr. Cavanagh.  How are

5     you doing?

6          MR. CAVANAGH:  Good afternoon, your Honor.  Again,

7     for the AbbVie Plaintiffs, I'm pleased to introduce Meredith

8     Pohl admitted pro hac vice.

9          THE COURT:  Great.  Welcome, Ms. Pohl.

10         MS. POHL:  Thank you, your Honor.  May it please

11    the Court, my name is Meredith Pohl on behalf of the AbbVie

12    Plaintiffs.  I'll try not to repeat too much of what you

13    just heard from my colleague, Ms. Cook, although, of course,

14    the AbbVie Plaintiffs join and agree with her argument.  If

15    you've read the briefs, you know we make many of the same

16    points.

17         THE COURT:  I forgot to say initially, and I should

18    have, that I've limited the time for argument, however, the

19    Court considers all of the arguments made in the extensive

20    briefings and supplements that been done fully argued and

21    raised in this for any appellate purposes that might come.

22         MS. POHL:  Thank you very much, your Honor.  I'm

23    going to focus today on four distinct points, if I may.  The

24    first is, Rhode Island's law interferes with 340B's

25    exclusive federal enforcement remedy.  You heard a lot, I

1    think, from Ms. Cook about the policy preemption, which we

2    completely agree with, but I would remind the Court that

3    both the *Arizona* and *Crosby* courts point that enforcement or

4    remedy conflict is no less a conflict subject to preemption

5    than a policy preemption point.

6         The second would be AbbVie has a takings claim.  It's a

7    little different than Novartis.  I'd like to talk about

8    that.  The third is patient access.  I'd like to take the

9    chance to convince you that Chapter 288 does not expand or

10   in any way affect patient access and it doesn't serve a

11   public use for as in the public interest.  And, fourth, I'd

12   like to talk briefly about claims data.

13        So, first, with respect to enforcement, one thing that

14   I think is different from the Eighth Circuit's decision in

15   *McClain*, which comes up a lot in both parties' briefings, is

16   that after the *McClain* decision came down, HRSA promulgated

17   a new regulation for the federal ADR rule.  It's 42 CFR

18   1021.  We talked a little about *Astra* this morning.  *Astra*

19   speaks to the harmonious and uniform hole of the enforcement

20   scheme.  The other thing I want to quote from *Astra*, also

21   from page 120, is that the Court was very clear, HHS is to

22   take the control rein.  One reason why it was important that

23   there be harmonious uniform nationwide enforcement was that

24   Medicaid and 340B have to operate together.  On way -- in

25   fact, the only way that the Court thought that you could

1   possibly do that is if HHS maintains the control rein of

2   enforcement.  They're supposed to do that through the

3   federal ADR process.  And in the rule that was promulgated

4   in the aftermath of *McClain*, I want to read the definition

5   to you of claims that are subject to the ADR Rule Section

6   1021.

7        (Reading) Claims include that a manufacturer has

8   limited the covered entities' ability to purchase covered

9   outpatient drugs at or below the 340B ceiling price.  I

10  don't understand the State to be saying that Chapter 288

11  covers anything else, that policies like AbbVie's,

12  manufacturers' policies limit access to a 340B price, that a

13  covered entity did not have the ability to purchase covered

14  outpatient drugs at or below the 340B ceiling price.

15       Those are the kinds of claims that are within the

16  exclusive enforcement realm of the ADR panel.  But under

17  Chapter 288, they're also subject to enforcement as a matter

18  of state law.

19       I want to pause here for a second and address a point

20  raised in the briefs, because I think it is an important

21  clarification.  At pages 31 and 32 of their brief, the State

22  talks about sort of your classic concurrent jurisdiction

23  problem.  And to be very clear, I have no doubt that the

24  state court is very competent to decide questions of federal

25  law.  I know that they do it all the time.  I think what's

1    different about 340B is that actually Congress divested even

2    federal courts of the ability to decide the kinds of

3    questions being discussed in those two pages.

4        So what AbbVie raised in its open brief was that in

5    response to enforcement action under Chapter 288, AbbVie may

6    have federal defenses, like a covered entity is not eligible

7    under the program, that a covered entity is engaging in

8    diversion and duplicate discounting.  And if AbbVie raises

9    that kind of federal defense, how is AbbVie able to

10   vindicate that defense in the context of the state

11   enforcement mechanism?

12       And the State's response to that in those two pages, 31

13   and 32, of its brief, is just to say, well, the state court

14   will just decide those, I think they called them, threshold

15   questions of federal law.  And just to be really clear, that

16   is a violation of *Astra*.  The Supreme Court was very clear

17   in that case that there is no court, only the ADR Panel has

18   the authority and jurisdiction in the first instance to

19   decide those kinds of questions.  And those questions now

20   also contemplate any time a manufacturer has limited covered

21   entity's ability to purchase at the price.  That's what I

22   think everyone here agrees AbbVie's policy does, which I

23   think segues well into my discussion of the takings claim.

24       So there's one point that I think other courts have

25   either -- there's sort of a misunderstanding, this is a more

1    nuance point.  I want to pause on it for a second.  AbbVie's

2    policy operates at the offer level.  So one way to think

3    about this is under the 340B statute, Subsection A says,

4    Manufacturers shall offer covered outpatient drugs at the

5    discounted price.  Doesn't say AbbVie has to sell them; just

6    says AbbVie has to offer them.

7         What the D.C. Circuit says in *Novartis*, I think this is

8    at page 461 of Judge Katsas's decision, is that what that

9    silence means is the covered entities don't have to accept

10   terms, simply any, that a covered entity may wish.  So

11   AbbVie imposed a reasonable condition, one contract pharmacy

12   submission of claims data.

13        And in practice, what this means is if the covered

14   entity doesn't accept those terms, doesn't want to purchase

15   on those terms, wants an unlimited contract pharmacy term,

16   for example, like a Chapter 288 would provide, AbbVie just

17   won't make the sale at the discounted price, the sale will

18   not occur.

19        So one way to think about that is, maybe AbbVie's

20   policy doesn't run afoul of Chapter 288 at all.  I could see

21   a world where that's true.  If you look at the definition of

22   340B drug under the state's law, it says that the drug is

23   purchased by a covered entity.  But here, actually, AbbVie's

24   whole point is, we will not sell it at the discounted price

25   to the covered entity under conditions that we do not allow.

1    And maybe that's true if you --

2            THE COURT:  Doesn't that go to my question to

3    Ms. Cook?  Isn't your real argument and beef with 288 better

4    set when you challenge the actions under 340B itself?

5            MS. POHL:  Well, respectfully, your Honor --

6            THE COURT:  At least to that last argument you were

7    making.

8            MS. POHL:  Actually, your Honor, no.  I think

9    especially with respect to the takings claim, it is Chapter

10   288 that is compelling additional sales at the confiscatory

11   price.  So AbbVie's point is, under *Novartis* as it existed

12   before -- well, I guess as it currently exists because

13   Chapter 288 is not in effect -- so as of today, AbbVie is

14   entitled to have under federal law its policy and effect,

15   and it does.  Starting tomorrow, Chapter 288 will come into

16   effect.  That means AbbVie will not be able to provide one

17   contract pharmacy limitation, it can't reject offers for

18   sale, requests for sale on other terms.  The imposition of

19   Chapter 288 is what's going to change the matrix there.  So

20   then after that, AbbVie will have to accept all of those

21   replenishment orders, all of those requests for

22   reimbursement.

23           THE COURT:  What did AbbVie do when HRSA opened up

24   the contract pharmacy availability as part of its regs?  Did

25   they stop selling?

```
 1            MS. POHL:  Stop selling in what context, your

 2    Honor?  At the discounted price?

 3            THE COURT:  Yes.

 4            MS. POHL:  Your Honor, AbbVie adopted its first

 5    contract policy in 2020.  It's called a DEM model, Data

 6    Integrity.  It was a pure claims submission policy.  Later,

 7    AbbVie adjusted its policy in the wake of the Sanofi and

 8    Novartis decisions to adopt a one contract pharmacy policy.

 9    And what AbbVie does now as a matter of that policy is,

10    pharmacies around Rhode Island and around the country can

11    purchase an unlimited amount of AbbVie drugs at the

12    commercial price.  They just can't order them at the 340B

13    discounted price unless they are the one contract pharmacy

14    recognized by the covered entity.

15        So to be really clear, it isn't really that AbbVie

16    isn't selling.  AbbVie sells its drugs at the commercial

17    price all the time with no limitation, and that's true

18    whether Chapter 288 is in effect or not.  But the imposition

19    of Chapter 288 compels additional sales at the discounted

20    price.  This is the volume problem.  There are just more

21    discounted drugs available for reimbursement when there's an

22    unlimited contract pharmacy requirement in effect.

23            THE COURT:  But only to patients of covered

24    entities.  We're talking about a small world in the realm of

25    the larger world.
```

1          MS. POHL:  I want to push back gently --

2          THE COURT:  Wait a minute -- go ahead.

3          MS. POHL:  I want to push back gently, your Honor.

4     I totally understand the point.  There is a number of

5     patients --

6          THE COURT:  There's no point.  It's a fact.  Either

7     it is -- that is true, right?  It only applies to those that

8     are sold to covered entity patients that use contract

9     pharmacies.

10         MS. POHL:  I think it's a matter of the design of

11    the federal law.  That is the way it's supposed to work,

12    yes.

13         THE COURT:  You won't agree with that fact that it

14    only applies to patients of covered entities?

15         MS. POHL:  The 340B statute does certainly.  I

16    think as a matter of Chapter 288, one problem is, first of

17    all, the definition of a patient is not static.  It's not

18    said by either the state law or the federal law.  It could

19    be changed, the criteria could change at the whim of the

20    covered entity that could affect who is a patient.

21         Also, if I were to point back to the 2010 HRSA

22    guidance, I would point you to, it's page 10278, the Federal

23    Register Volume 75, Number 43, and this was when HRSA

24    originally adopted the unlimited contract pharmacy policy

25    provision.  What HRSA said at this point is, well, covered

1     entities have to tell the patient that they're free to use

2     any pharmacy they want.  One reason why I think

3     pharmacies -- covered entities probably don't do that is the

4     patients don't get the discount.  So one problem we might

5     have is it's kind of awkward for the covered entity to say,

6     if you go to this one contract pharmacy, I make some money,

7     you get nothing, you have to continue to pay full price, but

8     I'll make some money.  So I think it's a matter of practice

9     they don't tell them.  But the part I want to point you to

10    is that what HRSA has said is that when a patient obtains a

11    drug from a pharmacy other than a covered entity's in-house

12    pharmacy, the manufacturer is not required to offer that

13    drug at the 340B price.  So AbbVie isn't doing anything

14    different vis-à-vis whether there's a patient or not,

15    whether they're picking it up at one pharmacy or others.

16    HRSA has said, actually, manufacturers never have to offer

17    the discount if it's at a noncontract pharmacy, which I

18    think maybe affects a little bit your question about the

19    identity of the patient.

20         Maybe this is a good point to stop and talk a little

21    bit about patient access and a matter of the public use and

22    the public interest.

23              THE COURT:  I don't think you have to convince me

24    that the arrangement that is taking place now is not geared

25    toward public access.

1          MS. POHL:  That's great.  Then I won't try.

2          THE COURT:  That's -- first of all, I think that's

3    a political argument, small public policy argument and not

4    necessarily a legal argument.  But I don't think you need to

5    spend any time on that.  I think we might think alike on

6    that.

7          MS. POHL:  Thank you, your Honor.  Then the last

8    piece I wanted to point to on the takings claim, setting

9    aside the notion of whether AbbVie will or won't sell and

10   that Chapter 288 imposes additional sales at the discounted

11   price, is just the text of the statute itself.  So Rhode

12   Island's law says that AbbVie cannot deny, restrict,

13   prohibit or otherwise interfere with indirectly or directly

14   the acquisition of a drug by a pharmacy.  Acquisition or

15   delivery.  They're disjunctive.  They have to mean two

16   different things.  I think oftentimes what I've seen either

17   from other courts and also from this state here,

18   respectfully, is the notion that this is a delivery

19   regulation.

20         Actually, at page 41 of their brief, I think the State

21   admits quite clearly that this is a medication price control

22   regulation.  And I think they're very honest about that.

23   But one thing that that means is that that's not a delivery

24   regulation.  An acquisition has to have a meaning other than

25   delivery as a matter of the text in the statute, otherwise

1    it's surplusage.  And I think one other way to think about

2    not denying someone's right to acquire your property is just

3    to say, you have to give it to them.  It's just a double

4    negative way to say that.  You cannot interfere with their

5    acquisition of your own property.  So for a textual reason,

6    we also believe that Chapter 288 works at taking.

7         One other brief point on claims data, and then if I

8    have time, I'd like to talk about vagueness really briefly.

9         THE COURT:  Sure.

10        MS. POHL:  Claims data is a ubiquitous and very

11   universal part of the health care industry as we know it

12   today.  In fact, it's not a burden on covered entities to

13   the extent that they don't already have it.  Usually, claims

14   data is created as an electronic matter every time you or I

15   go to the pharmacy and we fill a prescription.  It's also

16   the kind of data that is already shared between contract

17   pharmacies, TPAs and covered entities as a matter of how

18   they place replenishment orders.  So when AbbVie imposes a

19   submission of claims data condition on its offer, it isn't

20   telling a covered entity you have to go create this whole

21   new burdensome category of data; it's something they already

22   have.

23        And one reason why it's really important to AbbVie to

24   have access to that information is when we spoke a little

25   bit earlier about ADR.  The only way to access the exclusive

1    ADR forum is through an audit.  And in order to get an audit

2    from HRSA, we have to have good cause, we have to show good

3    cause to audit the covered entity.  And it's not an easy

4    process.  Covered entities can only be audited by one

5    manufacturer at a time.  There's a limit on how many audits

6    a covered entity must be subjected to in a particular amount

7    of time.  But one thing is, manufacturers cannot audit

8    without HRSA's permission.  And one way to demonstrate good

9    cause is to submit claims data showing duplicate discounting

10   or maybe divergent.  There would be ways to see that from

11   the claims data submitted.  Maybe you have two dispenses

12   from the same pharmacy at the same time.

13          I've seen -- I think there's a footnote in the State's

14   opposition brief where my friend says, you know, well,

15   AbbVie obviously didn't need claims data for the vast

16   majority of the time of the program because you were able to

17   audit presumably before that.  And to address that point,

18   because I think it's a common misunderstanding, for most of

19   the time that the program was in existence, unlimited

20   contract pharmacy usage was not permitted.  So if you think

21   about the first 20 years of the program, one contract

22   pharmacy with a segregated inventory, I walk in with my

23   prescription, I'm 340B eligible, I receive my drug from the

24   340B shelf, well, I don't know that anyone needed claims

25   data to determine if there was an auditable problem with one

1    contract pharmacy with a segregated inventory.  But HRSA is

2    very clear in the 2010 guidance, and I think even as a

3    matter of covered entities I think would agree, that if you

4    have more contract pharmacies, you end up with higher risk

5    of diversion.  And the only way really to combat that

6    problem or address it is through solicitation and submission

7    of claims data as an ability to get an audit.  So AbbVie

8    would submit that our inability to condition our offer on

9    the receipt of claims data interferes with and conflicts

10   with our ability to access the exclusive federal remedy.

11        Finally, just very quickly on vagueness, and then I'd

12   like to return -- reserve whatever the balance of my time is

13   for rebuttal, understanding it may not be very much, I think

14   there's some confusion between AbbVie's brief and the

15   State's brief on the vagueness point.  AbbVie's dispute is

16   very clearly with 19.3-5 Subsection B, which is not the

17   deny, restrict, prohibit provision which is Subsection A,

18   but the second one which just says, Manufacturers cannot

19   otherwise interfere.  And that has, for AbbVie, a company

20   that wants to conform its conduct to the law, we want to

21   prescribe our conduct to whatever is required, it's very

22   difficult to understand what that means, because the State

23   has only pointed back to Subsection A to say, AbbVie knows

24   what that means.  If AbbVie knows what Subsection A means, I

25   think we're in agreement that we then have no idea what

1    Subsection B means.  So as a matter of notice on the

2    potential for arbitrary enforcement, we would submit that at

3    least Subsection B is unconstitutionally vague.  Thank you

4    very much, your Honor.

5           THE COURT:  Thanks a lot.  We'll give you a couple

6    of minutes to rebut.  Don't worry.  Who's going to take --

7    are you going to split the argument or are you --

8           MR. ARGUIN:  No, your Honor.

9           THE COURT:  Come on forward.  While he's coming up,

10   I should have earlier welcomed the public health students

11   who are joined here with their Professor from Brown, who I

12   have the privilege of every year coming to their class and

13   teaching one of the public health classes with the

14   Professor.  So I should have earlier welcomed you all.

15       And I found out that they actually looked at a

16   preemption issue in public health earlier in the class, so

17   it kind of was unbelievable that they wanted to come observe

18   a court thing and we had this case for them.  So welcome to

19   all of you.

20          MR. ARGUIN:  Thank you, your Honor.  James Arguin

21   on behalf of the Defendants.  Let me start by correcting few

22   fundamental misunderstandings that I think underlie all of

23   AbbVie's and Novartis's challenges to Chapter 288.

24       Contrary to what's been said, Chapter 288 does not

25   expand the federal 340B program by allegedly forcing

1    manufacturers to sell drugs at discounted prices to entities

2    Congress never envisioned.  The price at which drugs are

3    sold under the 340B program is a requirement imposed by

4    federal, not state law.  The 340B program establishes that

5    ceiling price for drug sales.  Chapter 288 says nothing

6    about it.  And it's the 340B program, not Chapter 288, that

7    requires all manufacturers who voluntarily participate in

8    the 340B program to extend that pricing to covered entities.

9         Chapter 288 also does not expand the list of covered

10   entities beyond those originally envisioned by Congress.

11   The covered entities are all safety net health providers who

12   provide critical services to vulnerable communities.

13        THE COURT:  Right.  But let me jump ahead for a

14   second to a practical question, whether it has anything to

15   do with the legal issues that are before us in this case is

16   true.  You would agree that it would appear from reading of

17   the statute that the intent was to require drug companies

18   that were going to participate in Medicare and Medicaid to

19   offer lower drug prices to patients of covered entities

20   which are primarily lower income or people with less access

21   to health care or whatnot so that they would get the drugs

22   also at a lower price.  Am I off on what the State thinks

23   about 340B?

24        MR. ARGUIN:  The intent of the federal statute?

25        THE COURT:  Correct.

1            MR. ARGUIN:  Yes.  The intent --

2            THE COURT:  So, with that, you will agree that

3    somebody, I don't know who, came up with, I'm not going to

4    call it a scheme, but if I weren't on the record I would

5    call it the scheme because I don't want it being pejorative,

6    but the idea that third-party administrators would go in and

7    look at data after the sale at the pharmacy and that they

8    would resell, so to speak, for anyone who was a patient of a

9    covered entity at the lower price and that the money

10    actually enters back to the covered entity, not to the

11    patients, that that arrangement likely was not the

12    arrangement that 340B intended.  Do you agree with that?

13            MR. ARGUIN:  I don't, your Honor.

14            THE COURT:  Okay.

15            MR. ARGUIN:  First off, the intent of Congress in

16    enacting the 340B program was to generate savings by placing

17    a price cap on drugs sold to covered entity.

18            THE COURT:  For whose benefit?

19            MR. ARGUIN:  For the benefit of the covered

20    entities so that the covered entities could utilize those

21    savings to expand the health care safety net for vulnerable

22    communities, and Congress specifically said that their

23    intent in doing that was to maximize limited federal funding

24    by helping covered entities, many of whom are operating on

25    shoestring budgets, to invest those savings into their

1    operations and extended care.

2         THE COURT:  So you would agree with Ms. Pohl and I

3    that patient access to lower priced drugs, patients of

4    covered entities, access to lower priced drugs is not a

5    purpose of Chapter 280?

6         MR. ARGUIN:  No.  288 --

7         THE COURT:  288.  I apologize.

8         MR. ARGUIN:  -- the state law is a response to

9    efforts by the manufacturers to limit the way the drugs that

10   are prescribed by covered entities to their patients,

11   subject to the 340B program which means the ceiling price,

12   are delivered to the patients through contract pharmacy

13   arrangements.  And that's really where it's very

14   significant, because restricting how the patient can pick up

15   their medications that were prescribed by the covered

16   entities, under their policies, it takes the benefit of the

17   340B program away from the covered entities and threatens

18   the public health, because the covered entities then have

19   less resources to use to invest in care of vulnerable

20   communities.

21        And the Court need look no further than the affidavit

22   or the declaration that was submitted by AbbVie's head of

23   the 340B center.  It's the declaration of Edward Scheidler

24   that was attached -- his first declaration is attached to

25   their motion as Exhibit 1.  Mr. Scheidler bluntly

1    acknowledges, at paragraph 26 of his declaration, that the

2    restrictions that pharmaceutical manufacturers, including

3    Novartis and AbbVie, have imposed result in a significant

4    reduction in the volume of drugs eligible for the reduced

5    pricing under the 340B program.  And in its second

6    declaration attached to their reply brief, he notes that, in

7    fact, AbbVie's restrictions resulted in a 98 percent

8    year-over-year decline in the volume of 340B program

9    discounts available to covered entities in Rhode Island.

10        Now, the practical effect of these restrictions is very

11   simple.  Instead of generating savings that Congress

12   intended for the 340B program to provide to safety net

13   providers so they could use those funds at expanding access

14   to care and vulnerable communities throughout the state,

15   manufacturer restrictions are designed to generate more

16   profits by reducing the number of sales that they deem

17   eligible for 340B program savings.  And I stress, they deem

18   eligible, because Congress said nothing about these delivery

19   mechanisms.  These are imposed by manufacturers alone.

20        And they attempt to justify these restrictions by

21   pointing out that the 340B program has grown over the years,

22   it's become much larger and, therefore, is cutting into

23   their profit margins.  I'm not going to -- I don't know all

24   the reasons for that.  There are many reasons for that.  The

25   District of Maine just pointed out, in fact, it's the

1    adoption of the Affordable Care Act, which made care

2    available to a whole host of people who were underinsured.

3    There's also Congress's expansion of the number of covered

4    entities who could participate in the program.  And there's

5    a multitude of other factors.  It's certainly not just the

6    use of covered pharmacies, but that's what we're focused on

7    here today.

8         One thing that's important to note is Congress never

9    intended, contrary to what's been represented, to enable

10   manufacturers who participate in the 340B program to make

11   more profit on their drug sales.  The opposite is exactly

12   true.  The 340B program was a reaction to spiraling drug

13   prices that the manufacturers were responsible for.  And

14   those prices were driving up health care costs for everyone

15   but particularly in vulnerable communities served by safety

16   net providers and restricting access to care in those

17   communities.

18        What's also telling is that in enacting the 340B

19   program, Congress never put a cap or ceiling on the number

20   of medications that were eligible for 340B program ceiling

21   prices.  It put a cap on prices, but it never said, you can

22   only prescribe X number of medications, and it certainly

23   never said anything about where those medications are

24   delivered.

25             THE COURT:  One of the Defendants said, I forget

1      the exact reference, but in one of your briefings you

2      acknowledge that Chapter 288 law was a price control law as

3      opposed to what you're primarily arguing is that it's a

4      delivery regulation.

5              MR. ARGUIN:  And I think that's where there's some

6      confusion being sown, so let me try to clarify.  Chapter 288

7      does not change, as I said, who is eligible, who is a

8      covered entity eligible to participate, it doesn't change

9      any of the rules on pricing.  Congress sets the price, the

10     ceiling price, and that price is part of an agreement, as

11     they've said, between the federal government and the

12     manufacturers.  In the very next sentence of setting that

13     ceiling price, Congress also specified in the 340B statute,

14     manufacturers must offer the drugs for sale at that price to

15     the covered entities.  They didn't go on and say, oh, well,

16     you can impose this condition or that condition.  They were

17     talking only about pricing.  What they're trying to do is

18     read into that gap in the 340B statute an affirmative

19     obligation or an affirmative right to impose a host of other

20     restrictions.  And that is something that turns right into

21     the preemption arguments they made, but that is certainly

22     something that no court has recognized, because the general

23     rule, of course, is that silence is not a source of

24     preemption.  The opposite, in fact, is very much true.

25              As the District of Maine recently said, Congressional

1    silence usually defeats claims of preemption, not the other

2    way around.  Or as the Supreme Court said in the

3    *Hillsborough* decision, which is cited in our materials,

4    (reading) Merely because a federal program was sufficiently

5    comprehensive to meet the need identified by Congress does

6    not mean states are barred from identifying additional needs

7    or imposing further requirements in the field.

8         The cases on which the manufacturers rely to say they

9    have this now affirmative right created by federal law to

10   impose conditions that Congress never spoke on is completely

11   wrong.  The *Astra* case, for instance, said nothing at all

12   about preemption, as they conceded today.  The *Johnson* and

13   *Sanofi* cases, which they rely on a great deal from the

14   District of Columbia Circuit and the Third Circuit are

15   likewise irrelevant, because those cases had nothing to do

16   with state laws of preempting or -- a question of state laws

17   and whether they preempted the delivery of drugs to patients

18   of 340B covered entities.  Those cases dealt only with

19   whether federal regulators could prohibit manufacturers from

20   imposing limitations on the use of contract pharmacies.

21        But agencies, of course, can only have the powers

22   granted to them by statute.  The statute, the 340B Statute,

23   said nothing at all about it.  So the federal courts

24   correctly determined that HRSA or the Secretary of Health

25   and Human Services had no regulatory or authority under the

1    statute to impose such conditions.

2        But states, of course, are on an entirely different

3    footing.  One of the whole aspects of their sovereignty as

4    states is that they have the right to make broad policy and

5    regulatory rule making.  And that is exactly what the D.C.

6    Circuit Court in the *Johnson* case expressly recognized by

7    saying that although federal regulators couldn't impose

8    these conditions, it didn't mean that conditions -- other

9    lawful conditions could not be imposed, and otherwise lawful

10   conduct includes state regulations to fill the gap left open

11   by Congress's silence about delivery.

12       And Rhode Island is just the most recent and a number

13   of states that have tried to fill this void in the

14   legislative history from Chapter 288 by making sure that

15   safety net providers who are caring for communities in this

16   state are not put in the impossible position of having to

17   choose between agreeing to restrict delivery of medications

18   to their patients to only one pharmacy location, or whatever

19   other restrictions the manufacturers may dream up, or

20   forfeiting the benefit that Congress intended the 340B

21   program to extend to them so that they could continue

22   delivering care in those vulnerable communities.

23       That is exactly why Rhode Island and other states have

24   stepped in in the exercise of their judicial authority over

25   public health and safety to regulate in an area where states

1    preserve their right to regulate, because these matters,

2    although the Defense or the Plaintiffs say the State is

3    confused about that.  These are clearly public health and

4    safety regulations affecting the regulation of pharmacies

5    and the delivery of care by health care providers operating

6    in Rhode Island.

7           THE COURT:  Right.  But you're only regulating the

8    delivery of drugs priced at a certain level pursuant to a

9    federal statute.  And the real question is whether that has,

10   either by claim or field, preempted such that the state

11   doesn't have the power to regulate that federal -- the

12   application of that federal statute in each states'

13   individual manner.

14          MR. ARGUIN:  But this goes back to the fundamental

15   point of what is field preemption and whether field

16   preemption can occur when Congress is silent on the issue.

17   The state law is addressing something that Congress did not

18   address, but, also, their presentation of what the field is

19   is also widely overstated.

20          When a state such as Rhode Island regulates in an area

21   within its traditional police authority in protecting public

22   health and safety, it's entitled to a presumption -- there

23   is a presumption against preemption.  That presumption

24   against preemption applies here and it has not been

25   overcome, because it can only be overcome by clear and

1    manifest congressional intent to show that they wanted to

2    occupy the field.

3         Now, according to the manufacturers, the field is the

4    340B program.  But this kind of ipse dixit cannot be

5    correct.  Any time Congress steps in and regulates in an

6    area, it is obviously doing it to protect the public

7    interest as perceived by the federal legislators.  But the

8    Supreme Court has -- as the Supreme Court has noted in

9    *Hillsborough*, again, when Congress legislates on matters of

10   national concern, that's always the case in any federal

11   legislation, but this alone does not mean that every federal

12   scheme ousted all related federal law.

13        And, furthermore, the 340B statute, as I've already

14   alluded to, is nowhere near as comprehensive as the

15   manufacturers suggest.  The statute, after all, is only

16   eight pages long and it covers three discrete areas:  The

17   price at which a manufacturer is required to sell drugs to

18   340B covered entities, prohibition placed on covered

19   entities specifically related to the duplication of claims,

20   the diversion of claims, and, also, directing the Secretary

21   of Health to establish a dispute resolution mechanism to

22   resolve those claims.  That's it.

23        It doesn't get into the entire issue, as multiple

24   courts have recognized, of whether or not a covered entity's

25   use of contract pharmacies arrangements for the delivery of

1    medications to their patients is or is not authorized, which

2    is why multiple courts have said, this is a matter left to

3    the state.  And one need not look any further than the 340B

4    regulators' own statements, because the 340B under HRSA, the

5    HRSA regulatory authority from both 1996 and 2010, expressly

6    recognized that the states retain their traditional

7    authority to regulate the use of contract pharmacies.  And

8    so that was a matter that Congress didn't address because it

9    was left to the states.  That's exactly what most courts

10   that addressed this issue have held.

11       One other point.  There's a mention of the Prime Vendor

12   Program.  First of all, that argument was not raised in

13   their motion, so it's waived under Local Rule 7A.  But, more

14   importantly, the Prime Vendor Program is a voluntary program

15   that's really intended only to help 340B entities have a

16   better bargaining position on getting better pricing from

17   the manufacturers.  It doesn't talk about delivery, and it

18   doesn't have anything to do with the restraints that

19   manufacturers are trying to impose on contract pharmacy

20   arrangements.

21       If anything, the fact that there's reference to this

22   voluntary program in the statute shows that Congress knew

23   how to legislate about delivery or distribution but

24   specifically chose not to because it didn't make any mention

25   of it in imposing any type of restrictions on what

1    conditions could be imposed on the offer to sell apart from

2    the price, which is set by statute.

3         So I'll reserve whatever additional time I have, and we

4    would rest on our brief on the remaining matters.

5              THE COURT:  Great.  You don't get to reserve

6    anything.

7              MR. ARGUIN:  Okay.  I thought I'd try.

8              THE COURT:  Nice try.

9              MR. ARGUIN:  Nice try.  All right.  Thank you very

10   much, your Honor.

11             THE COURT:  You're welcome.  Ms. Cook.

12             MS. COOK:  Thank you, your Honor.  I'd like to

13   start with the presumption against preemption point that the

14   State just made.  This is not a law that regulates

15   pharmacies in general.  340B drugs is what it regulates.  It

16   doesn't talk about all drugs or all covered entities or all

17   hospitals.  It talks specifically about participants in the

18   340B program.  It regulates directly into that field.  And

19   there's no longstanding history of state regulation in that

20   area.  This is just not a circumstance where the presumption

21   would typically apply.

22        I also want to address the point about congressional

23   silence.  I think that ignoring the D.C. Circuit opinion

24   regarding what that congressional silence means is

25   dangerous.  The D.C. Circuit specifically said here, Silence

1    in the federal statute preserves rather than abrogates the

2    ability of sellers to impose at least some delivery

3    conditions.  It also said, Statutory silence implies that

4    manufacturers may impose distribution conditions by

5    contract; not that they are prohibited from doing so.

6        Especially in light of the fact that there was no state

7    activity in this area at the time the law was passed.  This

8    was not an area where Congress was intending to leave some

9    regulation or legislation to the state.

10       I didn't get to two of my conflicts in my opening, and

11   I want to briefly address one of them in particular.  The

12   claims data conflict is well briefed.  D.C. Circuit has said

13   manufacturers can require them; the state law says they

14   can't.  I think that's a clear conflict.  But the

15   enforcement mechanism point, I want to reinforce what

16   AbbVie's counsel noted, and I want to specifically talk

17   about it in the context of the patient definition, because I

18   can tell that's an issue that's near and dear to your heart.

19       The federal pathway lays out two ways to enforce the

20   law.  There's the HRSA enforcement proceeding where they

21   directly enforce against manufacturers, and there's an ADR

22   process.  Both of those implicate a number of federal

23   questions.  One of them is whether a particular transaction

24   involves a patient of the covered entity.

25       In seeking to implement Chapter 288, the State is

1   creating a third enforcement pathway.  And any effort to try

2   to enforce the state law would, by definition, require that

3   state actor to try to analyze a number of thorny federal

4   issues, because you can't violate the state law unless all

5   those cross-reference provisions of 340B are triggered.

6        The key question, and your Honor has asked it a couple

7   of times now, so I want to make sure to answer it, is

8   whether the patient of the covered entity is the person who

9   got the drug at the end of the day.  There's no federal

10  definition in the statute for what the patient term means.

11  It is open to debate.  And there is a lot of vagary and

12  confusion in the regulated community regarding what that

13  definition of patient means.

14       That is a question that should be answered by federal

15  law.  And by allowing states to make that decision, this was

16  my example about, if you bended (sic) the covered entity

17  five years ago for a different type of visit, would that

18  trigger the 340B discount.  That's precisely the kind of

19  question that should be answered by federal actors applying

20  the clear federal enforcement pathway and not by actors

21  implementing on a state-by-state basis their own

22  interpretation of what it means to be a patient.

23       The last thing I want to say is this point about the

24  state law not implicating pricing, because it doesn't change

25  what the actual ceiling price is for a drug, and it doesn't

1    change who a covered entity is.  It is impossible to

2    separate the delivery requirement from the pricing

3    requirement in the state law.  And the way that we know that

4    is if it's the case that a particular transaction is

5    triggered under the state law for that federal ceiling

6    price, you're changing the price on that unit, because

7    federal says you don't need to give the discounted price,

8    and state law says you do.  So while there isn't a

9    recalculation of the price under some new formula, there is

10   a definite change in what the manufacturer has to recognize

11   discount-wise for that price.  That's the way in which this

12   is a pricing law, not just a delivery law.

13            THE COURT:  Thanks, Ms. Cook.

14            MS. COOK:  Thank you, your Honor.

15            MS. POHL:  Thank you, your Honor.  Meredith Pohl

16   again for the AbbVie Plaintiffs.  I want to make very brief

17   points.  One is I think I actually got an answer to my

18   question from the State, which is, if AbbVie were to sell

19   its drugs at the commercial price, in other words, no

20   transaction occurs under the 340B price, AbbVie continues to

21   sell at the commercial price.  Even if that isn't purchased

22   by the covered entity under the meaning of Chapter 288, it

23   clearly is a violation of the state law, because I heard my

24   friend point to page 26 of Mr. Scheidler's declaration, the

25   paragraph in his second declaration about the reduction in

1    volume.  I think actually we're in agreement about this,

2    when Chapter 288 is in effect, it increases the volume of

3    discounted drugs that my client is compelled to sell.  That

4    is an admission that this is a taking under the Fifth

5    Amendment, that it compels additional confiscatory sales.

6        The other point is, I never heard anything about

7    Section 10.21, the definition of claims and whether Chapter

8    288 is, in fact, a complete Venn diagram circle between what

9    is enforceable ADR and what is enforceable as a matter of

10   the state law.

11       I did hear a lot about how Chapter 288 is a delivery

12   regulation.  And just to echo a point that Ms. Cook was

13   making at the very end, there cannot be delivery, this

14   cannot be a delivery regulation if it acts on the patient,

15   if it acts at all on the patient, after the patient has

16   consumed their drugs.  Because the way this works, as your

17   Honor knows, is that the patient comes, receives their

18   drugs, consumes them, and then on the back end there's a

19   retroactive accounting accommodation and then there's a

20   replenishment order placed.  In that instance, it's hard to

21   see where delivery ever acts.  And even if this is a

22   delivery regulation, I didn't hear a response as to what

23   acquisition has to mean separate and apart from delivery.

24       The last piece I wanted to touch on briefly is the

25   voluntary participation question.  I heard voluntary a lot

1   today from my friend on the other side.  It is true that

2   AbbVie participates as a voluntarily matter in the federal

3   program, but AbbVie has never voluntarily participated in

4   the hijack or the parasitic obligation imposed by Chapter

5   288.  And I haven't heard Rhode Island to give any sort of

6   additional benefit to my client for its participation.  And

7   if you look, in fact, at all of the cases actually cited by

8   the other side in their brief on the voluntary participation

9   point, which is *Garelick* (phonetic) in the Second Circuit,

10  *Minnesota Association of Hospitals* in the Eighth Circuit, in

11  fact, all of those cases suffer from the same problem, which

12  is, these are separate sovereigns.  Yes, AbbVie has an

13  agreement with the federal government, and that is a bargain

14  for exchange.  But Rhode Island and AbbVie have no bargain

15  for exchange with respect to 288.  And I haven't heard my

16  friends point to a single case where a second sovereign can

17  adopt its own obligations on top of the voluntary federal

18  program.

19      The last thing I want to say, your Honor, very briefly

20  is, I think one of your questions to the State hit on this

21  quite well.  Chapter 288 suffers from a level of generality

22  problem.  It isn't that AbbVie has defined its field really

23  broadly, which I think I heard from the other side.

24  Actually, AbbVie and Novartis and others have defined their

25  field quite narrowly.  It is the field of the 340B program.

1    And the problem is, Chapter 288 doesn't act on anything as a

2    matter of general applicability.  It only acts on drugs

3    priced at the 340B federal discounted price.  And for that

4    reason, Chapter 288 cannot stand, if the 340B program were

5    to disappear tomorrow, there would be nothing left for

6    Chapter 288 to regulate.  Thank you very much.

7        THE COURT:  Thanks, Ms-Pohl.  I have, through no

8    fault of anyone's, been put into a position that I told

9    counsel in arranging this schedule I didn't want to be in,

10   don't enjoy, which is the ability to spend some time

11   assuring that the legal logic following the rule of law is

12   well and thoroughly explained, primarily because of when

13   this was filed and what the briefing schedule required to be

14   and the fact that the statute that the Plaintiffs wish

15   enjoined goes into effect at the same time the federal

16   courts -- the federal government might shut down, which is

17   at midnight tonight.

18   So I'm going to read you brief thoughts on my opinion

19   and give you my ruling.  In 1992, Congress established the

20   340B program to support covered entities by giving them

21   price reductions, the ability to reach more eligible

22   patients and provide comprehensive services.  Drug

23   manufacturers do not have to participate in the 340B program

24   unless they want their covered outpatient drugs reimbursed

25   by Medicaid and Medicare Part B.  Manufacturers execute a

1    pharmaceutical pricing agreement agreeing to offer a covered

2    entity outpatient drugs for purchase at or below the

3    applicable ceiling price.  Health and Human Services through

4    Health Resource and Services Administration administers the

5    program.

6         Section 340B does not make any reference to pharmacies.

7    Most covered entities do not have in-house pharmacies so use

8    contract pharmacies.  HSS has long allowed this.  In 1996,

9    HRSA, that's H-R-S-A, endorsed a covered entity's use of a

10   single contract pharmacy, and in 2010, HRSA authorized a

11   covered entity's use of an unlimited number of contract

12   pharmacies to dispense 340B medications.  Drug manufacturers

13   believed that removing any limitation to this arrangement

14   has resulted in abuse of the Section 340B pricing and

15   subversion of the statute's original intent.  So they began

16   to implement new policies limiting the use of contract

17   pharmacies and requiring basic claims data to receive

18   340B-priced drugs.

19        Those policies led states to pass their own legislation

20   to stop manufacturers from restricting covered entities from

21   contracting with multiple contract pharmacies.  Joining 20

22   other states, Rhode Island passed the Defending Affordable

23   Prescription Drug Cost Act, RI General Laws Section 5-19.3,

24   to protect covered entities' ability to deliver 340B drugs

25   to contract pharmacies for distribution to patients of those

1    entities.  In addition to protecting a covered entity's

2    ability to contract with an unlimited number of pharmacies,

3    it also prohibits a manufacturer from requiring the

4    submission of claims data or other documentation that

5    identifies 340B drugs as a condition of reimbursement or

6    pricing, unless Medicare and Medicaid require it.

7         Plaintiffs, Novartis Pharmaceutical Corporation and

8    AbbVie, Inc., et al., filed suit in this court in August in

9    response to Rhode Island's law.  Before the Court are two

10   motions for preliminary injunction.  AbbVie, et al. moves

11   for injunctive relief based on both field and conflict

12   preemption, violations of the Takings Clause, and an

13   argument that Rhode Island law is void for vagueness.

14   Novartis also moves on preemption and for violation of the

15   Dormant Commerce Clause.

16        The First Circuit has said, quote, To secure a

17   preliminary injunction, a Plaintiff must show, one, a

18   substantial likelihood of success on the merits, two, a

19   significant risk of irreparable harm if the injunction is

20   withheld, three, a favorable balance of hardships, and,

21   four, a fit or lack of friction between the injunction and

22   the public interest.  The drug manufacturers have tested

23   other similar state statutes through lawsuits and requests

24   for injunctive relief based on the same or similar legal

25   claims.  All of the courts, with the exception of one, have

1  ruled that the manufacturers are not likely to succeed on

2  the merits of any of their claims because Section 340B

3  governs drug prices and not the delivery of drugs or how

4  covered entities and their patients can acquire those drugs.

5      This Court has reviewed the statutes, case law, the

6  parties' briefs, as well as amicus briefs; based on its own

7  reasoning and that of its sister courts, the Court agrees

8  that the Plaintiffs are not likely to succeed on the merits

9  of their claim.  The state law takes effect tomorrow,

10 October 1st, so the Court will provide the parties with a

11 brief analysis of its reasoning here.

12     Regarding field preemption, the Court first examines

13 the scope of 340B.  That section focuses on the price

14 arrangement and terms with covered entities but is silent as

15 to many of the terms involved in the manufacturers'

16 obligation to offer and provide the discounted drugs.  The

17 language Congress used to define the scope of 340B shows

18 that it did not intend to cover the field at the expense of

19 all state regulations.  Citing the Fifth Circuit's decision

20 earlier this month, *AbbVie versus Fitch*, quote, Congress

21 chose not to regulate distributions to patients, indicating

22 that it did not intend to occupy the entire field in this

23 area.  As the Supreme Court has held, quote, matters left

24 unaddressed, unquote, in an otherwise, quote, comprehensive

25 and detailed, unquote, federal regulatory scheme, quote, are

1    presumably left subject to the disposition provided by state

2    law.  And while Rhode Island state law says nothing about

3    what price a drug manufacturer participating in the program

4    can charge, it does address covered entities', quote,

5    distribution of drugs to patients and the role of pharmacies

6    in such distribution, unquote, a subject that 340B does not

7    cover.  There is no field preemption in this case.

8        The Plaintiffs' conflict preemption is also likely not

9    to succeed.  They argue that Rhode Island law expands 340B,

10   that it's enforcement provisions conflict with 340B, and

11   that it bars collection of data that 340B permits through

12   its ADR procedure.  Just below the surface of Plaintiffs'

13   argument is the reality that the two laws cover different

14   aspects of the process.  340B sets the pricing that a

15   participating manufacturer should charge and the Rhode

16   Island law deals with where those drugs can be delivered.

17   There is no conflict there.  As for enforcement, the Rhode

18   Island law seeks to enforce state law in the form of a

19   Deceptive Trade Practices Act claim, not federal law.  And

20   for the collection of data, 340B does not expressly require

21   covered entities to provide manufacturers with data.

22       Therefore, the Court finds that Plaintiffs are not

23   likely to succeed on their preemption claim.

24       Novartis argues that Rhode Island law violates the

25   Dormant Commerce Clause because it applies to transactions

1    between out-of-state manufacturers and wholesalers that take

2    place entirely outside of Rhode Island's borders.  It also

3    argues that the law discriminates and excessively burdens

4    out-of-state manufacturers in favor of the covered entities

5    and contract pharmacies.  The Dormant Commerce Clause,

6    however, does not apply to all laws that have

7    extra-territorial reach.  The Rhode Island law does not

8    dictate that Novartis -- what Novartis charges for the

9    drugs, and it does not exclusively burden interstate

10   commerce.  Novartis voluntarily participates in the 340B

11   program, and the discounts they provide is a function of

12   that federal program, not the Rhode Island law.  The Court

13   finds that Novartis is not likely to succeed on the merits

14   of its Dormant Commerce Clause claim.

15       The Court does not find that Rhode Island's law effects

16   a taking of AbbVie.  AbbVie believes that it is compelled to

17   make sales at 340B discounted prices to private third

18   parties and is being forced to follow a state law for which

19   it receives no benefit.  The obligation to sell drugs is to

20   covered entities at discounted prices, however, is a

21   consequence of AbbVie's voluntary participation in the 340B

22   program, not the Rhode Island law.  Voluntary government

23   programs like the 340B program do not give rise to

24   unconstitutional takings.  Therefore, AbbVie is not likely

25   to prevail on this claim.

1    AbbVie's claim -- AbbVie's vagueness claim is not

2    likely to succeed.  It argues that there are terms in the

3    statute like "interfere" that are undefined, leaving AbbVie

4    to guess whether its conduct violates the statute.  It is

5    also concerned that in light of the law's vagueness, the

6    Rhode Island Attorney General and Auditor General have free

7    rein to prosecute this vague law.  The meaning of the word

8    "interfere," though undefined, is clear from the plain text

9    of the law and when read in context.  And AbbVie's conduct

10   confirms that it is clear and that it understands the law.

11   It enacted its policies against delivering to unlimited

12   contract pharmacies because of laws like the one Rhode

13   Island eventually passed.  Because the law is not vague on

14   its face, it is not void and AbbVie is not likely to succeed

15   on the merits of that claim.

16       The Court, therefore, finds that the first element of a

17   preliminary injunction fall in Defendants' favor.  Because

18   of this finding, the First Circuit instructs us, the

19   consideration of the remaining merits are of little

20   consequence.  However, none of the final three preliminary

21   injunction factors, irreparable harm, balancing of the harms

22   or public interest, favorably impact the Plaintiffs'

23   requested injunction.  As for the cited harm, they cite

24   financial losses and argue that violations of their

25   constitutional rights are a harm.  The Court has already

1    found that their alleged constitutional harms are not likely

2    to succeed, so it cannot be considered a harm on a motion

3    for preliminary injunction.  And it is well accepted that

4    economic harm is not irreparable harm.  Therefore, this

5    factor is in Defendants' favor.

6        Plaintiffs argue that preserving the status quo would

7    also prevent them from being harmed by being forced to

8    provide massive discounts not required by federal law and

9    will not harm Defendants or patients in Rhode Island.  Even

10   considering some economic impact on Plaintiffs due to Rhode

11   Island law, when balancing that with the public's interest

12   in a covered entity's ability to deliver low cost drugs, the

13   Court finds that the public interest weighs heavily in favor

14   of the state.  The final two factors are in Defendants'

15   favor.

16       Therefore, the Court denies Plaintiffs' motions for

17   preliminary injunction in both 25-387 and 23-388.  A text

18   order will enter denying the preliminary injunction allowing

19   the parties to appeal this preliminary decision if they so

20   choose.  We'll stand adjourned.

21       (Proceedings Adjourned)

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4

5          I, Denise A. Webb, RPR, do hereby certify

6    that the foregoing pages are a true and accurate

7    transcription of my stenographic notes in the

8    above-entitled case.

9

10              Dated this 4th day of October, 2025

11

12

13

14          /s/ Denise A. Webb_____

15          Denise A. Webb, RPR
            Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25